SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel:  973/639-9100
Fax:  973/639-9393

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUKE O. BROOKS
RYAN A. LLORENS
ERIC I. NIEHAUS
ANGEL P. LAU
JEFFREY J. STEIN
655 West Broadway, Suite 1900
San Diego, CA  92101
Tel:  619/231-1058
Fax:  619/231-7423

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| HAREL INSURANCE COMPANY, LTD., E.M.I.-EZER MORTGAGE INSURANCE COMPANY LTD., ISRAELI SHARES PARTNERSHIP and HAREL PENSION AND PROVIDENT LTD., <br><br> Plaintiffs, <br><br> vs. | No. <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND THE ISRAEL SECURITIES LAW <br><br><br> DEMAND FOR JURY TRIAL |

[Caption continued on following page.]

PERRIGO COMPANY PLC, JOSEPH )
C. PAPA, LAURIE BRLAS, JUDY L. )
BROWN, GARY M. COHEN, MARC )
COUCKE, JACQUALYN A. FOUSE, )
ELLEN R. HOFFING, MICHAEL J. )
JANDERNOA, GERALD K. KUNKLE,)
JR., HERMAN MORRIS, JR., DONAL )
O'CONNOR, DAVID T. GIBBONS )
and RAN GOTTFRIED, )
 )
               Defendants. )
_____)

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF THE ACTION ...................................................1

II.  JURISDICTION AND VENUE..................................................16

III. PARTIES .......................................................................17

IV.  DEFENDANTS' FRAUDULENT SCHEME............................................21

    A.   Perrigo Transformed into a Global Roll-Up .......................21

    B.   Perrigo Colluded with Other Drug Manufacturers to Unlawfully Fix the Prices of Generic Drugs .........................................26

        1.   A Brief Overview of the Generic Pharmaceutical Market .......26

        2.   The Distribution and Manufacture of Generic Drugs..............36

        3.   The Markets for Perrigo's Generic Drugs Facilitated Collusive Pricing..................................................37

            a.   High Level of Market Concentration ............................37

            b.   Inelastic Demand ..................................................38

            c.   Commodity-Like Product ...............................................39

            d.   Lack of Available Substitutes.......................................40

            e.   Significant Barriers to Entry...........................................41

            f.   Inter-Competitor Contacts and Communications at Trade Association Events ...............................................41

        4.   The Price-Fixed Drugs.........................................45

            a.   Desonide ........................................................45

            b.   Econazole.......................................................51

|   |   | c. | Permethrin......................................................55 |
|---|---|---|---|
|   |   | d. | Tretinoin ......................................................59 |
|   |   | e. | Clobetasol ....................................................62 |
|   |   | f. | Halobetasol Propionate ..................................65 |

|   | 5. | Collusive Price Fixing Boosted Perrigo's Generic Rx Results.......................................................68 |
|---|---|---|
|   | 6. | Perrigo and Its Co-Conspirators Are Under Multiple Governmental Investigations for Anti-Competitive Price Fixing .................................................................70 |

| C. | Perrigo's Largest Acquisition Ever Quickly Experienced Major, Known Integration Issues...................................................78 |
|---|---|
| D. | Defendants Recommended that Shareholders Reject Mylan's Offer ......................................................................92 |
| E. | Defendants Admit They Violated GAAP to Hide Billions of Dollars of Deterioration in Perrigo's Largest Financial Asset.........101 |

|   | 1. | Perrigo's Admissions that Its Financial Statements Were Materially Misstated ...............................................101 |
|---|---|---|
|   | 2. | Defendants' GAAP Violations Were Used to Inflate Perrigo's Revenues ...............................................103 |
|   | 3. | Defendants' GAAP Violations Were Used to Hide Billions of Dollars of Deterioration in the Fair Value of the Tysabri Royalty Stream ....................................104 |

| V. | RELEVANT PERIOD MISREPRESENTATIONS AND OMISSIONS................................................................106 |
|---|---|

**Page**

A. Unlawful and Collusive Pricing Practices in Perrigo's Generic Rx Division......................................................................106

B. Inflated Organic Growth Claims .......................................135

C. Omega Integration and Overvaluation ..............................156

D. Declining Fair Value of Tysabri Royalty Stream ..............172

E. Relevant Period Financials................................................188

VI. LOSS CAUSATION .....................................................................197

VII. POST-RELEVANT PERIOD EVENTS ......................................206

VIII. ADDITIONAL ALLEGATIONS OF SCIENTER ....................208

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET ......................................................220

X. NO SAFE HARBOR ...................................................................221

XI. COUNTS ......................................................................................221

XII. PRAYER FOR RELIEF ..............................................................232

XIII. JURY DEMAND.........................................................................233

Plaintiffs Harel Insurance Company, Ltd., E.M.I.-Ezer Mortgage Insurance Company Ltd., Israeli Shares Partnership and Harel Pension and Provident Ltd. (collectively, "plaintiffs"), by their undersigned attorneys, allege the following based on plaintiffs' personal knowledge of plaintiffs' own acts and on information and belief as to all other matters, stemming from the investigation conducted by and through plaintiffs' attorneys, which included, among other things, a review of Perrigo Company Plc's ("Perrigo" or the "Company") public documents, conference calls and announcements, U.S. Securities and Exchange Commission ("SEC") filings, wire and news releases published by and regarding Perrigo, analysts' reports and advisories about Perrigo, review and analysis of Mylan, N.V.'s ("Mylan") SEC filings in connection with its tender offer for Perrigo, review and analysis of Perrigo's and Mylan's filings with the Irish Takeover Panel in connection with Mylan's tender offer for Perrigo, civil and regulatory complaints and court filings, information obtained from the Internet, drug pricing and market share information from proprietary databases, and consultation with industry experts.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     SUMMARY OF THE ACTION

1.     Plaintiffs bring this action under the Securities Exchange Act of 1934 ("Exchange Act") and Israel Securities Law, 1968, against Perrigo and certain of its

former and current officers and directors to recover damages for losses plaintiffs suffered in connection with their acquisition of Perrigo common stock between February 6, 2014 and May 2, 2017, inclusive (the "Relevant Period") and ownership of Perrigo common stock during Mylan's tender offer ending on November 13, 2016.[1]  Plaintiffs purchased or otherwise acquired Perrigo common stock at artificially inflated prices during the Relevant Period and suffered damages as a result of the violations of the securities laws alleged herein.  In particular, plaintiffs seek to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§10(b), 14(e), and 20(a) of the Exchange Act, SEC Rule 10b-5 of the Exchange Act, and the Israel Securities Law.

2.     Perrigo manufactures specialty, generic and over-the-counter ("OTC") pharmaceutical and healthcare products.  During the Relevant Period, as detailed herein, defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market, which artificially inflated Perrigo's common stock price.  Defendants' false statements and omissions concerned four key areas: (a) Perrigo's participation in a generic drug price-fixing conspiracy that

---

[1]   The defendants are Perrigo, Joseph C. Papa ("Papa"), Laurie Brlas, Judy L. Brown ("Brown"), Gary M. Cohen, Marc Coucke ("Coucke"), Jacqualyn A. Fouse, Ellen R. Hoffing, Michael J. Jandernoa, Gerald K. Kunkle, Jr., Herman Morris, Jr., Donal O'Connor, David T. Gibbons and Ran Gottfried (collectively, the "defendants").

is the focus of investigations by Congress, the U.S. Department of Justice's Antitrust Division ("DOJ"), and 45 state Attorneys General; (b) the integration of Perrigo's largest acquisition, Omega Pharma N.V. ("Omega"); (c) Perrigo's organic growth; and (d) the accounting treatment for Perrigo's largest financial asset, a royalty stream from the drug Tysabri. Defendants' false statements and omissions in each of these categories artificially inflated Perrigo's common stock price and also misled investors considering Mylan's tender offer.

3.     Throughout the Relevant Period, defendants concealed the fact that results in Perrigo's most profitable division, Generic Rx, were significantly inflated by illegal price fixing. Beginning in 2013 and continuing throughout the Relevant Period, Perrigo entered into collusive price-fixing agreements with other generic prescription drug manufacturers to contemporaneously raise prices for many generic products by *300% to 500%* or more. In particular, Perrigo colluded with its competitors to fix the prices of clobetasol, desonide, econazole, halobetasol, permethrin and tretinoin. These price hikes allowed Perrigo to reap hundreds of millions of dollars in collusive revenues.

4.     The evidence that Perrigo participated in the price fixing of generic drugs is substantial. The drugs' prices moved in near-perfect unison and increased suddenly and simultaneously at each drug company. The price increases were exponential. There is a clear pattern of industry conference attendance by Perrigo

and its competitors, followed by an abrupt and unprecedented spike in Perrigo's prices closely timed with spikes in Perrigo's competitors' prices.  For example, in April and May 2013, shortly after an industry conference attended by executives from Perrigo and its competitor Taro Pharmaceuticals ("Taro"), both companies suddenly hiked their prices for generic desonide from just over $0.50 per gram to almost $4.50 per gram.

5.    There is no non-collusive explanation for Perrigo's and its co-conspirators' sudden, synchronized price increases – there was no supply shortage, production problem or sudden increase in demand for these drugs during this period. The price hikes were not precipitated by competitors leaving the market.  Moreover, the markets for these drugs are highly susceptible to collusion because they are dominated by only a few companies – such a market concentration makes collusion easy.  The market for these drugs featured several other characteristics that facilitated collusion: demand for the drugs was inelastic, with increases or miniscule reductions in the quantities sold even after massive and sudden price hikes; the drugs were commodity-like products – generic drugs with price being the only distinguishing factor for purchasers; there were no viable substitutes for the drugs; the markets for the drugs had high barriers to entry; and information sharing and price discovery were common.  Finally, the drug prices did not decrease following the initial price

increases as one would expect if the sudden price increases reflected temporary supply shortages, cost increases or other benign market explanations.

6.      Perrigo's extraordinary and historic price increases for these generic drugs would have been against Perrigo's economic self-interest absent the existence of a price-fixing scheme.  Because generic drugs are commodity products, absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug at lower prices. Indeed, under the "maximum allowable cost" pricing regime that governs much of the U.S. generic pharmaceutical market, drug cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its price above this cap while its competitors do not, the reimbursements for the higher priced drug will cease.  Thus, it would not be in any drug manufacturer's interest to increase the prices of its generic drugs unless it had an agreement with the other manufacturers that they would do the same.

7.      The suspicious price increases by Perrigo and other drug manufacturers have spawned investigations by Congress, the DOJ, and at least 45 state Attorneys General.  These investigations have begun to reveal a broad, well-coordinated and long-running series of schemes to fix prices for a number of generic drugs.  They have also revealed that collusion on generic drug prices was centered around

meetings of trade associations, such as the Generic Pharmaceutical Association ("GPhA"), and other industry gatherings attended by senior Perrigo officials.

8.    Throughout the Relevant Period, defendants fraudulently concealed their illegal conduct, misrepresented the generic drug market's competitiveness, misled investors about the true cause of Perrigo's growth, revenues, profits and improved product pricing, and falsely claimed competitive advantages based on expertise and execution, when in reality they were derived from illegal price fixing. As a result, Perrigo's public statements were materially false and misleading throughout the Relevant Period.

9.    Perrigo's sales figures and other measures of Perrigo's financial performance – such as organic growth – were also misleading.  Defendants led investors to believe that Perrigo's results were an accurate representation of its products' success in a competitive market.  In fact, those results were inflated as a result of Perrigo's anti-competitive conduct and did not reflect the sales Perrigo would have been able to achieve absent its price-fixing activity.  Reasonable investors would have wanted to know this difference in the basis for Perrigo's sales – Perrigo's sales figures were inflated through its participation in anti-competitive activities and were therefore susceptible to being deflated if and when Perrigo was forced to cease these activities.

10.     Furthermore, Perrigo's sales inflation through collusive price fixing carried the significant risk of prosecution by state and federal antitrust authorities, along with the attendant negative financial and reputational harm.   Defendants downplayed that risk and falsely assured investors that Perrigo was "in compliance with all laws, regulations and orders of any government authority," that it was "committed to doing business in an ethical manner," and that it provided "consumers access to safe, effective and affordable healthcare products."

11.     Through these representations, defendants led investors to falsely believe that higher generic drug pricing was sustainable and that the Company's success was the result of its active competition in the industry.   Defendants' misleading statements voluntarily put the source of Perrigo's revenue from generic drugs at issue while concealing the use of illegal anti-competitive conduct to drive that revenue.   The Company's income statements were also misleading, because they conveyed a sense of strong profitability without mentioning the price-fixing collusion that fueled that profitability.

12.     Throughout the Relevant Period, defendants also made false and misleading statements about Perrigo's organic growth.   In particular, defendants projected between 5% and 10% organic revenue growth.   However, defendants failed to disclose that organic growth (which it did not regularly report) had slowed to a trickle at the start of the Relevant Period and was negative during some fiscal

quarters.  Defendants also failed to disclose that Perrigo's purported organic growth included revenue obtained from the sale of generic drugs with artificially high prices that resulted from its unlawful and collusive price-fixing scheme.  Perrigo also improperly recorded the Tysabri royalty stream as revenue and included that revenue in its organic growth predictions.

13.     On April 8, 2015, Mylan announced an unsolicited bid to purchase Perrigo for cash and stock.  Because Perrigo is an Irish corporation, Irish Takeover Rules applied.  During the takeover process, defendants doubled down on Perrigo's misleading organic growth projections, despite their express promises of accuracy, completeness and care as required by SEC and Irish regulations.  Indeed, several of the alleged false statements made by Perrigo during the Relevant Period are accompanied by the following language: "*The directors of Perrigo accept responsibility for the information contained in this announcement*.  To the best of the knowledge and belief of the directors of Perrigo (*who have taken all reasonable care to ensure such is the case*), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."[2]

---

[2]   Except where otherwise noted, all emphasis in this complaint has been added.

14.     Defendants also issued an unattainable profit forecast, guiding investors to expect 2016 earnings per share of $9.30 to $9.85, which Perrigo would later concede was not "realistic."  Defendants' misleading profit forecasts during the tender offer period were made with assurances to investors that "*[e]very such profit forecast (including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy and objectivity*."  *See* Irish Takeover Rule 28.1.  Despite these representations, defendants issued aggressive and unrealistic profit forecasts based upon flawed, grossly inaccurate assumptions.  For example, defendants improperly included income from the Tysabri royalty stream as operating revenue, assumed an organic growth rate far higher than the Company had recently been able to achieve, assumed success in achieving synergies in its Omega acquisition despite knowledge of various problems with the integration, and assumed that Perrigo could continue the unlawful and collusive price hikes driving profits in its Generic Rx division.

15.     Indeed, defendants touted synergies with Omega as central to Perrigo's growth claims during the Relevant Period, despite defendants Papa, Brown and Coucke knowing that there were multiple problems with the Omega integration and the underlying assets, including: (a) a decentralized structure, disparate information technologies ("IT") and management resistance at Omega; (b) regulatory hurdles to achieving the claimed synergies; and (c) weakening sales in many of Omega's key

markets, including Spain, Belgium, Italy and Turkey.  The concealed problems with Omega forced the Company to begin taking impairment charges less than a year after the Omega acquisition closed, ultimately impairing more than $2 billion, or nearly half of the total purchase price for Omega.

16.    Further, throughout the Relevant Period, defendants falsely recorded revenue from and presented an inflated value for Perrigo's largest financial asset – the Tysabri royalty stream.  Perrigo publicly disclosed that the Tysabri royalty stream was worth $5.8 to $6.1 billion, claiming its accounting for the asset followed generally accepted accounting principles ("GAAP").  Perrigo now admits both assertions were false.  Perrigo's accounting for the Tysabri royalty stream as an intangible asset rather than a financial asset during the Relevant Period violated GAAP.  Through its GAAP violations, Perrigo artificially inflated its revenue and hid billions of dollars of deterioration in the Tysabri royalty stream's value.  In a post-Relevant Period restatement on May 22, 2017, Perrigo admitted that its balance sheets should have recorded the following 1Q 2016, 2Q 2016 and 3Q 2016[3] deteriorating fair values for the Tysabri royalty stream:

|  | 1Q 2016 4/2/2016 | 2Q 2016 7/2/2016 | 3Q 2016 10/1/2016 |
|---|---|---|---|
| Value of Tysabri Royalty Stream as | $5,139,700,000 | $5,067,200,000 | $4,994,700,000 |

---

[3]    Perrigo's quarters are referred to herein as "1Q," "2Q," "3Q" and "4Q" followed by the year.

|  | **1Q 2016**<br>4/2/2016 | **2Q 2016**<br>7/2/2016 | **3Q 2016**<br>10/1/2016 |
|---|---|---|---|
| originally reported |  |  |  |
| Concealed Decline in Value | ($119,700,000) | ($1,047,200,000) | ($1,444,700,000) |
| Actual Fair Market Value of Tysabri Royalty Stream | $5,020,000,000 | $4,020,000,000 | $3,550,000,000 |
| % overstated | 2.4% | 26.0% | 40.7% |

17. From April 8, 2015 through November 13, 2015, defendants used these misrepresentations to convince Perrigo shareholders to reject Mylan's tender offer. Defendants' statements convinced shareholders that Mylan's offer undervalued Perrigo, and they ultimately rejected Mylan's offer. In reality, defendants' misrepresentations overvalued Perrigo and shareholders retained their artificially inflated Perrigo stock.

18. In early 2016, defendants' scheme began to unravel. On February 18, 2016, Perrigo reported 4Q 2015 revenue, profits and margins that were all well below defendants' projections. After defendants had raved about the accretive Omega acquisition and the progress of the integration, Perrigo revealed that certain Omega assets would need to be restructured and took a $185 million impairment charge, while also slashing the top end of the Company's 2016 per share profit guidance range from $10.10 to $9.80. On this news, the price of Perrigo shares fell $14.77 per share, or more than 10%, to close at $130.40 per share.

19.   Next, on April 22, 2016, *Reuters* and other news agencies reported that Papa would leave Perrigo for Valeant Pharmaceuticals International, Inc. ("Valeant"), a struggling company widely criticized for accounting violations and ethical lapses.[4]  Analysts and shareholders understood Papa's exit to mean that the problems at Perrigo were even worse than they were told in February.  As a result, the price of Perrigo shares fell $7.33 per share, or nearly 6%, to close at $121.35 per share.

20.   The following business day, April 25, 2016, Perrigo formally announced that Papa was leaving and, to facilitate his exit, Perrigo had waived parts of his non-compete agreement.  Perrigo also lowered its 2016 earnings guidance to $8.20 to $8.60 per share, a full $1.40 less than the midpoint of the guidance range three months earlier.  The Company also reported that it expected 1Q 2016 earnings to be only $1.71 to $1.77 per share, which it attributed to more competitive generic drug pricing, and that it was considering additional Omega impairment charges. CNBC Commentator Jim Cramer declared it a "terrible moment for Perrigo."  The April 25, 2016 partial disclosures caused the price of Perrigo shares to tumble $21.95 per share, or 18%, to close at $99.40 per share.

---

[4]   Specifically, Valeant has been called "the corporate poster-child for price-gouging" and investigated for potentially illegal practices.

21.     On May 12, 2016, Perrigo announced another $467 million impairment charge for Omega, tripling the original impairment figure only months after the Company had trumpeted the success of the Omega acquisition.  On this additional news, the price of Perrigo shares fell $3.71 per share, or 4%, to close at $89.04 per share.

22.     The fall in Perrigo's stock price was tempered, in part, by a new policy announced by the incoming Chief Executive Officer ("CEO"), John T. Hendrickson ("Hendrickson").  Going forward, Hendrickson promised, Perrigo would "try to be as transparent as possible" and issue "realistic" forecasts.  This was intended to be, and was taken by investors as, a clear admission that prior guidance under Papa had been neither transparent nor realistic.  Analysts praised Hendrickson's promise of candor, emphasizing the need to "reestablish credibility" after the prior regime.  But despite these promises, Perrigo did not come clean about the full extent of its problems integrating Omega, its collusive pricing in the Generic Rx division, the declining value of the Tysabri royalty stream, or the GAAP violations associated with the accounting for the Tysabri royalty stream.

23.     On August 10, 2016, Perrigo announced that it was cutting guidance yet again as a result of having to implement "transformational organizational changes" at Omega and because of additional pricing pressure in the Generic Rx division.  Even worse, Perrigo projected that Omega impairment charges in 2016,

which were excluded from this guidance, would nearly double, from $1.74 to $3.29 per share. Consequently, the price of Perrigo shares fell approximately 10% to close at $86.00 per share.

24.     On November 3, 2016, a *Bloomberg* article announced that U.S. prosecutors were "bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion."  According to the article, the investigation was focused on whether executives colluded to raise prices.  Following this announcement, the price of Perrigo shares dropped 4% from a November 3, 2016 opening price of $83.49 per share to close at $79.95 per share.

25.     On December 8, 2016, after announcing that it needed to restructure the entire branded division (consisting mostly of Omega assets), the price of Perrigo shares declined by an additional 2.37%, from $83.94 to $81.95 per share.  Before the year was over, Perrigo had accrued ***over $2 billion*** in impairment charges related to Omega, an asset it had just purchased in March of the previous year.

26.     On February 27, 2017, Perrigo stunned investors by announcing that it would sell the Tysabri royalty stream for only $2.2 billion in cash (plus additional contingent payments of up to $0.65 billion), over ***$3.5 billion*** less than the value of the asset recorded on Perrigo's books and presented to investors throughout the Relevant Period.  This deterioration would have been known to investors throughout the Relevant Period had Perrigo recorded the fair value of the asset each quarter.

The Company eventually conceded it had improperly accounted for the asset under GAAP.

27.    Perrigo also disclosed on February 27, 2017 that it could not timely file its 2016 Annual Report on Form 10-K because it needed to review historical revenue recognition practices for the Tysabri royalty stream and because of other potential GAAP violations.  The GAAP violations ultimately led to the restatement of every single financial statement issued during the Relevant Period.  The Company also revealed that its Chief Financial Officer ("CFO"), defendant Brown, was unexpectedly resigning.  On these additional disclosures, the price of Perrigo shares dropped another nearly 12%, or $9.91 per share, from $84.68 per share to $74.77 per share.

28.    On March 3, 2017, *Bloomberg* reported that Perrigo – like many other generic drug companies – was the target of DOJ investigators looking into generic drug price fixing.  In a filing made in a private lawsuit, the DOJ asked that private discovery be delayed with respect to Perrigo and other manufacturers of generic topical drugs, including desonide, because the government attorneys were concerned that private discovery "could reveal details of the ongoing criminal investigation and delay, or even frustrate, its progress."  This additional disclosure drove the price of Perrigo shares down an additional $2.80 per share to close at $72.76 per share.

29. Finally, after the market closed on May 2, 2017, Perrigo announced that its offices had been raided by the DOJ as part of a criminal price-fixing probe, a more severe action than was taken against most other generic drug companies. *The Wall Street Journal*'s Charley Grant noted on Twitter: "Federal investigations happen all of the time to companies. Federal raids do not." On this final disclosure, the price of Perrigo shares fell over 5%, or $3.88 per share, to close at $72.35 per share on May 3, 2017.

30. Shortly after the Relevant Period, Perrigo issued a restatement admitting that it violated GAAP in every single financial statement issued during the Relevant Period. Perrigo's restatement was one of the largest issued by any public company over the past two decades.

## II.    JURISDICTION AND VENUE

31. The claims asserted herein arise primarily under §§10(b), 14(e) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), 78n(e) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

32. This Court has jurisdiction over the subject matter of Counts I, II and III pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa. This Court has supplemental jurisdiction over Count IV pursuant to 28 U.S.C. §1367(a).

33.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts and conduct that constitute the violations of law complained of herein occurred in this District.  In addition, the Company maintains offices and/or operations in Piscataway, New Jersey, and Parsippany, New Jersey, which are situated within this District.

34.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

35.    Plaintiffs are subsidiaries of Harel Insurance Investments & Financial Services, Ltd. ("Harel"), an insurance and financial services conglomerate with over $49 billion in investments under management (including assets owned by Harel for its own benefit).  Harel is the largest insurance company in Israel in terms of volume of premiums and has been operating in the insurance industry for more than 80 years.

36.    Plaintiffs Harel Insurance Company, Ltd., E.M.I.-Ezer Mortgage Insurance Company Ltd., and Israeli Shares Partnership purchased Perrigo common stock during the Relevant Period at artificially inflated prices and suffered damages as a result of the securities law violations alleged herein.

37.     Harel Pension and Provident Ltd. is a long-term savings division of Harel Insurance Investments & Financial Services, Ltd. with over $20 billion in assets under management.  Harel Pension and Provident Ltd. is the trustee for the funds it manages and the beneficial owner of Perrigo common stock (for its beneficiaries through, among others, provident funds, pension funds and education funds).

38.     Defendant Perrigo is the world's largest manufacturer of OTC healthcare products.   Perrigo is also a significant supplier of generic pharmaceuticals, infant nutrition products, branded pharmaceuticals in Europe (through its Omega acquisition), and animal health products.  Initially founded in 1887 and based for most of its existence in Allegan, Michigan, in 2013 Perrigo re-domiciled as an Irish corporation with corporate headquarters in Dublin, Ireland. During all relevant times, Perrigo had significant operations in New Jersey, including a 14,000 square foot research and development facility in Piscataway Township.  Perrigo describes its Piscataway facility as a "strategic location in the hub of New Jersey's pharmaceutical industry" that "gives Perrigo a footprint in the northeast."   The Company also operates a research and development facility in Parsippany, New Jersey.

39.     Perrigo's common stock is dual listed on the New York Stock Exchange ("NYSE") and Tel Aviv Stock Exchange ("TASE"), both highly efficient markets,

under the ticker symbol "PRGO."  As of May 19, 2017, Perrigo had approximately 143 million ordinary shares outstanding.

40.     Defendant Papa joined Perrigo in October 2006 as its President and CEO and served in that capacity until April 25, 2016.  Papa was also a director of Perrigo between November 2006 and April 2016.  Papa is currently President and CEO of Valeant.

41.     Defendant Laurie Brlas ("Brlas") joined Perrigo's Board of Directors in August 2003 and served as a director at all times relevant hereto.  In April 2016, Brlas became Perrigo's Chairman of the Board of Directors.

42.     Defendant Brown served as Perrigo's CFO from July 2006 until her resignation on February 27, 2017.

43.     Defendant Gary M. Cohen ("Cohen") joined Perrigo's Board of Directors in January 2003 and served as a director at all times relevant hereto.

44.     Defendant Coucke was the co-founder, Chairman and CEO of Omega and served as the Executive Vice President and General Manager of Perrigo's Branded Consumer Healthcare division and as a representative of Mylecke Management, Art & Invest NV ("Mylecke"), one of the entities involved in the sale of Omega to Perrigo, from the closing of the Omega acquisition to April 2016.  Coucke and his wife own Alychlo, a holding company that received the equity

compensation portion of the Omega sale proceeds.  Coucke also served as a director of Perrigo between November 4, 2015 and April 2016.

45.     Defendant Jacqualyn A. Fouse ("Fouse") joined Perrigo's Board of Directors in November 2012 and served as a director until April 2016.

46.     Defendant Ellen R. Hoffing ("Hoffing") joined Perrigo's Board of Directors in July 2008 and served as a Perrigo director until her resignation in May 2017.

47.     Defendant Michael J. Jandernoa ("Jandernoa") joined Perrigo's Board of Directors in January 1981 and served as a director until his resignation in February 2017.  Jandernoa formerly served as Perrigo's CEO between 1988 and 2000, and its Chairman of the Board from 1991 to 2003.

48.     Defendant Gerald K. Kunkle, Jr. ("Kunkle") joined Perrigo's Board of Directors in October 2002 and served as a Perrigo director until his resignation in February 2017.  Kunkle served as the Lead Independent Director on Perrigo's Board of Directors from August 2009 through April 2016.

49.     Defendant Herman Morris, Jr. ("Morris") joined Perrigo's Board of Directors on December 1999 and served as a director until his resignation in February 2017.

50.     Defendant Donal O'Connor ("O'Connor") joined Perrigo's Board of Directors in November 2014 and served as a director at all times relevant hereto.

O'Connor was previously a director of Elan Corporation, plc ("Elan") from May 2008 until Perrigo's acquisition of Elan in December 2013.

51.    Defendant David T. Gibbons ("Gibbons") joined Perrigo's Board of Directors in June 2000 and served as a director until his resignation on November 4, 2015.  Gibbons was Perrigo's CEO and President from May 2000 through 2006 and Chairman from August 2003 until October 2007.

52.    Defendant Ran Gottfried ("Gottfried") joined Perrigo's Board of Directors in February 2006 and served as a director until his resignation on November 4, 2015.

53.    Defendants Papa, Brlas, Cohen, Fouse, Hoffing, Jandernoa, Kunkle, Morris, O'Connor, Gibbons, Gottfried and Coucke were directors of Perrigo during the Mylan offer and are collectively referred to herein as the "Director Defendants." The Director Defendants together with Brown are referred to herein as the "Individual Defendants."

## IV.    DEFENDANTS' FRAUDULENT SCHEME

### A.    Perrigo Transformed into a Global Roll-Up

54.    Defendant Perrigo is the successor to Perrigo Company, a Michigan corporation founded in 1887 as a seller of packaged goods.  For more than a century, Perrigo was a slow-growing manufacturer and distributor of healthcare products based in Allegan, Michigan, operating primarily in the United States.  Perrigo

focused on store-brand versions of popular OTC products such as analgesics and cough syrup.

55.     After Papa became Perrigo's CEO and Chairman of its Board in October 2006, Perrigo adopted a "roll-up" strategy, becoming a serial acquirer of healthcare companies.  Through these acquisitions, Perrigo both grew its core OTC business and expanded into markets like generic prescription drugs, infant nutrition and animal healthcare.

56.     In 2013, Perrigo participated in an "inversion" transaction with Elan, an Irish corporation.  The transaction closed on December 18, 2013, resulting in the formation of a new Irish corporation, Perrigo Company plc, that was 71% owned by shareholders of the former Perrigo and 29% owned by shareholders of Elan.  Perrigo trades on both the NYSE and TASE under the ticker symbol "PRGO."

57.     The inversion structure utilized by Perrigo has been described as "the tax-avoidance strategy du jour."  It "refers to a legal maneuver in which a company declares that its U.S. operations are owned by its foreign subsidiary, not the other way around, and uses this role reversal to shift reported profits out of American jurisdiction to someplace with a lower tax rate."  The tactic reportedly allowed Perrigo to save $150 million per year, primarily from avoiding U.S. taxes it would otherwise have had to pay.

58. Through the inversion, Perrigo also acquired Elan's major assets, including a financial interest in the royalty stream for Tysabri, a blockbuster treatment for multiple sclerosis manufactured and sold by Biogen Inc. (formerly known as Biogen Idec Corporation) ("Biogen"). Beginning with its periodic report for the quarter ended December 28, 2013 and throughout the Relevant Period, Perrigo reported its interest in the royalty stream as a separate reporting unit known as "Specialty Sciences."

59. As Perrigo now admits, GAAP required Perrigo to account for the Tysabri royalty stream as a financial asset. Accordingly, under GAAP, Perrigo was required to disclose the fair market value of the Tysabri royalty stream in each quarterly report and to take expenses (or recognize non-operating income) on a quarterly basis for all mark-to-market changes in value. However – as the Company has now admitted – defendants improperly accounted for the Tysabri royalty stream as an intangible asset and failed to make the required disclosures, concealing from investors the severe deterioration in the value of the Tysabri royalty stream.

60. Although the inversion transaction made Perrigo an Irish corporation and provided a financial asset – the Tysabri royalty stream – Perrigo gained no meaningful European operations. Perrigo continued to have virtually no presence in continental Europe. After the inversion transaction, Perrigo began to seek a

European foothold.  It ultimately purchased Omega, a European OTC healthcare company, for $4.5 billion.

61.    For most of the Relevant Period, Perrigo segmented its results into five major divisions:

(a)    Consumer Healthcare ("CHC"): Perrigo's CHC unit marketed primarily unbranded and store-brand OTC analgesics, cough syrups, smoking cessation products, gastrointestinal remedies, supplements and animal healthcare products.  This segment also included nutritional products, such as infant formula, which had previously been reported separately, and its Israeli-based pharmaceutical and diagnostic business, which had previously been reported as "Other."  The CHC division marketed thousands of products during the Relevant Period.  During the six months ended December 31, 2015, the CHC segment represented approximately 50% of consolidated net sales.

(b)    Branded Consumer Healthcare ("BCH" or "Omega Segment"): BCH contained the newly acquired Omega businesses, as well as a German supplement brand called Yokebe purchased in 2015, and additional European OTC brands purchased from GlaxoSmithKline in 2015.  As of June 27, 2015, the BCH unit marketed approximately 5,200 branded OTC products in Europe, focusing on natural health, vitamins, supplements and minerals, cough and cold, allergy, skin care, weight management, pregnancy and fertility products, sleep aids, and

antiparasitic products such as lice treatments. During the six months ended December 31, 2015, the Omega Segment represented approximately 23% of consolidated net sales.

(c)    Generic Rx: Perrigo's generic prescription drug unit manufactured and sold generic prescription drug products (including OTC drugs that are sold through the prescription channel to obtain reimbursement, which Perrigo calls ORx). The generic prescription drug unit focused on "extended topical" treatments, such as creams, ointments, gels, sprays, foams, powders, suppositories and shampoos. During the six months ended December 31, 2015, the Generic Rx segment represented approximately 20% of Perrigo's consolidated net sales.

(d)    Specialty Sciences: Specialty Sciences consisted of the royalty stream Perrigo received from Biogen for Biogen's sales of Tysabri. Perrigo was entitled to a royalty rate of 18% of annual worldwide sales of Tysabri up to $2.0 billion and 25% of sales above $2.0 billion. During the six months ended December 31, 2015, Specialty Sciences was reported to represent approximately 6% of Perrigo's consolidated net sales. Subsequently, in May 2017, Perrigo conceded that none of the royalty stream receipts should have been labeled "sales" or included in operating results.

(e)    Other: This division includes Perrigo's Active Pharmaceutical Ingredient ("API") business, which manufactures active ingredients sold to other

healthcare companies.  While Perrigo does not separately report a percentage of total sales figure for the "Other" segment, based on the percentages represented by the remaining segments, this segment contributed approximately 3% to the Company's net sales in the six months ended December 31, 2015.

62.     In February 2016, Perrigo shifted its financial reporting to coincide with the calendar year, rather than start on July 1 of each year as it had historically.[5]

**B.     Perrigo Colluded with Other Drug Manufacturers to Unlawfully Fix the Prices of Generic Drugs**

**1.     A Brief Overview of the Generic Pharmaceutical Market**

63.     Generic pharmaceutical drugs – drugs that are pharmaceutically equivalent in dosage, form, route of administration, strength or concentration and have the same active ingredients as the reference-listed brand-name drug – save consumers and the U.S. healthcare system tens of billions of dollars annually because they introduce competition into a market where none previously existed. When a high-priced branded drug comes off patent, generic drugs offer the prospect of lower prices and greater access to healthcare for all consumers in the United States.  In a January 31, 2012 report, the Government Accounting Office ("GAO")

---

[5]   Because of its change to a calendar year, Perrigo filed a Form 10-KT to report results for the six month stub period between the end of its prior official fiscal year (June 27, 2015) and the end of calendar year 2015.

noted that "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."

64.     Generic drugs have long been referred to as one of the few "bargains" in the U.S. healthcare system, and historically healthcare experts have said that cost savings from the growing number of generic drugs have gone a long way toward keeping the lid on overall increasing healthcare costs.  This was the way the generic drug market was intended to work, and has generally worked, since the implementation of the Hatch-Waxman Act in 1984.

65.     The Hatch-Waxman Act, formally titled the Drug Price Competition and Patent Term Restoration Act, was intended to balance two interests: encouraging drug innovation and promoting competition between brand and generic drugs in order to lower drug prices.  To encourage innovation, the Hatch-Waxman Act gave branded drug manufacturers longer periods of market exclusivity.  To promote competition, the law simplified the regulatory hurdles for bringing generic drugs to market and eliminated the prior requirement that generic drug companies file costly New Drug Applications ("NDAs") to obtain U.S. Food and Drug Administration ("FDA") approval.  Under the revised process, generic drug companies can instead file an Abbreviated New Drug Application ("ANDA").  A generic drug company that submits an ANDA generally is not required to include clinical trial data to establish the safety and efficacy of the drug.  Instead, the generic drug company can

- 27 -

rely on the safety and efficacy data supplied by the original NDA holder for a given drug.

66.    A generic drug must meet certain bioequivalence and pharmaceutical equivalence standards set by the FDA to ensure that the generic drug is essentially an exact substitute for the brand-name drug.  To receive FDA approval through an ANDA, a generic drug must contain the same active ingredient in the same dosage form and strength to be bioequivalent to the reference-listed drug (*i.e.*, the original brand-name version approved by the FDA through an NDA).  The FDA uses a review process to ensure that brand-name and generic drugs that are rated "therapeutically equivalent" have the same clinical effect and safety profile. According to the FDA: "Products classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."[6]  The FDA assigns an "AB" rating to generics that are deemed to be therapeutically equivalent to their brand-name counterparts.  Even drugs that are bioequivalent, but that do not share the same dosage form, are not AB-rated.

---

[6]  *See* U.S. Department of Health and Human Services – Food and Drug Administration, *Approved Drug Products with Therapeutic Equivalence Evaluations* vii (37th ed. 2017).

67.     The Hatch-Waxman Act also provides a 180-day exclusivity period for the first generic drug company that files an ANDA and simultaneously challenges the validity of the patent for a brand-name drug.  This exclusivity period, which allows the generic drug company to market its generic version free from competition, is intended to spur generic drug companies to provide alternatives to brand-name drugs.  When generic drugs enter the market, they are often priced well below the brand-name drugs and quickly take a large market share from the brand-name drug company.  The first generic drug will generally be priced 15% to 20% below the brand-name drug.  Once the exclusivity period ends and more generic versions enter the market, the price of the generic drugs continues to fall and their combined share of the market for that drug, relative to the brand-name equivalent, continues to grow.  The price of the generic versions of a given drug can fall to as little as 10% to 20% of the original price for the brand-name drug.  This competition allows purchasers to buy the generic equivalent of a brand-name drug at substantially lower prices.  As Stephen W. Schondelmeyer, Professor of Pharmaceutical Care and Health Systems at the University of Minnesota, College of Pharmacy, explained in his testimony before the Senate HELP Committee:

> The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic

competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.[7]

68.   The price differential between a brand-name drug and the generic equivalents, and the proportion of the market captured by the brand-name versus the generics, generally follows a predictable pattern.  Specifically, as mentioned above, the first generic to enter the market is generally priced 15% to 20% lower than the brand-name drug.  As more approved generics enter the market, the prices of the generics generally decline in both absolute terms and in relation to the brand-name drug for around five years.  Eventually, the prices of the generic drugs reach an equilibrium price point, at or close to the manufacturers' marginal production costs, resulting in significant savings for consumers, insurers and employers.

69.   Between 2005 and 2014, generic drugs saved the U.S. healthcare system more than $1.6 trillion.  Since the Hatch-Waxman Act was passed, generic drugs have moved from being less than 20% of prescriptions filled in the United States to 80% of prescriptions filled.  A complaint filed by the Attorneys General of 45 states following an investigation of generic drug manufacturers cites a study that found generic drugs saved consumers $193 billion in 2011 alone.

---

[7]   *Why Are Some Generic Drugs Skyrocketing in Price?: Hearing Before the S. Comm. on Health, Education, Labor and Pensions*, 113th Cong. 7 (Nov. 20, 2014) (statement of Stephen W. Schondelmeyer).

70.    The maximum allowable cost ("MAC") pricing regime also serves to control drug prices.  Under this regime, individual states or pharmacy benefits managers ("PBMs") – third-party administrators of prescription drug programs – establish MACs for drug products using a variety of different inputs and formulas. If the cost for a pharmacy to dispense a given drug exceeds the MAC, the pharmacy will either opt to substitute a less expensive version, if available, or sell the drug at a loss to service the patient.  This MAC framework incentivizes pharmacies to fill prescriptions with the least expensive therapeutically equivalent version of a drug to maximize their potential profits.

71.    Over the last several years, the pricing dynamic started to change for a large number of generic drugs.  Prices for dozens of generic drugs have uncharacteristically risen – some have skyrocketed – for no apparent reason, sparking outrage from public officials, payers and consumers across the country whose costs have doubled, tripled or in some cases increased a 1,000% or more.  A December 2016 analysis conducted by the GAO found that more than 300 of the 1,441 established generic drugs examined by the study had one or more instances of "'extraordinary price increases'" – *i.e.*, "periods of prices at least doubling over the five-year study period."  In 2014 alone, more than 100 generic drugs experienced these extraordinary price increases.  For 48 of these 100 drugs, the price increases were 500% or higher.

72.    The growing outrage and public reports of unexplained price increases caused the State of Connecticut to commence an investigation in July of 2014, which was followed shortly thereafter by a Congressional inquiry and a reported criminal grand jury investigation by the DOJ.

73.    Generic drug manufacturers have argued publicly that the significant price increases were due to a myriad of benign factors, such as industry consolidation, FDA-mandated plant closures, or elimination of unprofitable generic drug product lines.  But what regulators have found through their investigations is that the underlying reason for many of these price increases is much more straightforward and nefarious – collusion among generic drug competitors.

74.    As detailed in *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-02056 (D. Conn. Dec. 14, 2016), a joint complaint filed by the Attorneys General of 20 states following a lengthy investigation into generic drug price increases (the "AG Complaint"), generic drug manufacturers operate through their respective senior leadership and marketing and sales executives in a manner that fosters and promotes routine and direct interaction among their competitors.  *Id.* ¶7.  The companies exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements.  *Id.*  The anti-competitive agreements are further refined and coordinated at regular "industry dinners," "girls nights out," lunches,

parties and numerous and frequent telephone calls, emails and text messages. *Id.* ¶¶7, 55.

75.   On October 31, 2017, the Attorneys General filed a motion to amend their complaint to include over 40 Attorneys General and new and more detailed allegations. *In re State Attorneys General Cases*, No. 16-MD-2724 (E.D. Pa.). In a fact sheet published on October 31, 2017, the Attorneys General stated:

> [T]he evidence demonstrates broad understanding of these conspiracies and agreements across the industry. The evidence also demonstrates that companies understood this conduct was illegal and took steps to both destroy potential evidence and to avoid creating evidence of their actions.
>
> The states allege that this conduct violated both federal and state antitrust laws as well as certain state consumer protection laws.

Although the proposed amended complaint included more company defendants and generic drugs, the Attorneys General stated: "We described the conduct outlined in our initial complaint as 'the tip of the iceberg,' and stated that our ongoing investigation had revealed much broader collusion across the generic drug market," and "[a]larmingly, we do believe the conduct is even more pervasive, and we continue to investigate with the likelihood of further expansion of the complaint at the appropriate time." Perrigo is not currently named as a defendant in *Connecticut v. Aurobindo*, which was transferred to the Eastern District of Pennsylvania and consolidated into a pending multi-district litigation ("MDL") against generic drug manufacturers. However, according to the Attorneys General, their investigation

"thus far has centered on conspiracies in which Heritage Pharmaceuticals served as a central player.  The investigation is ongoing as to numerous additional companies, numerous additional drugs and numerous additional conspiracies."

76.    Throughout the Relevant Period, Perrigo's Generic Rx unit relied on anti-competitive markets to generate its "star" performance.  In contrast to the price declines that are typically associated with maturing generic markets, Perrigo relied on collusion with other generic drug manufacturers, or in some cases took advantage of pre-existing price-fixing conspiracies, to engage in unprecedented price hikes that could never be accomplished in a competitive market.  According to a *Wall Street Journal* analysis into generic drug price fixing, ***eight of the nine best-selling Perrigo generic drugs analyzed had price boosts of up to 531% since September 2013***:



### Potent Hikes

The cost of many of Perrigo's best-selling drugs increased considerably under CEO Joseph Papa.

| | Comparative name brands* | Percent change |
|---|---|---|
| **Betamethasone dipropionate** – lotion .05% (1 ml) $0.75 | Diprolene | ▲ 275% |
| **Clindamycin phosphate** – topical solution 1%† (1 ml) $3.15 | Cleocin T | ▲ 140% |
| **Clobetasol propionate** – gel .05% (1 gm) $9.87 | Clobevate | ▲ 495% |
| **Desonide** – cream .05% (1 gm) $5.35 | Tridesilon | ▲ 529% |
| **Econazole nitrate** – cream 1% (1 gm) $6.54 | | ▲ 495% |
| **Halobetasol propionate** – cream .05% (1 gm) $4.57 | Ultravate | ▲ 151% |
| **Mupirocin** – ointment 2% (1 gm) $0.51 | Bactroban | ▼ 75% |
| **Permethrin** – cream 5% (1 gm) $3.09 | Elimite | ▲ 531% |

Pre-2011 price — 2016 price

Source: Connecture    *Not available for all drugs    †Base price is from September 2013    THE WALL STREET JOURNAL.

*See* J. Rockoff and M. Rapoport, *Valeant's New CEO Brings Familiar Prescription*, Wall St. J. (July 5, 2016). Experts from SSR Health LLC cited in the article concluded that "Generic drug prices rose significantly in 2013 and 2014 . . . and Perrigo upped the list prices of its generics more than many rivals. The list prices of Perrigo's drugs rose 52% over the past four years, compared with an average 18% across manufacturers." A Perrigo spokeswoman quoted in *The Wall Street Journal* article conceded that "we take our competitors' pricing into account" when raising prices for Perrigo generics.

## 2. The Distribution and Manufacture of Generic Drugs

77.  Generic drug manufacturers control the sale of drugs to many different drug wholesalers, distributors, retailers and group purchasing organizations ("GPOs"). Wholesalers and distributors purchase drugs from the manufacturers and distribute them to customers such as pharmacies, hospitals and medical facilities. Some of the larger generic drugs wholesalers and distributors include Cardinal Health, Inc. and AmerisourceBergen Corporation. Generic drug retailers include retail or supermarket chain pharmacies (such as Walgreens and Walmart), mail-order or specialty pharmacies, hospitals, healthcare plans and GPOs. GPOs are membership-based entities that negotiate with manufacturers, wholesalers and distributors on behalf of a group of purchasers to obtain optimal prices and terms for their members. GPOs can represent retail, government or healthcare groups. Some of the larger GPOs include Vizient and Premier, Inc.

78.  Because the various generic drugs produced by different drug manufacturers are all therapeutically equivalent, the competition between manufacturers to sell generic drugs to wholesalers, distributors, retailers and GPOs is largely based on each manufacturer's price and ability to provide a supply of that drug. Perrigo and the other drug manufacturers and/or suppliers should be competing directly with each other for the sale of the generic drugs discussed herein to U.S. consumers.

### 3. The Markets for Perrigo's Generic Drugs Facilitated Collusive Pricing

79. The markets for the price-fixed drugs were highly conducive to collusion because of the following characteristics: (a) a high level of market concentration, (b) inelastic demand, (c) the commoditized-nature of the products, (d) lack of available substitutes, (e) significant barriers to entry, and (f) the ease of information sharing. Perrigo and its co-conspirators took advantage the market's susceptibility to collusion and agreed to fix the prices for several generic drugs, including desonide cream and ointment, econazole cream, permethrin cream, tretinoin cream, clobetasol gel and foam, and halobetasol cream and ointment (the "Price-Fixed Drugs"). Perrigo's and the other drug manufacturers' anti-competitive behavior highlighted a series of collusive markers in the generic drugs market, as shown by uniform price hikes within close timeframes, highly correlated price movements, low volatility of drug prices post-collusion, and the high stability of market shares inconsistent with competitive markets.

### a. High Level of Market Concentration

80. The Herfindahl-Hirschman Index ("HHI") is a widely accepted market concentration measurement and is used by antitrust enforcement agencies, such as the Federal Trade Commission ("FTC") and DOJ, for assessing market competitiveness. An HHI of 0 is indicative of perfect competition and an HHI of 10,000 is indicative of a monopoly. The DOJ and FTC's Horizontal Merger

Guidelines classify a market as unconcentrated when the HHI is below 1,500, moderately concentrated when the HHI is between 1,500 and 2,500, and highly concentrated when the HHI exceeds 2,500.

81.    The score is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, in a market consisting of three companies with market shares of 10%, 40% and 50%, the HHI is 4,200 (100 + 1,600 + 2,500).

82.    Throughout the Relevant Period, the markets for all of the Price-Fixed Drugs were highly concentrated with HHIs ranging between 2,500 and 5,000.



83.    Such highly concentrated markets allow participants to coordinate their activities because fewer firms need to reach a price-fixing deal, collusive revenues are high for each firm, and the cartel tends to be stable with fewer participants.

### b.    Inelastic Demand

84.    Elasticity of demand ("Ed") is measured by the change in quantity of goods sold relative to the change in price.  When Ed is zero, demand is perfectly

inelastic, as there is no change in the quantity of goods sold despite a large increase in price.  Inelastic demand encourages cartel behavior, as a significant increase in price has a minimal effect on the quantity demanded by consumers.  As such, the cartel can maximize profit because price increases will directly translate into revenues.

85.    When Perrigo suddenly hiked the prices of the Price-Fixed Drugs, their markets were characterized by nearly perfect inelastic demand with Ed measured at close to zero.  For example, market demand for clobetasol gel actually grew despite a seven-fold increase in price.  The following chart shows the Eds of the Price-Fixed Drugs alongside classic examples of relatively inelastic and highly elastic markets.

| Examples | Elasticity of Demand | % Change in Price | % Change in Quantity Demanded | Elasticity |
|---|---|---|---|---|
| Clobetasol (Gel) | 0.024 | 743% | 18% | Highly inelastic |
| Desonide (Ointment) | 0.018 | 516% | 9% | Highly inelastic |
| Econazole (Cream) | 0.021 | 678% | 14% | Highly inelastic |
| Halobetasol (Ointment) | -0.005 | 233% | -1% | Highly inelastic |
| Permethrin (Cream) | -0.117 | 72% | -8% | Highly inelastic |
| Tretinoin (Cream) | 0.189 | 189% | 36% | Highly inelastic |
| (Example) Medical Care and Insurance[1] | -0.80 | 125% | -100% | Relatively inelastic |
| (Example) Public Transportation[1] | -3.50 | 29% | -100% | Highly elastic |

Note: Elasticity measured over a 6 month period prior to and post price hikes.

### c.    Commodity-Like Product

86.    Markets for commoditized products are more susceptible to collusion because price is the only distinguishing factor for purchasers.  By their very nature, all generic versions of a given drug are interchangeable, as every generic version of a drug must be bioequivalent to the original brand-name drug.

87.     For commodity-like products, price hikes are only sustainable through collusion if the dominant manufacturers participate.  Price hikes by Perrigo without the co-conspirators' agreement to join the heightened price levels would enable competitors to take market share away by simply setting prices below Perrigo's price point.  Thus, the coordinated massive price hikes could only be sustainable with the cooperation of and an agreement among the co-conspirators.

### d.     Lack of Available Substitutes

88.     The lack of a viable substitute encourages cartel behavior because consumers cannot replace the product after significant price hikes.

89.     The Price-Fixed Drugs each require a prescription, and pharmacists can only substitute another drug if that drug has demonstrated bioequivalence and received an "AB" rating.  Therefore, a pharmacist can only fill a prescription for a given Price-Fixed Drug with the brand-name version of the drug or one of the AB-rated generic versions.

90.     Additional characteristics of the medical field also serve to promote the resistance to prescription changes.  These barriers include doctors' reluctance to change well-known prescriptions, insurance and Medicare's absorption of most of the price shock, lags in co-payment tiering changes, and the restriction on Medicare from negotiating drug prices with pharmaceutical companies.

### e.    Significant Barriers to Entry

91.    Collusion is more effective in markets with high barriers to entry because new competitors cannot easily enter the market and undercut the agreed-upon price.  Barriers to entry into a market can delay, diminish or even prevent the attraction and arrival of new market participants, which is the usual mechanism for checking the market power – *i.e.*, the ability to set prices above market costs – of existing participants.  Entry barriers include things like trade secrets, patents, licenses, capital outlays required to start a new business, pricing elasticity and difficulties buyers may have in changing suppliers.

92.    A competitor attempting to enter the generic drug market faces numerous barriers, including high manufacturing costs and regulatory and intellectual property requirements.  For example, an ANDA approval by the FDA takes an average of 36 months.  Upon approval, the manufacturing facility is subject to regulatory oversight and compliance expenses.  The high barriers to entry into the Price-Fixed Drugs' markets enabled the collusive price-fixing to be sustained over an extended time period.

### f.    Inter-Competitor Contacts and Communications at Trade Association Events

93.    Information sharing is important in a conspiracy to enable the cartel to come to an agreement and monitor pricing decisions and compliance.

94.     Representatives from Perrigo and its co-conspirators routinely attended conferences, meetings and trade shows sponsored by various pharmaceutical trade associations.   These events provided frequent opportunities for individuals from Perrigo to interact with representatives from other companies and discuss their respective businesses and customers.   Social events and other recreational activities – including golf outings, lunches, cocktail parties and dinners – also were organized in conjunction with the trade association events and provided further opportunities for representatives from the drug manufacturers to meet outside of the traditional business setting.   These trade associations and the related formal and informal events provided representatives from Perrigo and its co-conspirators with ample opportunities to meet, discuss, devise and implement the price-fixing schemes.

95.     According to the AG Complaint, "trade shows and customer conferences provide generic drug manufacturers, including but not limited to the defendants, with ample opportunity to meet, discuss, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' market for generic drugs."   AG Complaint ¶52.   As a result of these findings, the DOJ is scrutinizing "'trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers.'"

96.    Two trade associations – the Association for Accessible Medicines (f/k/a Generic Pharmaceutical Association) ("GPhA") and the National Association of Chain Drug Stores ("NACDS") – held several meetings and conferences during the Relevant Period that were well attended by Perrigo and its co-conspirators.

97.    According to the GPhA's website, GPhA is "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The GPhA's website describes the GPhA as "the unifying and organizing force" for generic drug companies and touts its members' ability to "[n]etwork with other members and professionals across the industry."  It claims that GPhA members supply "9 out of every 10" generic prescription drugs dispensed in the United States and "form an integral, and powerful, part of the healthcare system."

98.    According to its website, the NACDS has four strategic goals: (a) "Foster an advantageous business and political environment in which NACDS chain member companies are better able to achieve their business objectives"; (b) "Promote the role and value of chain community pharmacy as an integral component of the healthcare system, thus helping to preserve its viability"; (c) "Provide effective channels of communication, involvement and forums for members and other stakeholders"; and (d) "Ensure that NACDS internally operates

as a cutting edge association, effectively meeting the needs of its membership." The NACDS describes the membership benefits for suppliers as including: "Access to the NACDS Annual Meeting"; "Online Membership Directory listing and access chain member, sales and marketing, peer, and other B2B solution contacts"; and "Popular 'Meet the Retailer' and 'Meet the Market' programming at NACDS events with preparatory webinars throughout the meeting cycle." The NACDS lists as another benefit for supplier members the "NACDS-Nielsen Company Syndicated Data Program," which it describes as providing "syndicated data to help those members gain a better understanding of the competitive marketplace and to position their products accordingly."

99.   The NACDS describes its Annual Meeting as the association's "signature event," highlighting "results[,] . . . relationships . . . [and] member service." According to the NACDS's website, "[p]articipants at the Annual Meeting include Retail Chairmen, CEOs, Presidents, and Senior Vice Presidents of Marketing, Merchandising, Operations, and Pharmacy and their executive-level counterparts and decision makers from supplier companies." In addition, the NACDS represents that the "Annual Meeting provides numerous opportunities to meet and discuss strategic issues with key trading partners."

100.   As described in more detail below, the price hikes for the Price-Fixed Drugs each occurred following a GPhA or NACDS meeting that was attended by

Perrigo and its co-conspirators.  These meetings provided mutual access among decision-makers and an unencumbered opportunity to reach an agreement about price increases.

### 4.    The Price-Fixed Drugs

101.   Each of the Price-Fixed Drugs showed independent and substantial signs of collusion between Perrigo and its competitors.

### a.    Desonide

102.   Perrigo colluded with Actavis Pharma ("Actavis"), Taro and other generic drug manufacturers to improperly raise and maintain desonide prices beginning in mid-2013.  Desonide is a mild topical corticosteroid that has been used to treat a variety of skin conditions since the 1970s.  Generic desonide has been available for decades.  For years, competition among generic manufacturers kept prices stable, at relatively low levels.  Prior to the Relevant Period, Perrigo and Taro dominated the market for the most prevalent form of generic desonide, external cream:



103.    Representatives of Perrigo, Taro and Actavis all attended the annual meetings of GPhA from February 20-22, 2013, in Orlando, Florida; NACDS from April 20-23, 2013, in Palm Beach, Florida; and the June 4-5, 2013, GPhA CMC workshop in Maryland.  In fact, Papa personally attended the April 20-23, 2013 NACDS annual meeting.

104.    Promptly after these trade meetings, between April and June 2013, Perrigo and Taro both abruptly raised desonide prices by approximately 600%. Thereafter, Perrigo and Taro continued to maintain this high fixed price, and other manufacturers entered the market at the exact same level.



According to the calculations of plaintiffs' expert, between 2013 and 2016, Perrigo's prices for generic desonide were 96.86% correlated with those of Taro Pharma USA, and were 100% correlated with prices from new market entrants Actavis and G&W

Labs.   These coordinated, extreme price hikes and the complete lack of price variation following fixing are both strong indicia of collusion:



105.   There was no reasonable justification for the price hikes discussed above.   While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of desonide was reported during the relevant time period.   In addition, there was no significant increase in the demand for desonide or in the drug's production costs that would explain the enormous price increase.   Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

106.   In addition, price increases of this magnitude would have been contrary to each of the manufacturers' economic interests absent the price-fixing scheme. Without the certainty that all of the manufacturers would raise and maintain the

prices for generic desonide, each manufacturer risked getting undercut by the others, leading to a loss of market share and revenue. This risk was alleviated by the manufacturers' agreement to raise and maintain their prices for generic desonide.

107. On February 3, 2015, an article in *eDermatology News* noted the lack of a rational basis for generic desonide price hikes:

> [R]ecently I've become aware of a new wrinkle that complicates daily practice life for both doctors and patients in a significant way. I can't make any sense if it.
>
> I mean the high price of desonide.
>
> When I was student many years ago, my teachers told me that I should prescribe generic drugs whenever possible. This would help hold down medical costs. It was the right thing to do.
>
> *       *       *
>
> But lately I've been getting complaints from patients about the high cost of desonide. My first reaction to these was, "How on earth is that possible?"
>
> *       *       *
>
> I asked my secretary to call the pharmacy to get a price for other generic steroid creams. Triamcinolone would cost $14.70. Alclometasone would cost $35.20.
>
> And desonide – generic desonide – would cost $111.70. For a 15-g tube. $111.70 for 15 g of a generic cream that's been on the market forever! Does that make any sense?

108. The coordinated price hikes substantially increased monthly desonide revenues for Perrigo and other generic manufacturers:



109.   Plaintiffs' expert estimated the collusive revenues that Perrigo earned by supracompetitive pricing of desonide by first ascertaining what the price per unit would have been but for the collusion.  To do this, the expert first validated that there was no significant relationship between price and sales quantity, allowing the expert to properly model "but for prices" on a unit basis.  Then the expert ran three "but for" pricing models:

(a)     a time series regression of generic desonide prices prior to the collusion to determine "but for" prices based on the prior price trend and volatility;

(b)     a time series regression of generic desonide prices prior to the collusion and the Consumer Price Index ("CPI") to determine "but for" prices based on prior price trend, volatility and inflation.

(c)    analysis of prices over the entire prescription drug market (7,128 drugs) to calculate average industry price changes for the period following the collusion:



110.    These average price changes were then applied to pre-collusion prices for generic desonide to determine "but for" prices based on industry price trends. The results of the three models were averaged to determine a robust "but for" price, which was deducted from the actual price per unit as reported by Symphony Health Solutions to determine the price per unit that could be attributable to collusion.  To be conservative, and because Perrigo reports revenue on a "net sales" basis, these amounts were reduced to account for rebates and discounts.[8]  Finally, the amount of collusive revenue per unit, after reduction to account for rebates and discounts, was

---

[8]    Rebates are non-transparent and are not reported on an individual drug level. Plaintiffs' expert used a proxy to determine rebates, deducting 23.1% for rebates based off figures reported by the Medicaid Drug Rebate Program.  Discounts were accounted for by using the National Average Drug Acquisition Cost as a proxy.

multiplied by reported unit sales, to determine collusive revenue.  Based on these models, plaintiffs' expert determined that Perrigo derived $98.3 million in collusive revenue across its formulations of generic desonide for 2014, $49.7 million for 2015, and $22.6 million for 2016:



### b.    Econazole

111.   Similarly, beginning in mid-2014, Perrigo colluded with other generic drug manufacturers to improperly raise and maintain the price of generic econazole, a prescription cream marketed since 1982 and available in generic form since 2002. Like desonide, Perrigo dominated the generic econazole market in the years preceding the Relevant Period:



112. Just as with desonide, Perrigo and other manufacturers made unprecedented, coordinated price hikes in generic econazole cream prices just after attending industry meetings, in this case the February 19-21, 2014 GPhA annual meeting in Orlando, Florida, and the June 3-4, 2014 GPhA CMC workshop meeting in Maryland:



113.   According to the calculations of plaintiffs' expert, between 2014 and 2016, Perrigo prices for generic econazole cream were 97.52% correlated with prices from Igi Labs, and 77.03% correlated with prices from Taro.  The lockstep extreme price hikes and lack of price variation following generic econazole price fixing indicate a high likelihood of collusion.



114.   There was no reasonable justification for the price hikes discussed above.   While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of econazole was reported during the relevant time period.   In addition, there was no significant increase in the demand for econazole or in the drug's production costs that would explain the enormous price increase.   Even if there was such a benign market explanation for the price increase, at no point

following the initial spike did the price return to the pre-spike equilibrium price point.

115.   In addition, price increases of this magnitude would have been contrary to each of the manufacturers' economic interests absent the price-fixing scheme. Without the certainty that all of the manufacturers would raise and maintain the prices for generic econazole, each manufacturer risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the manufacturers' agreement to raise and maintain their prices for generic econazole.

116.   The coordinated 2014 price hikes in generic econazole were extremely lucrative for Perrigo and its partners in the scheme, Taro and Igi.  As seen below, monthly revenues increased substantially following the price hikes:



117.   Employing the models described in ¶¶109-110 above, plaintiffs' expert determined that Perrigo reaped $72.5 million in collusive revenue from generic econazole cream in 2014, $125.2 million in 2015, and $53.6 million in 2016:



### c.   Permethrin

118.   Beginning in early 2013, Perrigo colluded with other generic drug manufacturers to improperly raise and maintain the price of permethrin cream, a prescription treatment for lice and scabies that is on the World Health Organization's List of Essential Medicines.  Permethrin has been available in branded form since 1986 and in generic form since 1998.  Perrigo, which has sold permethrin since 2003, dominates the market, selling far more than its peers Actavis and Renaissance Acquisition Holdings (now a division of Mylan):



119.   Contrary to fundamental economic principles, Perrigo successfully increased prices for permethrin as competitors entered the market.  The 300% price hikes occurred after industry conferences, including the 2013 annual GPhA meeting, which the DOJ identified for its role in facilitating price fixing in the generic drug industry:



120.   Even with these large hikes, plaintiffs' expert has calculated that Perrigo's prices for generic permethrin cream remained 99.37% correlated between

2011-2015 with those of Actavis.   Such lockstep pricing is strong indicia of collusion:



121.   There was no reasonable justification for the price hikes discussed above.   While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of permethrin was reported during the relevant time period.   In addition, there was no significant increase in the demand for permethrin or in the drug's production costs that would explain the enormous price increase.   Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

122.   In addition, price increases of this magnitude would have been contrary to each of the manufacturers' economic interests absent the price-fixing scheme.

Without the certainty that all of the manufacturers would raise and maintain the prices for generic permethrin, each manufacturer risked getting undercut by the others, leading to a loss of market share and a loss of revenue. This risk was alleviated by the manufacturers' agreement to raise and maintain their prices for generic permethrin.

123. The coordinated price hikes caused monthly sales to increase substantially for both Perrigo and Actavis, demonstrating the benefit of the price-fixing conspiracy to its participants and the demand inelasticity of permethrin:



124. Using the models described in ¶¶109-110 above, plaintiffs' expert determined that Perrigo received collusive revenues for permethrin cream totaling $79.1 million in 2014, $60.4 million in 2015, and $73.8 million in 2016:



*Source: Symphony Health Solutions*

### d.      Tretinoin

125.   Tretinoin is a topical treatment for acne more commonly known as Retin-A.   Perrigo acquired a portfolio of tretinoin products from Matawan Pharmaceuticals, a division of Rouses Point Pharmaceuticals ("Rouses"), in December 2015.  Perrigo had previously served as the authorized generic distributor of these products from 2005 to 2013, so it was familiar with the pricing of the drug in a normal competitive market.   At all relevant times, the portfolio of products distributed by Perrigo, briefly sold by Rouses itself, then reacquired by Perrigo, dominated the market for generic tretinoin:



126.   In 2014, lockstep price increases were implemented while the tretinoin portfolio was controlled by Rouses, which were maintained after Perrigo's December 2015 purchase:



127.   There was no reasonable justification for the price hikes discussed above.   While a supply shortage can explain an abrupt rise in prices, here –

notwithstanding the drug manufacturers' obligation to report shortages to the FDA –
no such shortage of tretinoin was reported during the relevant time period.   In
addition, there was no significant increase in the demand for tretinoin or in the drug's
production costs that would explain the enormous price increase.  Even if there was
such a benign market explanation for the price increase, at no point following the
initial spike did the price return to the pre-spike equilibrium price point.

128.   In addition, price increases of this magnitude would have been contrary
to each of the manufacturers' economic interests absent the price-fixing scheme.
Without the certainty that all of the manufacturers would raise and maintain the
prices for generic tretinoin, each manufacturer risked getting undercut by the others,
leading to a loss of market share and a loss of revenue.  This risk was alleviated by
the manufacturers' agreement to raise and maintain their prices for generic tretinoin.

129.   As a result, employing the models described in ¶¶109-110 above,
plaintiffs' expert determined that Perrigo's results were inflated by $84.1 million in
collusive revenue from generic tretinoin revenues in 2016:



*Source: Symphony Health Solutions*

### e.  Clobetasol

130.  Beginning in mid-2014, Perrigo colluded with other generic drug manufacturers to improperly raise and maintain the price of clobetasol, a potent corticosteroid used to treat eczema, dermatitis and psoriasis, among other skin conditions.  Clobetasol was an important revenue driver for Perrigo and many of its formulations showed signs of collusion.  For example, for generic clobetasol gel, Perrigo was the dominant producer throughout the Relevant Period in a market with only four substantial participants:



131.  For the gel formulation of clobetasol, the other three substantial producers engaged in coordinated, collusive price hikes in 2014, simultaneously inflating prices by several hundred percent.  In January 2016, Perrigo joined the existing price-fixing conspiracy and raised its own prices five-fold so that they were approximately identical to all other competitors:



132.   There was no reasonable justification for the price hikes discussed above.   While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of clobetasol was reported during the relevant time period.   In addition, there was no significant increase in the demand for clobetasol or in the drug's production costs that would explain the enormous price increase.   Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

133.   In addition, price increases of this magnitude would have been contrary to each of the manufacturers' economic interests absent the price-fixing scheme.   Without the certainty that all of the manufacturers would raise and maintain the prices for generic clobetasol, each manufacturer risked getting undercut by the others, leading to a loss of market share and a loss of revenue.   This risk was alleviated by the manufacturers' agreement to raise and maintain their prices for generic clobetasol.

134.   Price inflation for clobetasol led to massive spikes in Perrigo's revenue. Plaintiffs' expert has determined, using the methodology outlined in ¶¶109-110 above, that Perrigo's collusive revenues across various formulations of clobetasol were $28.0 million in 2014, $21.1 million in 2015, and $43.0 million in 2016:



Source: Symphony Health Solutions

### f.    Halobetasol Propionate

135.   Perrigo colluded with other generic drug manufacturers to improperly raise and maintain the price of another key topical generic drug, halobetasol propionate.  Halobetasol propionate is a corticosteroid used on the skin to reduce swelling, redness and itching due to certain dermatological conditions.  It has been available in generic form since 1990.  Perrigo dominated the market for generic halobetasol propionate ointment, along with another manufacturer, G&W Labs:



Source: Symphony Health Solutions

- 65 -

136.   Perrigo and G&W Labs kept their prices highly correlated between 2012 and 2016, including a massive lockstep hike in 2013 just after the annual GPhA meeting:



Despite the large price hike initiated by Perrigo in early 2013, the price of Perrigo's halobetasol ointment remained 97% correlated with G&W Labs' price.   Such lockstep pricing is strong indicia of collusion:



137.   There was no reasonable justification for the price hikes discussed above.   While a supply shortage can explain an abrupt rise in prices, here – notwithstanding the drug manufacturers' obligation to report shortages to the FDA – no such shortage of halobetasol propionate was reported during the relevant time period.  In addition, there was no significant increase in the demand for halobetasol propionate or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

138.   In addition, price increases of this magnitude would have been contrary to each of the manufacturers' economic interests absent the price-fixing scheme. Without the certainty that all of the manufacturers would raise and maintain the prices for generic halobetasol propionate, each manufacturer risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the manufacturers' agreement to raise and maintain their prices for generic halobetasol propionate.

139.   The coordinated price hikes in halobetasol propionate ointment were very profitable for both Perrigo and G&W Labs.  Monthly sales revenue from the drug more than doubled for both Perrigo and G&W Labs immediately following the lockstep 2013 price hike:



140.   Applying the same methodology described in ¶¶109-110 above, plaintiffs' expert determined that the collusive revenues from halobetasol propionate were $17.7 million in 2014, $15.4 million in 2015, and $14.4 million in 2016:



### 5.   Collusive Price Fixing Boosted Perrigo's Generic Rx Results

141.   While Perrigo was principally known as a manufacturer of store-brand OTC products, its Generics Rx division was the operating segment with the greatest impact on earnings.  For the six quarters ending on March 28, 2015, the Generic Rx

division contributed more to Perrigo's adjusted net operating earnings than any other

segment:

| Quarter ending: | 12/28/2013 | 3/29/2014 | 6/28/2014 | 9/27/2014 | 12/27/2014 | 3/28/2015 |
|---|---|---|---|---|---|---|
| Generic Rx adjusted net operating income | $123.1m | $100.3m | $122.3m | $81.1.m | $127.7m | $120m |
| Rank among Perrigo operating divisions | 1st | 1st | 1st | 1st | 1st | 1st |

142.  Accordingly, Perrigo's ability to maintain its profit margin in the

Generic Rx division was of paramount importance to investors.  Perrigo claimed to

enjoy these margins because the topical generic sector in which it focused was

difficult for competitors to enter.  For example, at the J.P. Morgan Healthcare

Conference on January 13, 2014, defendant Papa told analysts that:

> Our Rx segment, generic Rx segment, has been a real star for us.
> This segment has really been a focus on going after products that are
> generic equivalent products, but importantly staying away from just the
> simple oral tablet and going after what we call extended topicals.  And
> by extend[ed] topicals, they fall under the category of dermatology,
> absorb[ed] topically through the skin; absorb[ed] topically through the
> lungs; nasal products absorbed topically through the nasal mucosa;
> ophthalmic and otic are the areas that we predominantly focus on.  And
> the reason why that's important is that it's much harder to bring these
> products to the market to be clear.  But once you get them to the
> marketplace they're much harder for other competitors to come into the
> space.

In other words, as Papa explained, Perrigo had "unique positioning" because its Generic Rx business was focused on products where it could be "one of two or three players entering a market rather than 1 of 20 players."

> **6.    Perrigo and Its Co-Conspirators Are Under Multiple Governmental Investigations for Anti-Competitive Price Fixing**

143.   In light of massive generic drug price increases, on January 8, 2014, the CEO of the National Community Pharmacist Association wrote a letter to Congress requesting an oversight hearing to determine the causes of the price jumps.  In July of 2014, the State of Connecticut commenced an investigation because generic drug prices had "uncharacteristically risen – some ha[d] skyrocketed – for no apparent reason, sparking outrage from public officials, payers and consumers across the country whose costs have doubled, tripled or in some cases increased up to 1,000% or more."

144.   On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings also launched an investigation into "soaring generic drug prices."  Sen. Sanders and Rep. Cummings sent out letters to various generic pharmaceutical manufacturers, including some of Perrigo's co-conspirators, demanding information relating to generic drug price increases.

145.   One month later, the DOJ convened a grand jury in the U.S. District Court for the Eastern District of Pennsylvania.  Shortly thereafter, it began to issue

subpoenas to drug manufacturers.   On August 6, 2015, one of Perrigo's co-conspirators, Allergan plc, reported that its Actavis generic drug unit had received a DOJ subpoena in June 2015.

146.   On November 3, 2016, media outlets reported that U.S. prosecutors might file criminal charges by the end of 2016 against several pharmaceutical companies for unlawfully colluding to fix generic drug prices.   In the article, entitled "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," *Bloomberg* reported, in relevant part:

> U.S. prosecutors are bearing down on generic pharmaceutical companies in a sweeping criminal investigation into suspected price collusion, a fresh challenge for an industry that's already reeling from public outrage over the spiraling costs of some medicines.
>
> ***The antitrust investigation by the Justice Department, begun about two years ago, now spans more than a dozen companies and about two dozen drugs, according to people familiar with the matter. The grand jury probe is examining whether some executives agreed with one another to raise prices, and the first charges could emerge by the end of the year, they said***.

147.   On December 12 and 13, 2016, the DOJ filed the first criminal charges in connection with its investigation against Jeffrey A. Glazer ("Glazer") and Jason T. Malek ("Malek") of Heritage Pharmaceuticals Inc. ("Heritage").   Malek was Heritage's President and Glazer was Heritage's CEO and Chairman during the period covered by the DOJ's investigation.   On December 14, 2016, the DOJ released a complaint charging Glazer and Malek with criminal violations of §1 of

the Sherman Antitrust Act (15 U.S.C. §1) for price fixing and other anti-competitive conduct. Glazer and Malek pled guilty to the DOJ charges on January 9 and 10, 2017.

148. On December 14, 2016, in a *Forbes* article entitled "The Man the Feds Are Using to First Crack Open Their Big Antitrust Case Against Generic Drug Makers," Robert Connolly, former chief of the DOJ's Antitrust Division, stated the following:

> [A] criminal information against an individual for antitrust charges prior to any other government action in an antitrust case suggests the individual is cooperating with the government investigation. "*It sounds like it can be just the first case and others will follow, it would be unusual for the federal government to charge just one individual so I would assume there is more to come*."

149. On December 15, 2016, the Attorneys General filed the AG Complaint, revealing that they had sued generic drug companies for their roles in the conspiracy to artificially inflate generic drug prices. The AG Complaint states that the Attorneys General "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time." AG Complaint ¶9. The Attorneys General describe these conspiracies as "schemes to fix and maintain prices, allocate markets and otherwise thwart competition" and explain that they are carried out by generic drug companies through their senior executives, who "exploit their interactions at various and

frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements." *Id*. ¶¶7-8.

150.   According to the AG Complaint, the drug manufacturers attempted to explain the suspicious price hikes through "a myriad of benign factors," however, the plaintiff states "found through their investigation . . . that the reason underlying many of these price increases is much more straightforward, and sinister – collusion among generic drug competitors."  *Id*. ¶6.   Among other things, the company executives met at "regular 'industry dinners'" and exchanged "numerous and frequent telephone calls, emails and text messages."  *Id*. ¶7.

151.   The Connecticut Attorney General, George Jepsen ("Jepsen"), noted in his December 15, 2016 press release that the price collusion was not the isolated misconduct of a few rogue employees, explaining "that the misconduct was conceived and carried out by senior drug company executives and their subordinate marketing and sales executives."  As Jepsen explained:

> "While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, ***we have evidence of widespread participation in illegal conspiracies across the generic drug industry*** . . . .   We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market."

152.   As reported by *The New York Times* on December 15, 2016, in an interview about the AG Complaint, Jepsen stated that there was more to come:

"We believe that this is just the tip of the iceberg," George C. Jepsen, Connecticut's attorney general, whose office started the inquiry that led to the charges, said in an interview on Thursday. "I stress that our investigation is continuing, and it goes way beyond the two drugs in this lawsuit, and it involves many more companies than are in this lawsuit."

153.    On May 1, 2017, the DOJ filed a motion to stay discovery in the civil antitrust cases in which Perrigo is a defendant. *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 2:16-MD-2724 (E.D. Pa.), ECF No. 279. The filing in the MDL noted that there were "significant overlaps between the criminal investigation and the cases that have been consolidated into [the] MDL for pretrial proceedings." A number of the cases consolidated into the MDL included those where Perrigo was a defendant and desonide, clobetasol and econazole were the generic drugs at issue. The DOJ's filing stated that "[e]vidence uncovered during the criminal investigation implicates other companies and individuals (***including a significant number of the Defendants here***) in collusion with respect to doxycycline hyalite, glyburide, and other drugs (***including a significant number of the drugs at issue here***)."

154.    Meanwhile, the DOJ investigation remains ongoing and has recently implicated Perrigo. On March 3, 2017, *Bloomberg* reported that Perrigo was the target of DOJ investigators looking into generic drug price fixing. In a filing made in a private lawsuit, the DOJ asked that private discovery be delayed with respect to Perrigo and other manufacturers of generic topical drugs, including desonide,

- 74 -

because the government attorneys were worried that private discovery "could reveal details of the ongoing criminal investigation and delay, or even frustrate, its progress."

155.    On May 2, 2017, Perrigo revealed that the DOJ had raided its offices as part of the price-fixing investigation.  The raid was a far more severe measure than was taken against most other generic drug manufacturers, who merely received subpoenas.  Charley Grant, from *The Wall Street Journal*, noted on Twitter: "Federal investigations happen all of the time to companies.  Federal raids do not."  The fact that the DOJ ordered the raid after investigating Perrigo and its competitors strongly suggests that evidence learned through the investigations led the DOJ to believe that Perrigo was also engaged in improper pricing.

156.    On May 24, 2017, Connecticut Attorney General Jepsen issued a press release announcing that Glazer and Malek had entered into settlement agreements with 41 states and territories.  As part of the settlement, Glazer and Malek agreed to cooperate with the Attorneys General's investigations, including providing "all pre-existing information, documents or other tangible evidence," market data and information, and all facts relating to the investigations without the service of subpoena.

157.    According to the Attorneys General's motion for a separate government track filed on November 14, 2017, based on the cooperation of Glazer and Malek

and the review of "a legion of documents, emails, phone records and text messages," the states developed a proposed complaint with allegations involving an expanded list of drugs and generic drug manufacturers ("AG Proposed Complaint") and continued to investigate "defendants and other generic manufacturers, regarding the sale of other drugs not identified" in the complaint.[9]    The Attorneys General anticipate filing additional complaints, and "such future actions will be based on evidence that does not focus as centrally on Heritage as this [proposed] complaint does." *Id.* at 4.

158.    From their investigations, the Attorneys General found that the conspiratorial conduct identified in their allegations was "pervasive and industry-wide and the schemes identified are part of a larger, overarching understanding about how generic manufacturers price and allocate markets to suppress competition." *Id.* at 8.    The overarching understanding applied whether the scheme involved allocation of market share or agreement to fix price  *Id.* at 9.    According to the AG Proposed Complaint, "[t]his overarching agreement is widespread across generic drug industry and is broader than the Defendants named in this Complaint."    AG Proposed Complaint ¶92.

---

[9]    Memorandum of Law in Support of Motion by Plaintiff States for a Separate Government Track, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 2:16-MD-02724-CMR, ECF No. 525-2 (E.D. Pa. Nov. 14, 2017), at 4 n.6, 7.

159.   The overarching conspiracy rested on the "general rules of the road" that were put in place by generic manufacturers over a decade ago – that each competitor was entitled to a certain percentage of market share "based on the number of competitors in the particular drug market, with a potential adjustment based on the timing of their entry." *Id.* ¶¶90-91.  In general, the earlier entrant was entitled to additional market share.  *Id.*  In practice, a generic manufacturer with more than its fair share of the market would walk away from a customer by instigating a price increase to allow its competitor seeking to obtain its fair share to bid slightly below the increased pricing.  *Id.* ¶99.  After the market reached an equilibrium, the manufacturers then agreed on not competing on prices or significantly raising prices in coordination.  *Id.*  At the equilibrium state, manufacturers did not take advantage of another competitor's price increase by bidding lower prices, as doing so would be "viewed as 'punishing' a competitor for raising prices – which [was] against the rules." *Id.* ¶106.

160.   Adherence to the "general rules of the road" by all competitors was crucial to maintaining high prices, because even a single deviant could lead to competition and lower prices.  *Id.* ¶107.  Even for a new entrant to the market seeking to attain market share, "an underlying code of conduct," widespread in the industry, was adhered to that allowed the new entrant and existing manufacturers to determine

"a generally agreed-upon standard of 'fair share' in order to avoid competing and keep prices high." *Id.* ¶¶14, 100.

### C.   Perrigo's Largest Acquisition Ever Quickly Experienced Major, Known Integration Issues

161.   In late 2014, Perrigo attempted to expand into Europe by announcing its largest acquisition ever.   On November 6, 2014, Perrigo announced it would acquire Omega for €3.6 billion, or $4.5 billion.   The acquisition closed on March 30, 2015.   Omega was one of the largest OTC healthcare companies in Europe, with a commercial presence in 35 countries.   Like Perrigo, Omega operated as a roll-up, growing primarily through acquisition.   But unlike Perrigo, Omega focused on name-brand products rather than store-brand or unbranded products.

162.   Omega was far larger and more complex than any other company that Perrigo had previously acquired.   With annual revenues of approximately $1.6 billion, approximately 2,500 employees (including a 1,100 employee sales force), a portfolio of several thousand branded products, decentralized management, and a variety of different IT systems, Omega posed an integration challenge far more substantial than Perrigo had previously faced.

163.   Defendants were aware of considerable integration and operating challenges with Omega.   Perrigo was exposed to these challenges during the extensive due diligence prior to the acquisition.   As described in deal documents, Perrigo was provided a confidential package of information regarding Omega

- 78 -

businesses during the latter half of July 2014 and, with the assistance of its professional advisors, between September 7, 2014 and November 4, 2014 engaged in additional due diligence into Omega group companies and their "business, operations, assets,  liabilities, legal, tax, commercial and accounting and financial condition."  As part of this due diligence, Perrigo and its advisors received access to a confidential "Data Room," participated in a presentation by Omega management on September 25, 2014, conducted meetings with management of Omega and Omega group companies, and were provided further information in the form of answers to written questions.  Perrigo Company, plc, Current Report (Form 8-K) (Nov. 12, 2014), Ex. 10.1, at 1.

164.   Defendants described the Omega acquisition as a key part of the 5% to 10% organic growth they trumpeted in their opposition to Mylan's tender offer.  As defendants explained during the Relevant Period, their profit forecast assumed that the Omega assets would deliver organic growth at the midpoint of that range, or 7.5%.  Perrigo's growth assumption for Omega ***was more than double*** the 3.2% organic growth that Omega's management had independently projected for 2013-2017 as part of its goodwill calculation.  While Papa and the Director Defendants claimed that they had prepared their own elevated assumption for Omega's organic growth in compliance with the "scrupulous care, accuracy and objectivity" standard

required under Irish Takeover Rules, they were in fact aware of extensive Omega integration problems imperiling their aggressive guidance.

165.   Christine Ray (formerly known as Christine Kincaid) ("Ray"), who was Perrigo's Global Cyber Security Manager from June 2015 to December 2015, explained many of these known integration problems.   Ray served for a portion of her tenure as the Company's acting Chief Security Officer, reporting directly to the Chief Information Officer ("CIO"), Tom Farrington ("Farrington"), who also served as Papa's direct appointee to oversee the Omega integration.[10]   Ray was responsible for IT integration projects in Europe.   Ray indicated that IT integration between Perrigo and Omega had completely stalled by mid-2015.   The standstill caused Farrington to instruct Ray in July of 2015 to reach out to her direct counterpart in Belgium – the Omega segment's head of IT – to find out why integration was not advancing.

166.   According to Ray, at Farrington's direction, as well as through her standard integration responsibilities, she had multiple conversations with Omega's head of IT integration.   During these conversations, Omega's head of IT recounted

---

[10]   Defendant Papa stated during a call with investors on June 2, 2015 that "there was a specific person that I had designated in my Company who heads up all my integrations.   And I said, Tom, you need to help us successfully integrate Omega. That's your role.   Make sure it happens.   And that's your focus."

various issues that were causing "discord" between Omega's CEO and CFO, to whom Omega's head of IT reported directly, and the top executives of Perrigo.

167.   In addition to conversations with her Omega counterpart, Ray personally experienced major integration impediments, as well as cultural discord between Omega and Perrigo.  For example, Ray explained that European Union ("EU") regulations would make it difficult to replace Omega's EU suppliers with Perrigo's U.S.-based supply chain.[11]  As Ray indicated, during July and August of 2015, Omega's most senior executives tried on multiple occasions to communicate their concerns to Papa and Brown but were frustrated by their refusal to engage in discussions about these issues (in part because Perrigo's senior executives appeared more focused on fighting the Mylan takeover).  Ray was told by Omega's head of IT that he himself was personally instructed by Coucke in mid-2015 to put integration on hold pending resolution of these problems.

168.   Additionally, Ray explained that Papa's understanding of the integration problems was reflected by his mid-2015 appointment of Mary Donovan

---

[11]  In particular, pursuant to EU regulations, the home country of the Omega business segment making the purchase is the primary preferred source of suppliers, other EU member states are the second, and non-member countries are the third.  As such, changing Omega's source of manufactured drugs from existing EU suppliers to Perrigo – which manufactured in the United States – would change the terms of service for numerous existing and future Omega service contracts with its customers and could cause serious disruption to those customer relationships.

("Donovan"), an Irish executive, as an additional representative to bridge communication gaps between Perrigo's U.S. operations and Omega. According to Ray, one of Donovan's first acts upon being appointed to the role was to pay a week-long visit to Allegan, Michigan, in order to meet the IT development teams, Perrigo's Chief Technology Officer (known at Perrigo as the VP of Global Infrastructure) Brian Marr, Ray, and other project managers to discuss the integration. Ray explained that during these visits, Donovan hosted meetings in which numerous integration issues, including breakdowns in communication, IT processes and other problems, were acknowledged and discussed in detail. When Ray left Perrigo in December 2015, which was after the Mylan tender offer, Donovan had only begun "conceptual work" related to IT integration and no actual work at integrating the IT systems of the two companies had begun.

169. Moreover, Ray stated that in September 2015, Brian Marr, who (like her) reported to Farrington, asked Ray to "quietly and discretely" identify and hire a forensic IT analytics firm to go to Belgium where it would analyze senior Omega executives' e-mail to ascertain whether they had revealed material confidential business information to Mylan to aid Mylan's takeover. Ray identified the firm for hire, but left Perrigo before the team was sent to Belgium. She noted, however, that the need for such forensic analysis was indicative of the extent to which a deep distrust had developed between Perrigo's and Omega's top executives. All of this

occurred as defendants touted the integration of and synergies with Omega's business as a key source of growth.

170.   Confidential Witness 1 ("CW1") was the Associate Director of Global Systems Applications and Products ("SAP") and Database Services from October 2011 through July 2015 and the Director of Global Security, SAP and Platform Services from July 2015 through July 2017.  Like Ray, CW1 reported to Farrington.  CW1's duties during the Relevant Period included cybersecurity and SAP integration.  CW1's recollection of events surrounding Omega's integration into Perrigo complements and further bolsters Ray's account.

171.   According to CW1, as far as the Omega acquisition was concerned, there was fundamentally no IT-related integration over the course of Papa's tenure, because he did not permit it, and the lack of integration continued after Papa left.  Moreover, according to CW1, system integration planning commenced after Papa departed, but actual integration continued to be deferred because resources were not budgeted for the integration.  In fact, when CW1 departed Perrigo in July 2017, Omega still had not been integrated with Perrigo's systems and Omega's and Perrigo's respective operations continued to be divided.

172.   After the acquisition, Perrigo had overall responsibility for cybersecurity, including Omega's cybersecurity.  Because of the slow process of the integration and the lack of centralized tools, according to CW1, complying with

European privacy laws for the various Omega units was virtually impossible. CW1 stated that cybersecurity implementation with Omega still had not been completed at the time CW1 departed Perrigo. CW1 contends that Perrigo should have more thoroughly vetted Omega and that its due diligence pursuant to the Omega acquisition was a failure.

173. Numerous other former Perrigo and Omega employees also confirmed Ray's account of the stalled integration process from an operational perspective and recounted multiple further operational impediments:

(a) Poor organizational structure at Omega:

(i) CW2 worked at Perrigo in various capacities from 2010 through the end of 2016. From February 2014 through May 2016, CW2 was an Associate Director of Global Applications, and from May 2016 through December 2016, CW2 was an Associate Director of Business Process Architecture. According to CW2, it was widely understood, even before the acquisition, that Omega's franchises were "not working together" and that Omega was not an integrated company. Omega's lack of integration within its own company was one reason, according to CW2, that Perrigo deliberately allowed Omega to operate independently from Perrigo following the acquisition. In fact, CW2's understanding was that for up to a year after the acquisition there had not been any integration of Omega into Perrigo.

(ii)    CW1 similarly stated that Omega was entrepreneurial in the way it operated.  As CW1 explained, Omega was ostensibly a single company, but in reality it operated as two or three dozen separate companies, each of which used its own operating system.  These facts brought further difficulty to integrating Omega with Perrigo.

(iii)    From December 2014 through July 2015, CW3 was Perrigo's Chief Information Security Officer ("CISO"), working out of the Company's Allegan, Michigan U.S. headquarters.   CW3 reported directly to Farrington and was involved in the IT component of the Omega integration.  CW3 confirmed that Farrington held weekly or bi-weekly meetings with senior members of Perrigo's IT leadership team.  The meetings included: (i) Farrington; (ii) Brian Marr; (iii) Paula Makowski, Farrington's Chief of Staff; (iv) Mary Sheahan, who was responsible for communicating with Omega concerning the IT integration process;  (v) Scott McKeever, Perrigo's VP of Global Applications Service Delivery; and (vi) Brona Brilliant, Perrigo's Vice President of Business Process Architecture. According to CW3, based on conversations with Perrigo's leadership and others involved in the Omega integration, Omega's own systems were not integrated, which presented complexities in Perrigo obtaining data from Omega.  In fact, CW3 explained that Omega's financial systems were distributed and reflected a franchised

model, and most franchises were not connected at all.  As such, consolidated Omega sales and accounting data was not available.

(iv)   Information from a former employee that was cited in the amended complaint filed in *Roofer's Pension Fund v. Perrigo Co., Plc, et al.*, No. 2:16-cv-02805-MCL-LDW (D.N.J.), on June 21, 2017 (the "Class Complaint"), corroborates CW2's and CW1's accounts.  A Senior Marketing Manager for Omega in Turkey from January 2015 to December 2016 reported high turnover, declining business and lack of direction from Omega headquarters.  In particular, the Senior Marketing Manager reported that Omega's headquarters in Belgium did not provide a centralized business strategy, marketing plan or pipeline for the company's Turkish operations.  Consistent with this assessment, on November 10, 2016, then-CEO Hendrickson set a goal to "get the infrastructure in a better place in Europe instead of a number of unique different infrastructures."  Class Complaint ¶62(a).

(b)   IT integration problems:

(i)   Several former employees confirmed that there were difficulties integrating Omega's IT systems with Perrigo's.  Ray indicated that there was "definite" discord between senior Omega and Perrigo management, and for a variety of technical and operational reasons, Perrigo had not come close to completing the technology integration of Omega when she left the Company in December 2015.

(ii)     CW1 indicated that because of Omega's entrepreneurial spirit among its different locations, Papa directed "hands off" IT integration of Omega.  CW3 conceded that the myriad of disparate systems throughout Perrigo would have made IT integration really challenging.

(iii)    Because Omega's information systems were so disjointed, it was CW3's understanding that Perrigo was not receiving Omega's live financial data and had no real-time access to critical Omega financial data, including (i) sales data; (ii) purchase and returns data; (iii) inventory data; and (iv) accounting data. Because the financial data was not available, in CW3's estimation there was a lack of confidence in the data because Perrigo had to rely on Omega's representations.  It was CW3's understanding that the technical issues with the financial data impacted Perrigo's visibility into Omega's financial performance and likely hampered Perrigo's ability to understand Omega's financial performance, projections and overall results.

(iv)    A Senior Global Compensation Analyst for Perrigo at its Allegan, Michigan headquarters between July 2014 and December 2016 ("CW4") noted that obtaining authorization to move Omega employee data across borders was a "slow" and "lengthy process."  Beginning in July 2016, over a year after the Omega acquisition closed, CW4 began working on an executive compensation project that required CW4 to obtain compensation information for Omega employees.  Despite

the acquisition being over a year old, CW4 was not able to get all of the information needed due to certain EU laws related to the transfer of employee data. Moreover, when CW4 left Perrigo in December 2016, the project still had not been completed.

(v)     In addition, according to the Class Complaint, a former Marketing Director for Omega in Portugal between March 2016 and September 2016 said that technology and infrastructure was not as much of a priority for Omega. For example, rollout of a major SAP database implementation was delayed because budget priorities were placed elsewhere. An Operations Manager at Omega in Belgium from 2012 to the fall of 2015 corroborated this account, noting that many Omega divisions, including the one in which the Operations Manager worked, had not implemented SAP for financial reporting, making reconciliation of accounts difficult. Class Complaint ¶62(b).

(c)     Management resistance:

(i)     Ray also stated that Omega management was to blame for the failure to shut down Omega's SAP system in favor of Perrigo's. According to Ray, the transition from Omega's SAP system to Perrigo's SAP system did not occur because Omega senior leadership ignored the supplier arrangements Perrigo imposed and raised concerns about its employees' data privacy.

(ii)     CW3 explained that beginning in or around March 2015, based on conversations CW3 had with Farrington, there were contentious

discussions between Omega and Perrigo personnel concerning Perrigo's financial goals for Omega.   According to CW3, Omega personnel were giving Perrigo pushback on the financial goals, as they did not agree with Perrigo's expectations. CW3 pointed out that Perrigo wanted to report numbers in a way that would help fend off the Mylan offer.

(iii)   The Class Complaint alleges that Omega's HR Corporate Director between October 2014 and August 2015 reported directly to Omega CFO Barbara De Saedeleer, and helped implement new human resources policies that Perrigo wanted Omega to put in place as part of the integration.   He or she corroborated that defendant Coucke and other Omega managers were not cooperating with Perrigo in the integration.   Class Complaint ¶62(c).

(d)   Diversion of resources and budget to fight Mylan bid:

(i)   Ray described how Perrigo divested costs related to the Omega integration to keep them off the balance sheet while fending off the Mylan tender offer.   According to Ray, a legacy Omega manufacturing site in Mexico had been out of compliance for eight years with regards to its SAP ERP licensing software.   Bringing the site into licensing compliance would have cost $19 million at the end of the fiscal year.   Despite being aware of the cost, Perrigo did not include it in the IT capital expenditure at the time of the tender offer.   Ray was aware of the $19 million cost because it was discussed at IT staff meetings she attended and was

included as a "line item" in IT-related expenditures that Farrington presented to Perrigo's Board.

(ii)    It was CW3's understanding that Perrigo was seeking to make projections, including synergy and cost-savings projections, in the most positive light possible in order to withstand Mylan's tender offer.  According to CW3, some of the cost cutting Perrigo sought to achieve included cancelling IT programs that had been previously approved.

(iii)    Supporting Ray's account, the Class Complaint alleges that the Senior Global Compensation Analyst at Perrigo explained that after the Mylan bid, "a lot of attention went to Mylan" and not as much attention was paid to the Omega integration.  Class Complaint ¶62(d).  According to analysts, there were "a lot of moving balls" leading up to the Mylan tender offer.  Thus, the Omega integration "took more of a backseat."  Budgets were also diverted.  An employee of the Client Relations Department of Omega France from 2006 to December 2015 corroborated that operating spending was cut at Omega and salaries frozen in an attempt to fend off the Mylan bid.

(e)    Underperformance in key Omega markets:

(i)    A Perrigo Scientific Advisor for Medical Affairs from October 2014 to January 2017 ("CW5") confirmed that Omega was underperforming.  CW5 worked at the Company's Martin, Michigan location, which

was considered part of Perrigo's headquarters. CW5 learned of Omega's underperformance during quarterly update meetings in the second half of 2015 and early 2016. These meetings were usually led by Graisme Quinn and Louis Yu. At one of these meetings, Quinn stated that the same slides shown at the meeting were also shown to Perrigo executives two weeks prior. During these meetings, CW5 learned that Omega was struggling, failing to meet its performance goals, and was not at all what Perrigo had expected. CW5 got this information from slides that included performance details of Perrigo's various divisions, including Omega. CW5 also knew Omega was not performing because it was a factor that affected CW5's performance bonus, as quarterly employee bonuses were based on overall company performance. According to CW5, CW5's quarterly bonuses began to progressively dissipate beginning in 2015 and continued through 2016.

(ii)    Similarly, the Class Complaint alleges that a Global Brand Manager for Omega France and Belgium between July 2014 and June 2016 explained that underperformance was documented in a file circulated each month that provided current sales information for Omega brands and divisions. He indicated that Spain, in particular, was having trouble. The Marketing Director for Omega in Portugal said that Omega's operations in Belgium and Italy were also underperforming. The Senior Marketing Manager in Omega's Turkish division noted the Turkish division's abysmal performance in 2015 and 2016, stating that the

pharmaceutical sales and finance teams there were cut from 70 employees to 24 and that sales plans were repeatedly revised downwards after the business failed to meet targets.  Class Complaint ¶62(e).

### D. Defendants Recommended that Shareholders Reject Mylan's Offer

174.   On April 8, 2015, after unsuccessful negotiations for a friendly business combination, Mylan made an unsolicited offer directly to Perrigo shareholders to acquire the Company for $205 per share in cash and stock, a premium of approximately 25% above the price that Perrigo shares had closed at the prior trading day and substantially above any price at which Perrigo shares had traded for the entire history of the Company.

175.   Because Perrigo is an Irish company, Mylan's April 8, 2015 proposal commenced an offer period under Irish Takeover Rules, which strictly governed both Mylan's bid and Perrigo's defense against the bid.  In particular, to prohibit unsubstantiated claims to support or defeat an offer, the Irish Takeover Rules require the directors of the offeror and offeree, when making public statements, to

> ***accept responsibility for the information*** contained in the document or advertisement and [to state] that, to the best of their knowledge and belief (***having taken all reasonable care to ensure that such is the case***), the information contained in the document or advertisement is in accordance with the facts and, where appropriate, that it does not omit anything likely to affect the import of such information.

Irish Takeover Rule 19.2.

176.   Because financial projections by the offeror and offeree can unfairly influence takeovers, the Irish Takeover Rules require that every profit forecast by an offeror or offeree "(including the assumptions upon which it is based) *shall be compiled with scrupulous care, accuracy and objectivity by the directors of the offeror or (as the case may be) of the offeree*."  Irish Takeover Rule 28.1.

177.   Both Mylan's and Perrigo's stock prices sharply increased in response to the announcement.  Analysts were similarly positive.  Bank of America/Merrill Lynch stated: "From a business combination perspective, this makes sense to us as it brings together two companies with arguably best-in-class operations in the generic (MYL) and OTC (PRGO) spaces."  Barclays wrote: "We believe a combination between MYL and PRGO would offer a unique value proposition to their customers . . . ."  Deutsche Bank concluded that "the combination of these companies makes a lot of strategic sense . . . .  MYL represents a de-risking as PRGO would  otherwise be in a multi-year globalization phase."  UBS predicted that the combined stock would move higher over the next year.  Market observer Jim Cramer opined that "[t]hese two would be a match made in heaven."

178.   On or about April 21, 2015, defendants decided to reject Mylan's unsolicited bid and keep Perrigo an independent company.  In a press release issued that day, despite Perrigo's stock trading as low as $192.35 per share at the time, defendants falsely told investors that Mylan's $205 bid "substantially undervalues

- 93 -

the Company and its future growth prospects," and that the offer "does not take into account the full benefits of the Omega Pharma acquisition."

179.    In an investor presentation also held on April 21, 2015, defendants ramped up their claims that an independent Perrigo was worth more than $205 per share because it had a "durable competitive position" and a "compelling growth strategy."  Each Director Defendant accepted personal responsibility in writing for the April 21, 2015 investor presentation, making the representations required by Irish Takeover Rule 19.2 and set forth in ¶175 above.

180.    In a slide entitled "Proven Financial Track Record," defendants claimed that Perrigo had a "proven history of meeting [its] goals," identifying organic net sales growth of 7% between 2011 and 2014, and also that Perrigo had "the ability to keep delivering" growth in the 5% to 10% range.  For its Generic Rx division, Perrigo enhanced its hype even further, telling investors to expect growth in the 8% to 12% range.  In the oral part of the presentation, Papa claimed to "see additional upside for Perrigo on the horizon over and above" the organic growth goal. Defendants omitted entirely the fact that organic growth had slowed substantially and that even the growth reported was boosted by anti-competitive practices in the Generic Rx division and the Tysabri royalty stream's improper contribution to revenue.

181.  Perrigo called its growth strategy "base plus plus plus," which it depicted visually with a pyramid:



The "base" portion included the existing businesses with defendants' inflated 5% to 10% growth projections.  At the very top of the pyramid, as the final "plus" factor, was the projection of "Tysabri Upside" from possible new indications in stroke and secondary progressive multiple sclerosis.  Defendants continued to rely on the "base plus plus plus" graphic through November 2015, while encouraging investors to decline Mylan's tender offer, even though growth failed to meet projections and Tysabri's upside continued to erode.  *See* ¶¶202-203.

182.   The April 21, 2015 presentation was also misleading with respect to generic drug pricing.  Papa falsely told investors that "[o]n the question of pricing, our goal on pricing has been the same goal, really for all the time, almost nine years I've been at Perrigo.  What we seek to do on our pricing is keep pricing flat to up slightly."  In truth, Perrigo had massively spiked prices of many of its most important generic drugs by colluding with other generic manufacturers and/or joining prices fixed by existing illegal conspiracies.

183. Defendants' presentation claimed the Omega acquisition was "accretive to Perrigo's organic growth profile," and Papa further claimed: "We're very pleased with our initial integration projects."  In fact, Papa and the other defendants were aware of the serious problems with the Omega integration and management.  Defendants knew that Omega management had modeled long-term organic growth of just 3.2%, well below the 5% to 10% range claimed by Perrigo.

184.   Defendants repeated these misrepresentations and omissions and made additional misrepresentations and omissions throughout the offer period, all of which are detailed in §V.C. below.

185.   On April 24, 2015, Mylan made a legally binding commitment to tender for Perrigo shares at $60 cash plus 2.2 Mylan shares for each Perrigo share tendered.  At Mylan's closing price that day of $76.06 per share, the revised bid was

worth over $227 per share.  Perrigo's Board of Directors again rejected the offer and encouraged shareholders not to tender their shares.

186.   On April 29, 2015, Mylan increased its bid again, this time to $75 cash plus 2.3 Mylan shares for each Perrigo share tendered.  At Mylan's closing price of $74.50 per share on April 29, 2015, the revised bid was worth over $246 per share.  Again, Perrigo's Board rejected the offer and encouraged shareholders not to tender their shares.

187.   While promoting Perrigo's organic growth claims to investors, defendants knew that organic growth was eroding.  In 2Q 2015, organic growth turned negative, for both the quarter and the trailing twelve months.  Nonetheless, defendants issued an investor presentation on August 6, 2015, purportedly developed under the strict requirements of the Irish Takeover Rules, reiterating that organic growth targets remained intact and claiming to have a "strategy for delivering 5-10% organic growth."  However, at the time: (a) Perrigo had not been able to consistently deliver organic growth in that range; (b) Perrigo was having substantial problems integrating its largest acquisition, Omega; (c) Perrigo and other generic drug competitors were facing considerable headwinds, as increasing scrutiny from regulators and customers made it more difficult to obtain the supracompetitive pricing that was driving results in Perrigo's Generic Rx division; and (d) although

masked by Perrigo's accounting violations, the fair value of Perrigo's largest financial asset, the Tysabri royalty stream, had already started to plummet.

188.   By the time of Perrigo's August 2015 investor presentation, generic drug makers were under increasing scrutiny for price fixing.  Four manufacturers, including Actavis, which shared the lucrative tretinoin, desonide and permethrin markets with Perrigo, disclosed that they had received subpoenas from the DOJ's Antitrust Division related to generic drug pricing and collusion.  An August 7, 2015 *FiercePharma* article reported that "the DOJ is looking into whether trade associations were used as a conduit to trade drug-pricing information."  This put Perrigo in the regulators' spotlight, as it had increased prices of several generic drugs by several hundred percent or more in coordination with competitors shortly after trade association meetings.  *See* §IV.B.6.

189.   On September 14, 2015, Mylan commenced its formal tender offer to purchase Perrigo shares.  As Mylan had earlier promised, Perrigo shareholders would receive $75 in cash and 2.3 Mylan shares for each Perrigo share tendered. The deadline to tender shares was November 13, 2015, and the offer required that only 50% of shares be tendered.  Mylan described its offer to Perrigo shareholders as deciding between one of two scenarios: either accept a "highly attractive offer," including $75 in cash and a total value substantially greater than Perrigo's market price, or, alternatively, receive no cash and risk a significant decline in the value of

Perrigo's stock, while "weathering the delays and potential execution and integration risk inherent in Perrigo's standalone strategy."

190.   On September 17, 2015, defendants urged Perrigo investors to reject Mylan and not tender their shares into the offering.  The letter to investors issued that day by Perrigo, the Board and Papa (which was subject to the Irish Takeover Rules and contained an acceptance of responsibility statement signed by Papa) boasted that since 2007, "*we have successfully integrated 27 acquisitions* with trailing 12-month net sales of  more than $3.2 billion, all while maintaining our relentless focus on return on invested capital.  *Simply stated, Perrigo has an outstanding track record of value creation and our future is bright*."   In fact, Perrigo had not successfully integrated its largest acquisition, Omega, and had covered up the plummeting value of its largest financial asset, the Tysabri royalty stream, by applying the wrong accounting treatment and refusing to mark the asset to its fair market value as GAAP requires.  Also, Perrigo's Generic Rx revenues were not sustainable because they were the result of improper collusive price-fixing schemes between Perrigo and other generic drug manufacturers.

191.   On October 22, 2015, Perrigo announced results for the third calendar quarter, emphasizing income growth in the Generic Rx division without disclosing the anti-competitive practices boosting that growth.  As with the prior quarterly release, Perrigo masked the diminished value of its largest financial asset, the

Tysabri royalty stream, by admittedly failing to account for the change in fair value as required by GAAP.  Perrigo also announced that it would cut costs by laying off 800 workers and authorized a debt-fueled $2 billion share buyback.  However, defendants did not disclose that cutting workers would impair Perrigo's organic growth and integration efforts.

192.  That same day, defendants doubled down on their materially misleading profit forecasts, purportedly issued under the strict standards of the Irish Takeover Rules.  With the Mylan takeover deadline only weeks away, defendants projected not only strong results in the remainder of the 2015 calendar year, but also blockbuster returns for 2016.  Defendants touted a baseline earnings projection of $9.30 per share and projected that share buybacks and efficiency gains would further boost that figure to $9.83 per share.  In a letter to shareholders issued pursuant to the Irish Takeover Rules, and filed with the SEC as an attachment to Form 8-K on October 22, 2015, defendants acknowledged their obligation to make "certain attestations to those profit forecasts."  They further conceded that the directors prepared the profit forecast and did so based on growth assumptions that were expressly "within the directors' influence and control."

193.  Defendants' misrepresentations and omissions succeeded.  On November 13, 2015, Perrigo investors tendered less than the 50% threshold, ending Mylan's takeover bid.  Instead of receiving $75 in cash and additional equity

compensation, Perrigo investors had to face Perrigo's true prospects as an independent company.

### E.   Defendants Admit They Violated GAAP to Hide Billions of Dollars of Deterioration in Perrigo's Largest Financial Asset

194.   As alleged herein, throughout the Relevant Period, the royalty stream for Tysabri was Perrigo's largest financial asset and played an important role in Perrigo's "base plus plus plus" growth strategy.   However, as described below, defendants improperly accounted for the Tysabri royalty stream in order to inflate Perrigo's revenues and hide billions of dollars of deterioration in the value of the royalty stream.

#### 1.   Perrigo's Admissions that Its Financial Statements Were Materially Misstated

195.   Defendants' failure to properly account for the Tysabri royalty stream rendered Perrigo's Relevant Period financial statements materially misstated and in violation of GAAP and SEC regulations. [12]   Defendants have admitted that each of

---

[12]   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.   SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.   Regulation S-X requires that interim financial statements must also comply with GAAP.   17 C.F.R. §210.10-01(a).

Perrigo's Relevant Period financial statements violated GAAP and "***should no longer be relied upon***."  On April 25, 2017, the Company disclosed:

> [I]t was determined that, under existing U.S. GAAP, the Tysabri® royalty stream ***should be recorded as a financial asset, rather than an intangible asset***, on the date of acquisition . . . .
>
> *       *       *
>
> The Company has determined that it is necessary to ***restate certain previously issued financial statements*** to address th[is] issue[].

196.   The Financial Accounting Standards Board ("FASB"), the governing body that promulgated the accounting rules regarding restatements of prior financial statements, has defined "restatement" as "the process of revising previously issued financial statements ***to reflect the correction of an error in those financial statements***."  *See* FASB Accounting Standards Codification ("ASC") Topic 250-10-20, *Accounting Changes and Error Corrections*.

197.   As noted by the SEC, "GAAP only allows a restatement of prior financial statements based upon information 'that existed at the time the financial statements were prepared,'" and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared."[13]

---

[13] *Amicus Curiae* Brief of the U.S. Securities and Exchange Commission as Regarding Defendants' Motions *in Limine* to Exclude Evidence of the Restatement and Restatement Report, *In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks (S.D. Fla. Feb. 22, 2002).

198.   Thus, the fact that Perrigo restated its previous financial statements is an admission that: (a) the financial results originally issued during the Relevant Period and its public statements regarding those results were ***materially misstated***; and (b) the financial statements reported during the Relevant Period were misstated ***based on information available to defendants at the time*** the results were originally reported.

199.   Perrigo's restatement corrected over $1 billion of misstated financials and was one of the largest restatements of any public company since 2001.   As accounting consultancy Audit Analytics noted: "Since 2001, there have only been 19 restatements that exceeded the $1 billion threshold."

## 2.   Defendants' GAAP Violations Were Used to Inflate Perrigo's Revenues

200.   Defendants do not dispute that "***under existing U.S. GAAP, the Tysabri® royalty stream should [have been] recorded as a financial asset***."  In fact, in May 2016, then-CEO Hendrickson expressly called the Tysabri royalty stream a "financial asset."   Accordingly, there was no basis for Perrigo to dodge the accounting required by ASC 815.  As a financial asset accounted for under ASC 815, the Tysabri royalty payments should not have been recorded as revenue in the Company's financial statements.  However, during the Relevant Period, defendants accounted for the royalty stream as if it were an "intangible asset" so that the royalty payments could be recorded as revenue.

201.   As a result of this improper accounting, the Company's revenues were materially overstated during the Relevant Period.   In April 2017, the Company admitted that its net sales had been overstated as a result of recording the Tysabri royalty stream as revenue.   Specifically, the Company stated:

> Accounting for the Tysabri® royalty stream as a financial asset required us to adjust our financial statements for the Restated Periods to . . . **remove the Tysabri® royalty stream from net sales** in our Consolidated Statements of Operations . . . .

The chart below reflects the overstatement of revenue by quarter during the Relevant Period.

| (in millions) | Q1 2014 3/29/2014 | Q2 2014 5/28/2014 | Q3 2014 9/27/2014 | Q4 2014 12/27/2014 | Q1 2015 3/28/2015 | Q2 2015 6/27/2015 | Q3 2015 9/25/2015 | Q4 2015 12/31/2015 | Q1 2016 4/2/2016 | Q2 2016 7/2/2016 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenue (as reported) | $1004.2 | $1144.2 | $951.5 | $1071.7 | $1049.1 | $1531.6 | $1344.7 | $1424.8 | $1383.2 | $1481.0 |
| Tysabri Royalty Revenue Overstatement | ($53.4) | (85.9) | ($90.4) | ($85.1) | ($79.9) | ($81.6) | ($83.1) | ($83.3) | ($85.7) | ($88.9) |
| % Overstated | 5.3% | 7.5% | 9.5% | 7.9% | 7.6% | 5.3% | 6.2% | 5.8% | 6.2% | 6.0% |

### 3.   Defendants' GAAP Violations Were Used to Hide Billions of Dollars of Deterioration in the Fair Value of the Tysabri Royalty Stream

202.   Defendants' failure to properly record the Tysabri royalty stream as a "financial asset" also allowed them to conceal its deteriorating value.   Under GAAP, defendants were explicitly required to record financial assets at fair value each quarter during the Relevant Period.   However, defendants avoided this requirement when they accounted for the Tysabri royalty stream as an "intangible asset."   Unlike a "financial asset," the value of an "intangible asset" is not required to be "marked-

to-market" each quarter and is only subject to an annual impairment test. Thus, defendants' GAAP violations were used to create the impression that the valuation of the Tysabri royalty stream remained intact, even as its actual value plummeted due to known adverse clinical and competitive developments, including:

- In June 2015, the Phase II trial for Tysabri as a treatment for stroke failed to meet its primary endpoint. This indication was one of the two potential new indications that defendants Perrigo and Papa touted as "Tysabri Upside."

- In October 2015, the Phase III trial for the other proposed new indication, secondary progressive multiple sclerosis (or "MS"), also failed.

- In October 2015, the Phase III trial results for a competitor's pipeline product, Ocrevus, were so positive that experts called it a "game changer."

- In February 2016, the FDA designated Ocrevus a "breakthrough therapy."

- In June 2016, the FDA granted Ocrevus priority review with a target action date in December 2016.

Nonetheless, defendants continued to use the purported growing value of the Tysabri royalty stream in Perrigo's "base plus plus plus" graphic promoting the rejection of Mylan's tender offer.

203. In May 2017, the Company filed its 2016 Form 10-K and admitted that it had overstated the value of the Tysabri royalty stream during the Relevant Period. Specifically, the Company stated:

> Accounting for the Tysabri® royalty stream as a financial asset required us to adjust our financial statements for the Restated Periods

to . . . include the quarterly changes in fair value of the Tysabri®
royalty stream as a component of other non-operating income/expense.

The chart below reflects the 1Q 2016, 2Q 2016 and 3Q 2016 overstatement of the

Tysabri royalty stream by quarter:

| | 1Q 2016<br>4/2/2016 | 2Q 2016<br>7/2/2016 | 3Q 2016<br>10/1/2016 |
|---|---|---|---|
| Value of Tysabri Royalty Stream as originally reported | $5,139,700,000 | $5,067,200,000 | $4,994,700,000 |
| Concealed Decline in Value | ($119,700,000) | $1,047,200,000 | ($1,444,700,000) |
| Actual Fair Market Value of Tysabri Royalty Stream | $5,020,000,000 | $4,020,000,000 | $3,550,000,000 |
| % overstated | 2.4% | 26.0% | 40.7% |

## V.   RELEVANT PERIOD MISREPRESENTATIONS AND OMISSIONS

### A.   Unlawful and Collusive Pricing Practices in Perrigo's Generic Rx Division

204.   Throughout the Relevant Period, defendants made false and misleading

statements concerning Perrigo's generic drug prices and sales, including failing to

inform investors that the generic drug prices and sales were achieved through

improper collusion with Perrigo's competitors.

205.   On February 6, 2014, Perrigo filed its fiscal 2Q 2014 Form 10-Q with

the SEC.  The Form 10-Q misleadingly described Perrigo's generic prescription drug

segment strategy as follows:

The strategy in the Rx Pharmaceuticals segment is to be the first to market with those new products that are exposed to less competition because they have formulations that are more difficult and costly to develop and launch (*e.g.*, extended topicals, specialty solutions or products containing controlled substances).

206. Perrigo made identical misrepresentations describing its generic prescription drug strategy in Form 10-Qs filed on May 7, 2014, November 6, 2014, February 5, 2015 and April 29, 2015.

207. In addition, in Exhibit 10.10 of its 2Q 2014 Form 10-Q, Perrigo unequivocally represented and warranted its compliance with laws and regulations and affirmatively covenanted to continual compliance:

> "Material Adverse Effect" means a material adverse effect on . . . the business, assets, operations, prospects or condition, financial or otherwise, of the Borrower and its Subsidiaries taken as a whole . . . .

*      *      *

Representations and Warranties

*      *      *

> SECTION 3.07.   Compliance with Laws and Agreements. Except as set forth in the SEC Documents and the Disclosed Matters, **each of the Borrower [Perrigo Company plc] and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it** or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

*      *      *

Affirmative Covenants

- 107 -

\*     \*     \*

SECTION 5.07.   Compliance with Laws.   ***The Borrower [Perrigo Company plc] will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it*** or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

208.   Perrigo made identical or similar misrepresentations describing its compliance with laws in SEC filings throughout the Relevant Period.

209.   The statements identified in ¶¶205-208 were materially false and misleading or omitted material facts.  Defendants failed to disclose the Company's participation in unlawful and collusive generic drug price fixing.  Furthermore, Perrigo's inflation of its sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm.  In addition, Perrigo's failure to make required disclosures regarding the impact of artificial price increases (tied to unlawful price-fixing activity) on its reported revenue was in violation of SEC disclosure rules.  As a result, defendants' public statements were materially false and misleading at all relevant times.

210.   On August 14, 2014, Perrigo filed its fiscal 2014 Form 10-K with the SEC.  The 10-K was signed by defendants Papa, Brown, Brlas, Cohen, Fouse, Gibbons, Gottfried, Hoffing, Jandernoa, Kunkle and Morris and included the

following false and misleading statement concerning generic prescription drug competition:

> *The market for generic prescription drugs is subject to intense competition from other generic drug manufacturers, brand-name pharmaceutical companies launching their own generic version of a branded product (known as an authorized generic), manufacturers of branded drug products that continue to produce those products after patent expirations and manufacturers of therapeutically similar drugs.* Among the Company's competitors are Actavis, Apotex, Glenmark Generics Inc., Impax, Mylan, Prasco, Sandoz, Taro Pharmaceuticals, Teva Pharmaceutical Industries Ltd., Triax Pharmaceuticals, and Zydus Pharmaceuticals, as well as brand-name pharmaceutical companies where the Company offers a generic equivalent.

> The Company believes that one of its primary competitive advantages is its ability to introduce difficult to develop and/or manufacture topical and other specialty generic equivalents to brand-name drug products. Generally, these products are exposed to less competition due to the relatively longer and more expensive development, clinical trial and approval processes. In addition, *the Company believes it has a favorable competitive position due primarily to its efficient distribution systems, topical production economies of scale, customer service and overall reputation.*

> *Price competition from additional generic versions of the same product, as well as potential price competition from the original branded or authorized generic products, may result in a significant and/or rapid decline in sales and profit margins.* In addition, competitors may develop their products more rapidly or complete the regulatory approval process sooner and market their products earlier than the Company. New drugs and future developments in improved and/or advanced drug delivery technologies or other therapeutic techniques may provide therapeutic or cost advantages to competing products.

*     *     *

Many of the Company's customers, which include chain drug stores, wholesalers, distributors, hospital systems and group purchasing organizations, continue to merge or consolidate.  In addition, a number of its customers have instituted sourcing programs limiting the number of suppliers of generic pharmaceutical products carried by that customer.  *As a result of these developments, heightened competition exists among generic drug producers for business from this smaller and more selective customer base*.

211.  The Form 10-K made further false and misleading statements concerning generic prescription drug competition:

*The markets for OTC pharmaceutical, animal health, nutritional, infant formula, generic pharmaceutical and API products are highly competitive.  Competition is based primarily on price, quality and assortment of products, customer service, marketing support and availability of new products*.  Competition also comes from national brand companies and branded pharmaceutical companies.   That competition could be intensified should those companies lower prices or manufacture their own store brand or generic equivalent products.  *Due to the high degree of price competition, the Company has not always been able to fully pass on cost increases to its customers*.  The inability to pass on future cost increases, the impact of store brand competitors and the impact of national brand companies lowering prices of their products, offering special promotional discounts or operating in the store brand market could have a material adverse impact on financial results . . . .

*Selling prices of generic drugs typically decline, sometimes dramatically, as competition intensifies due to additional companies receiving approvals for a given product or brands launching authorized generics*.  To the extent that the Company succeeds in being the first to market a generic version of a significant product, the Company's sales and profit can be substantially increased in the period following the introduction of such product and prior to a competitor's introduction of an equivalent product.   The Company's ability to sustain its sales and profitability on any product over time is dependent on both the number of new competitors for such product, some of whom

may be significantly larger than the Company, and the timing of their approvals.

212.    The Form 10-K also falsely stated that Perrigo was "committed to doing business in an ethical manner" and was engaged in an effort to help "consumers access safe, effective and ***affordable*** healthcare products."

213.    On August 14, 2014, during Perrigo's 4Q 2014 earnings conference call, defendants made additional false and misleading statements concerning Perrigo's generic drug sales.  Papa stated that Perrigo's strong sales results were "***driven by great execution, especially within our Rx business segment***, and the acquisition of Elan."  Brown further elaborated on the generic drug business, stating that "you can see that our Rx business continues its robust performance, ***as net sales growth was driven by new product sales of $35 million***, and sales related to products acquired from the acquisition of Fera, of $20 million."

214.    During  the  August 14,  2014  conference  call,  analysts  sought clarification concerning the generic drug segment:

> [David Steinberg – Jefferies & Co. – Analyst:]    I    had    a question on your Rx pharma business.  You've had very healthy growth over the past couple years; I think around 25% this past fiscal year.  But in your guidance, you are looking for 5% to 9%, which is a pretty sharp deceleration. Just curious what might be going on there.  Are there pricing dynamics?  Is more competition expected?  Anything else going on,  why  you'd  forecast  a  substantially  lower  growth  rate  going forward?  Thanks.
>
> [Papa:]  I think, David, you're right.  ***Actually, the growth rate for the full year was actually a little higher than that: 31%.***  So we did

have a very strong year. Having said that, we're excited about the future. We think we've got some great new products. ***One of the questions, really – there's some competitive challenges that we expect for some of the new products***. If that does not manifest itself, and we find ourselves without some of those competitive challenges, there may be some upside in the growth. But much of what we're doing in the Rx business, in terms of having an upside, would be really manifest itself in the new product category, depending on what happens in new products.

*     *     *

[Chris Schott – JPMorgan – Analyst:] Primary question here was on the Rx market, and some of the price assumptions you're making for your base businesses in 2015? I guess we've seen some positive price trends in select product offerings across the space. Can you just talk a little about, do you see more opportunity for price? And just also give us a flavor of what's in that guidance?

*     *     *

[Papa:]     I'll take the first part of the question here on the Rx market. I think probably the best way to answer this question is, do I think there are some opportunities on pricing in the Rx category? The answer is yes. ***The overall comment I would make is that our strategy on pricing hasn't really changed in the past six, seven years that I've been at Perrigo. It is to try to keep our pricing flat to up slightly, across our total book of business***. In other words, across all of our portfolios, keep pricing flat to up slightly. Our logic being that in any given year, any given quarter, we may raise prices on product A, but we may take a concession on product B and C, but try to keep that pricing flat to up slightly.

215.   On November 21, 2014 and November 24, 2014, Perrigo filed with the

SEC two Form 8-K underwriting agreements signed by Brown, in which Perrigo

unequivocally represented and warranted its compliance with laws and regulations:

<u>Representations and Warranties of the Company</u>.

*    *    *

["Material Adverse Effect" means] a material adverse effect on the business, properties, management, financial position, stockholders' equity, results of operations or prospects of the Company [Parent Guarantor] and its subsidiaries taken as a whole or on the performance by the Company [or the Parent Guarantor] of its obligations under this agreement . . . .

*    *    *

(o) *No Violation or Default*: **Neither the Company [the Parent Guarantor] nor any of its subsidiaries is . . . (iii) in violation of any law or statute** or any judgment, order, **rule or regulation** of any court or arbitrator or **governmental or regulatory authority**, except, in the case of clause (iii) above, for any such default or violation that would not, individually or in the aggregate, have a Material Adverse Effect.

*    *    *

(z) *Disclosure Controls*. ***The Company [Parent Guarantor] and each of its subsidiaries maintains an effective system of disclosure controls and procedures (as defined in Rule 13a-15 and Rule 15d-15 of the Exchange Act) that are designed to ensure that the information required to be disclosed in the reports that the Company, files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms, and is accumulated and communicated to management of the Company, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding disclosure***.

(aa) *Accounting Controls*. The Company [Parent Guarantor] and each of its subsidiaries maintains effective internal control over financial reporting (as defined under Rule 13a-15 and 15d-15 under the Exchange Act), and the Company and its subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (A) transactions are executed in accordance with management's general or specific authorization; (B) transactions are recorded as necessary to permit preparation of financial statements in

- 113 -

conformity with U.S. GAAP, and to maintain accountability for assets; (C) access to assets is permitted only in accordance with management's general or specific authorization; (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences; and (E) in the case of the Company, interactive data in eXtensible Business Reporting Language included or incorporated by reference in the Registration Statement fairly presents the information called for in all material respects and is prepared in accordance with the Commission's rules and guidelines applicable thereto.

216.   Similarly, on December 9, 2014, Perrigo filed a Form 8-K, signed by Brown, in which it unequivocally represented and warranted its compliance with laws and regulations and affirmatively covenanted to continual compliance:

<u>Representations and Warranties</u>

\*      \*      \*

SECTION 3.07.   <u>Compliance with Laws and Agreements</u>. Except as set forth in the SEC Documents and the Disclosed Matters, ***each of the Company and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property*** and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

\*      \*      \*

<u>Affirmative Covenants</u>

\*      \*      \*

SECTION 5.07.   <u>Compliance with Laws</u>. ***The Company will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property***, including by instituting and maintaining policies and procedures that are reasonably designed to ensure continued compliance therewith, except where the failure to do so, individually or

- 114 -

in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

\*       \*       \*

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Company and its Subsidiaries taken as a whole . . . .

217.   The statements identified in ¶¶210-216 were materially false and misleading or omitted material facts.   Defendants' statements above about the generic drug market and competition were false and misleading because they omitted: (a) that Perrigo's generic drug prices were artificially inflated by its unlawful and collusive price-fixing scheme with its competitors;  (b) that competition was not based on price or quality of products but was instead eliminated because Perrigo was unlawfully and collusively fixing prices; and (c) that Perrigo was not in compliance with laws and regulations because it was unlawfully colluding with its competitors to fix the prices of generic drugs.  Defendants' statements above concerning Perrigo's compliance with the laws and regulations governing the Company were false and misleading because Perrigo's inflation of its sales through illegal price fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm.

218.   On February 5, 2015, during Perrigo's 2Q 2015 earnings call with analysts, defendants again misleadingly discussed Perrigo's generic drug business.

Papa stated that the "Rx segment once again achieved record results, growing sales 12% with adjusted operating margin of 46%." Brown continued the generic drug discussion, stating: "[Y]ou can see that our Rx team continues to outperform expectations, delivering 12% net sales growth, to a record $277 million in the second fiscal quarter. . . . Volume increases were partially offset by $14 million of discounted products."

219. The statements identified in ¶218 were false and misleading because they omitted that sales and growth in the Generic Rx segment were caused by an unlawful and collusive price-fixing scheme among generic drug manufacturers, which also eliminated true competition.

220. During the April 21, 2015 investor presentation discussed herein, Perrigo and the Director Defendants projected 8% to 12% net sales growth for the Generic Rx division. Papa stated:

> On the question of pricing . . . our goal on pricing has been the same goal, really for all the time, almost nine years I've been at Perrigo. **What we seek to do on our pricing is keep pricing flat to up slightly** and I'm very comfortable that certainly in our current year, in our calendar 2015 as we look to the future, if we can keep pricing flat to up slightly. So that's really what our goal has been. There is no doubt that there has been some continued wholesaler consolidation and buying group consolidation has occurred. We're working very closely with those customers. They are very important to our Consumer business; obviously, they're very important to our Rx business. So we continue to work very closely with all of them to continue to drive, and talk about what we refer to as the Perrigo advantage and what is unique about us that allows us the help them to meet the needs of their

customers or the consumers in the world.  So clearly, we do think that that is something we can continue to drive.

221.   The statements identified in ¶220 were materially false and misleading when made because Perrigo's pricing strategy in the Generic Rx division was not to "keep pricing flat to up slightly," but rather to wildly increase pricing for select generic drugs where it could fix the market price in collusion with competitors and/or join an existing price-fixing conspiracy.

222.   Perrigo filed its fiscal 3Q 2015 Form 10-Q with the SEC on April 29, 2015.  The Form 10-Q was signed by Papa and Brown and continued to mislead investors concerning Perrigo's drug pricing.  For example, the Form 10-Q stated that Perrigo was "a top five global over-the-counter consumer goods and pharmaceutical company, offering consumers and customers high quality products at *affordable prices*."

223.   The statement identified in ¶222 was false and misleading when made because Perrigo did not offer its generic prescription drugs at "affordable prices." Instead Perrigo was engaged in an unlawful and collusive price-fixing scheme that caused drug prices to skyrocket.

224.   On May 12, 2015, Papa attended the Bank of America Merrill Lynch Health Care Conference, and stated as follows:

> [Unidentified Audience Member:]     Great.  So you and IGE [Farben (a German pharmaceuticals conglomerate)] both have a[n Rx] product that you both benefited from a price increase and recently you

decreased price and IGE has made some comments as to what they think you are doing, but it seems to be there may be some [pricing strategy you] created around your Rx products to address a certain customer demand or go after a certain group of customers. I was wondering if you could just elaborate on what the strategy may be there.

[Papa:]      Sure. I'm not going to comment specifically on this particular product conflict or product opportunity. ***Obviously it's a competitive market out there. There is always going to be – in a pricing world somebody is going to gain some share, somebody is going to lose some share***.

***I think as a general rule, what I've tried to do with pricing at Perrigo in the eight years, nine years, I've been a part of the company is to keep pricing flat to up slightly***. And if I do that, I believe that puts me in the best long-term position to deliver shareholder value for the company.

Any specific product conflict issue is just a normal part of give and take in terms of market share, gaining market share, losing market share. Right now, as I sit here today, Perrigo is the leader in what I would call extended topical. So anything that's absorbed topically, dermatology, respiratory, nasal, ophthalmic, we've got a leading position there ***and I think we're just going to certainly try to continue to make good decisions on that pricing because I think as you've seen in our business, we've been able to drive some very significant growth both on the top line and the bottom line for the Company relative to our operating margins in the mid-40%s.***

225.   The statements identified in ¶224 were materially false and misleading when made because: (a) Perrigo's pricing strategy in the Generic Rx division was not to "keep pricing flat to up slightly," but rather to unlawfully increase pricing on select generic drugs where it could fix the market price in collusion with competitors and/or join an existing price-fixing conspiracy; (b) many of Perrigo's generic drugs were not sold in a "competitive market," but rather a market where natural

competition was constrained by collusion; and (c) it was not "good decisions on . . . pricing," but rather massive unsustainable price hikes accomplished through collusion that could not be replicated on an ongoing basis that were responsible for the inflated operating margins in Perrigo's Generic Rx division.

226.  On June 2, 2015, Papa attended the Jefferies Global Healthcare Conference and made the following materially false and misleading statements:

> [David Steinberg:] Okay.  Moving to another business line, generics, in retrospect, the acquisition of Paddock several years ago was really a brilliant one, and your star performer in the last several quarters were generic drugs.  As you look at your portfolio, I know you're reticent to raise price on store brands.  But as you look at your portfolio, are there any pricing opportunities in some of your extended dermatologics?
>
> And secondly, with regards to M&A, what type of assets are you looking to bring in to augment your current generic portfolio?
>
> [Papa:]      Sure.  The approach we take on pricing is really a portfolio approach.  And I'm sure it's very similar to many of you in the audience, as you think about the individual stocks you buy.  You take a portfolio view on what you're trying to accomplish.  That's what we do on our pricing for our business.  Across all the Perrigo segments, the consumer segment, the nutrition segment, the RX segment and the API segment, we try to take a view on pricing across that total portfolio, with the goal of keeping our pricing flat to up slightly.
>
> Now in any individual category, like Rx, there may be more upside.  ***But we're recognizing that there is going to be some products in Rx that I'm going to have to decrease for competitive reasons, as well as increase some.  So what we try to do is take a holistic view across the entire portfolio, and keep pricing flat to up slightly***.
>
> I will say, over the last several years to be fair, there's been more pricing upside in the Rx category than perhaps some of the other

categories.  But we still take that kind of total portfolio view of keeping pricing flat to up slightly as a view.

227.   The statements identified in ¶226 were materially false and misleading when made because: (a) Perrigo's policy with respect to pricing generic drugs was not to "keep pricing flat to up slightly," but rather to unlawfully inflate prices on select generic drugs in collusion with other generic drug manufacturers; and (b) the statements omitted that the "pricing upside in the RX category" over the last several years was the result of unlawful and collusive price fixing by Perrigo and other generic manufacturers.

228.   During the August 5, 2015 conference call regarding Perrigo's 4Q 2015 results, Papa made the following materially false and misleading statements:

> [Marc Goodman – UBS – Analyst:]   And third, *in the generics business, just remind us of where we are in this price increase dynamic and how sustainable you feel like those increases are*?  Thanks.

> [Papa:]      I'm going to go to your third part on generics and pricing . . . .  *On the generics and the pricing environment, our team has done a great job at looking at pricing* . . . .

> Across that portfolio we think there are still opportunities to do pricing.  We will continue to look at it.  We think there's something that we'll be talking about in the future for pricing.  But I think it really supports the strength of that operating profit line of 49.5% and what we achieved with our Rx business in the quarter.  And importantly, the gross profit line is 64.8%.  For those reasons, we think we have got a strong Rx business and we look to still find some additional pricing opportunities for the future.

229.   The statements identified in ¶228 were materially false and misleading when made because they omitted that: (a) Perrigo's massive price increases on select drugs in its Generic Rx division were made in collusion with competitors and/or because Perrigo had joined an existing price-fixing conspiracy; (b) the "price increase dynamic" had changed and it had become more difficult to make similarly sized price increases as the generic drug industry faced more scrutiny on pricing and collusion; and (c) the pricing achieved in prior quarters in the Generic Rx division was not the result of a "great job" by Perrigo's team, but rather the result of unlawful and collusive price fixing with other generic drug manufacturers.

230.   On August 13, 2015, Perrigo filed with the SEC its fiscal year 2015 Form 10-K.  The Form 10-K was signed by defendants Papa, Brown, Brlas, Cohen, Fouse, Gibbons, Gottfried, Hoffing, Jandernoa, Kunkle, Morris and O'Connor and falsely stated that the Generic Rx division "operate[d] in a ***highly competitive environment***" and "face[d] ***vigorous competition from other pharmaceutical companies*** that may threaten the commercial acceptance and pricing of our products."

231.   The August 13, 2015 Form 10-K included further false and misleading statements concerning competition in the generic prescription drug market.   For example:

> ***The market for Rx pharmaceuticals is subject to intense competition from other generic drug manufacturers, brand-name***

*pharmaceutical companies launching their own generic version of their branded products (known as an authorized generics), manufacturers of branded drug products that continue to produce those products after patent expirations, and manufacturers of therapeutically similar drugs*.  Among our generic drug manufacturer competitors are Actavis plc, Apotex Corp., Glenmark Generics Inc., Impax Laboratories, Inc., Mylan, Prasco, LLC, Sandoz, Sun Pharmaceuticals, Taro Pharmaceuticals, Teva Pharmaceutical Industries Ltd., Triax Pharmaceuticals, LLC, and Zydus Pharmaceuticals, Inc.

We believe that one of our primary competitive advantages is our ability to introduce difficult to develop and/or manufacture topical and other specialty generic versions to brand-name drug products. Generally, these products are exposed to less competition due to the relatively longer and more expensive development, clinical trial, and approval processes.  In addition, we believe we have a favorable competitive position due primarily to our efficient distribution systems, topical production economies of scale, customer service, and overall reputation.

*       *       *

Many of our customers, which include chain drug stores, wholesalers, distributors, hospital systems, and group purchasing organizations, continue to merge or consolidate.  *Such consolidation has provided and may continue to provide them with additional purchasing leverage, and consequently may increase the pricing pressures we face*.  The emergence of large buying groups representing independent retail pharmacies enable those groups to extract price discounts on our products.  In addition, a number of our customers have instituted sourcing programs limiting the number of suppliers of generic pharmaceutical products carried by that customer.  *These developments have resulted in heightened pricing pressure on our products, as well as competition among generic drug producers for business from a smaller and more selective customer base*.

232.  The statements identified in ¶¶230-231 were materially false and misleading when made because Perrigo's Generic Rx division did not operate in a

"highly competitive environment" or face "vigorous competition" or "intense competition" for many of its key products, but instead operated in an environment where prices had been fixed with other generic drug manufacturers at artificially high prices to garner collusive revenues that would not be possible in a competitive market.

233.   Perrigo's August 13, 2015 Form 10-K also included false and misleading statements concerning Perrigo's ethical behavior and drug prices.  The Form 10-K falsely stated that Perrigo was "committed to doing business in an ethical manner" and was helping "consumers access safe, effective and ***affordable healthcare products***."  To the contrary, Perrigo was engaged in an unlawful and collusive price fixing-scheme that caused drug prices to skyrocket.

234.   On October 22, 2015, Perrigo held a conference call to announce its fiscal 1Q 2015 financial results in which Papa made the following materially false and misleading statements in response to an analyst's question regarding generic drug pricing:

> [Elliot Wilbur – Raymond James – Analyst:]  And then maybe more importantly, obviously financial markets have become very concerned about the price inflation component of growth, both on the generic and brand side going forward.
>
> And certainly the generic topical business has been one of the few segments of [the] generic [industry] that has really benefited from a strong overall pricing dynamic.  And just thinking about 8% to 10% growth next year, how much do you think that is going to be driven by price?

*Or do you think we've kind of hit an inflection point maybe where growth metrics can be far less dependent on price, and maybe we are actually looking at potential negative impact on price going forward in that segment.* Thanks.

[Papa:]   I think, Elliot, you had about three or four things I want to comment on.

\*        \*        \*

On the question on pricing, certainly we see that out in the marketplace, but I would remind the audience today that what we've always said about pricing is that our pricing across our total book of business is . . . flat to up slightly. While there may be a product that we do raise the price on, there are other products we're taking price down.

Our total strategy for pricing, as I have said I think on numerous calls, is to keep pricing flat to up slightly. Which means that yes, some [products] we may attempt to raise prices there, but in other products we're bringing the price down. So think about us as keeping pricing flat to up slightly as really the way we're going to look at our total portfolio.

*Whether we are talking about any specific product or any specific category or any segment of our business, the overall comment is flat to up slightly for our pricing. And I think that's really the best place for the long, sustainable consistent approach to pricing that we've had in the past [and] we will in the future*.

235.   The statements identified in ¶234 were materially false and misleading

when made because: (a) Perrigo's pricing strategy in the Generic Rx division was

not to keep pricing "flat to up slightly," but rather to unlawfully raise prices of select

generic drugs in collusion with competitors and/or join an existing price-fixing

conspiracy; (b) Perrigo's actual generic drug pricing strategy was not a "sustainable

consistent approach"; and (c) the statements omitted that the "strong overall pricing

dynamic" that Perrigo enjoyed in its Generic Rx division, which the analyst had inquired about, was the result of anti-competitive price hikes that could not be replicated on a continuing basis.

236.   On January 5, 2016, Papa attended the Goldman Sachs Healthcare CEOs Conference and made the following materially false and misleading statements:

> [Jami Rubin – Goldman Sachs – Analyst:]  I want to touch upon your generic business because it has performed exceptionally well.  But it also appears, Joe, that **your business has benefited from a very positive pricing environment**.  I think you've acknowledged that.  How much of the growth in your business has been driven by price?  Have we hit an inflection point where growth metrics are going to be far less dependent on price?  And what happens to growth if generic pricing turns negative?  And our analyst Bob Jones is tracking prescription generic drug inflation and noting that it's turning into negative territory.  I don't know how much of that is affecting your business, but I imagine eventually it will.

> [Papa:]  About three or four questions, I'll start with first one.

> [Jami Rubin:]  I'm sorry.

> [Papa:]  Number one, our goal – I've been at Perrigo nine years.  **My goal in pricing has been the same for the nine years: try[ing] to keep my pricing flat to up slightly**.  Now, to be clear, what that means is that I'm taking some products up, and some products can be competition and I'm taking them down.  On balance, what I've tried to – what I strive very hard to achieve is what I would call pricing flat to up slightly.

> Now, within a category like let's use the generic Rx products, there may be more volatility up or down in products.  Certainly there's more [in] generics than there is in my consumer business.  My consumer business has a very minimal volatility.  So that's what I've strived to accomplish.

- 125 -

Is there a place now as we sit here today that there's going to be less pricing?  I think the answer really is – I'm a believer in economic theory.  It all comes down to supply and demand.  In other words, if there are five players, 10 players supplying drug, I could pretty much tell you what the price points are going to be.  It's going to be your cost of goods plus 10%.  It's going to find its way down to that level.

In a case where there's only two players or three players, it's – you are going to make better margins.  And that's why we have purposely tried not to be in the commodity generics but to stay in the extended topicals.

Do I think the point of your question is is there going to be more price competition in even things like dermatology?  Yes, I do because there are some people coming in.

237.   The statements identified in ¶236 were materially false and misleading when made because: (a) Perrigo's pricing strategy in the Generic Rx division was not to keep "pricing flat to up slightly," but rather to unlawfully increase pricing on select generic drugs in collusion with competitors and/or join an existing price-fixing conspiracy; (b) for many of its most important generic drugs, Perrigo did not just raise prices to meet competition, but engaged in coordinated price hikes in collusion with so-called competitors; (c) the additional "price competition" in dermatological drugs referenced by Papa was not simply the result of economic forces caused by new competitors entering the market, but rather the increased scrutiny on anti-competitive practices in the generic drug industry and the increased difficulty of replicating price increases in the face of such scrutiny; and (d) as a result of collusive price fixing, the market in which Perrigo operated, the price of Perrigo's generic drugs, and the Company's market share were not governed by "supply and demand."

238.   On February 18, 2016, Perrigo announced its 4Q 2015 calendar year results and held a conference call in which Papa and Brown made the following materially false and misleading statements:

[Elliot Wilbur:]     Thanks.  Good morning.  I'm sure there will be a lot of question on BCH.  Maybe I'll actually start off and ask a question on the Rx generics segment.  Judy, if you have the numbers available, could you give us a sense of what the full-year contribution was from new products versus decline in the base?  I'm just looking at fourth quarter and it looks like there was about a 10% rate of decline in the base, which maybe seems a little bit higher than average, which leads me into part of my question here.  ***It just seems like at the margin certain segments within the generic area are seeing more pricing erosion, particularly dermatologics.  I'm just wondering how you are thinking about potential head winds there in terms of accelerated pricing erosion in 2016***.  Obviously, it's been a very strong tail wind the past couple of years.  Thanks.

[Papa:]        Judy, why don't you take the first part of it and I'll take that latter part.

[Brown:]     Were you to go through and accumulate the comments we made each quarter throughout calendar 2015 on new products and Rx, new products contributed approximately $121 million over the course of those four quarters.  ***And pricing-wise, we did see some pressure, give or take, in the total portfolio over the course of the year, approximately 1%.***

[Papa:]        And the latter part of your question, it really talks about the pricing dynamics and what we're thinking about and looking at for the future.   And I'd say the following.   Are there some increment[al] product competition that we're going to face?   The answer is yes.  However, what we've tried to do at Perrigo Group is not just stay focused only on dermatology.  As you know, we've moved into what I refer to as extended topicals.  So those are things beyond just certainly dermatology – but respiratory, nasal, ophthalmic.

And with those product categories – for example, at the end of the year, we'll launch our ProAir product in terms of a meter-dosed

inhaler for respiratory – those are the things that are giving us great strength in our Rx category. ***And, as we believe, that will give us a very high gross margin and operating margin, certainly as we think about the 2016 and beyond***. So, we like what we see in terms of our ability to launch these new products and what they mean for gross margins and operating margins.

239.   The statements identified in ¶238 were materially false and misleading when made because they omitted that: (a) generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices in select generic drugs by colluding with other drug manufacturers; and (b) the pricing erosion and "increment[al] product competition" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers and the increased difficulty of replicating price increases in the face of such scrutiny.

240.   On February 25, 2016, Perrigo filed its Form 10-KT for the fiscal six-month stub period ending December 31, 2015.  The Form 10-KT was signed by defendants Papa, Brown, Brlas, Cohen, Coucke, Fouse, Hoffing, Jandernoa, Kunkle, Morris and O'Connor and falsely stated that, as a manufacturer of generic versions of brand-name drugs, Perrigo "operate[d] in a highly competitive environment" and "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of our products."

241.   The February 25, 2016 Form 10-KT included further false and misleading statements concerning competition in the generic prescription drug market.  For example:

> *The market for Rx products is subject to intense competition from other generic drug manufacturers, brand-name pharmaceutical companies launching their own generic version of their branded products (known as an authorized generic), manufacturers of branded drug products that continue to produce those products after patent expirations, and manufacturers of therapeutically similar drugs*.  Among our generic drug manufacturer competitors are Allergan plc, Apotex Corp., Glenmark Generics Inc., Impax Laboratories, Inc., Mylan, Prasco, LLC, Sandoz, Sun Pharmaceuticals, Taro Pharmaceuticals, Teva Pharmaceutical Industries Ltd., Triax Pharmaceuticals, LLC, and Zydus Pharmaceuticals, Inc.

> We believe that one of our primary competitive advantages is our ability to introduce difficult to develop and/or manufacture topical and other specialty generic versions to brand-name drug products. Generally, these products are exposed to less competition due to the relatively longer and more expensive development, clinical trial, and approval processes.  In addition, we believe we have a favorable competitive position due primarily to our efficient distribution systems, topical production economies of scale, customer service, and overall reputation.

> \*       \*       \*

> Many of our customers, which include chain drug stores, wholesalers, distributors, hospital systems, and group purchasing organizations, continue to merge or consolidate.  *Such consolidation has provided, and may continue to provide, customers with additional purchasing leverage, and consequently may increase the pricing pressures we face*.  The emergence of large buying groups representing independent retail pharmacies enable those groups to extract price discounts on our products.  In addition, a number of our customers have instituted sourcing programs limiting the number of suppliers of generic pharmaceutical products carried by that customer.  *These developments have resulted in heightened pricing pressure on our*

*products, as well as competition among generic drug producers for business from a smaller and more selective customer base*.

242.   The Form 10-KT also included false statements concerning Perrigo's purported ethical behavior and drug prices.  The Form 10-KT stated that Perrigo was "***committed to doing business in an ethical manner***" and was helping "consumers access safe, effective and ***affordable*** healthcare products."

243.   The statements identified in ¶¶240-242 were materially false and misleading when made because Perrigo's Generic Rx division did not operate in a "highly competitive environment" or face "vigorous competition" for many of its key products, but instead operated in an environment where generic drug prices had been fixed in collusion with other manufacturers at artificially high prices to garner collusive revenues that would not otherwise be possible in a competitive market.  In addition, rather than "doing business in an ethical manner" and helping to provide access to "affordable healthcare products," Perrigo was engaged in an unlawful and collusive price-fixing scheme that caused drug prices to skyrocket.

244.   On May 12, 2016, Perrigo announced its 1Q 2016 financial results and held a conference call in which Brown made the following materially false and misleading statements:

> Rx net sales increased 2%, which came in below our expectations.  We experienced negative organic growth within the segment resulting from several factors, so let me explain.  The change in the competitive landscape was much more disruptive to our plan than had been anticipated and impacted our overall pricing strategies for the segment.

- 130 -

During the quarter, we experienced 24 competitive launches against our portfolio, producing sharp price erosion in a number of topical products we sell. These factors, combined with continued pricing pressure due to the consolidation of the large buying cooperative groups, and the absence of significant new products in the quarter, further impacted our ability to execute on our planned pricing strategies.

Despite all of this, however, the team was able to maintain its extended topicals leadership position in the quarter. These pricing pressures impacted both the adjusted gross and operating margins, accounting for the decline you see here year-over-year.

*     *     *

[Chris Schott – JPMorgan – Analyst :]  If I could sneak in a quick follow-up on the Rx business. Judy, I'm sorry to re-ask this, but I'm still just not clear exactly why. Why isn't the business seeing more margin erosion, given the competitive dynamics and pricing.

Seems like many of your peers who are seeing pricing competition, that's translating to very steep margin erosion. I'm trying to understand why that isn't the case with Perrigo, and I would think lower price would drive down margins here. Thanks so much.

*     *     *

[Brown:]  And we've had the acquisitions completed at the end of 2015, and beginning of 2016, which has contributed attractive margins to the basket, as well. So on a year-over-year basis, there are pluses and minuses. On a quarter-over-quarter basis, there were the pricing pressures that we spent a lot of time on already this morning, offset in large part from a margin perspective with the acquired products. So the basket's still working. The portfolio, on a margin perspective, is still working well.

245.   The statements identified in ¶244 were materially false and misleading

when made because they omitted that: (a) generic drug pricing had been favorable

in prior years because Perrigo had been able to dramatically raise prices for select

generic drugs by colluding with so-called competitors; and (b) the "sharp price erosion" and "continued pricing pressure" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers and the increased difficulty of replicating price increases in the face of such scrutiny.

246.   On May 16, 2016, Perrigo issued a press release announcing its 1Q 2016 results, in which it made the following materially false and misleading statements: "[T]he Rx segment delivered strong margins in an increasingly challenging pricing and competitive environment," and "[f]irst quarter adjusted operating income of $117 million decreased by 3% compared to the prior year, primarily driven by industry pricing and competitive pressures."

247.   The statements identified in ¶246 were materially false and misleading when made because they omitted that: (a) generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices for select generic drugs by colluding with so-called competitors; and (b) the "increasingly challenging pricing and competitive environment" and "industry pricing and competitive pressures" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers and the increased difficulty of replicating price increases in the face of such scrutiny.

248.   Also on May 16, 2016, the Company filed with the SEC its 1Q 2016 Form 10-Q.  The Form 10-Q was signed by Brown and stated that the Company had experienced "a recent reduction in pricing expectations in our U.S. businesses from historical patterns, in particular in our Rx segment due to industry and competitive pressures in the sector," which it attributed in part to "competition in specific product categories."

249.   Perrigo's 2Q 2016 and 3Q 2016 Forms 10-Q, dated August 10, 2016 and November 10, 2016, respectively, were also signed by Brown and contained statements substantially similar to the statements in ¶248, above.

250.   The statements identified in ¶¶248-249 were materially false and misleading when made because they omitted that: (a) generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices for select generic drugs by colluding with so-called competitors; (b) the "recent reduction in pricing expectations . . . due to industry and competitive pressures in the sector" and the "competition in specific product categories" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers and the increased difficulty of replicating collusive price increases in the face of such scrutiny.

251.   On May 24, 2016, Brown participated in the UBS Global Healthcare Conference and made the following materially false and misleading statements:

[Marc Goodman:]  Switching gears just to the generics business for a second, I'm curious.  Maybe, Judy, you're the right person for this. If we were trying to tease out the difference between the new lower sales guidance, what part of it came from the consortiums getting tougher just in general versus typical product-specific pricing issues that you're just going to have because of competition?  Like, how do we tease that out?  Can you quantify the pricing pressure that's being put on by these consortiums?

[Brown:]  So, of the total guidance change, if you go midpoint to midpoint on our guidance range and you back up into operating income movement as a proxy for the EPS change, over half of that align move came from Rx.

And the majority of that is coming not through operating expenses, but it's coming through the pricing and timing on new products just being adjusted from the original guidance, mostly though pricing related.

So, now, if you're trying to say, of that basket, how much is pressure versus specific pricing initiatives, in some cases, one could say that they're intrinsically linked.  What do I mean?  We saw a dynamic in Q1 of products being launched against us when we didn't have our product launches right at that time.  So, we saw some competitive pressure.  We'll have our products launching later in the year, but we got the pressure at this point and weren't ready with our own launches at that moment.

Now, you start to say: Okay.  Now, we're seeing a different pricing dynamic for the remainder of the year.  We have some price increases slated over the rest of the calendar year.

How do we feel?  Are those really going to happen?  Are we going to have some pressure on being able to execute against that tactical plan in our price increases?  Will there be challenges?  So, is that directly pricing pressure from the consortia, or is it really a situation of indirect?  And is it our own reticence perhaps to be able to execute on those specific actions?

So, they're linked.  So, you think, of the changing guidance, more than half is Rx.  And of those changes, it's linked to the environment.

It's linked to how well we'll be able to execute on those remaining plans because of the environment, as well as some things, the dynamic that happened in Q1 that flows through, obviously, for the rest of the year.

252.   The statements identified in ¶251 were materially false and misleading when made because they omitted that: (a) generic drug pricing had been favorable in prior years because Perrigo had been able to dramatically raise prices for select generic drugs by colluding with so-called competitors; and (b) the "competitive pressure" and "different pricing dynamic for the remainder of the year" were actually the natural result of increased scrutiny by regulators and others into collusion among generic drug manufacturers and the increased difficulty of replicating price increases in the face of such scrutiny.

## B.   Inflated Organic Growth Claims

253.   On May 7, 2014, during Perrigo's fiscal 3Q 2014 earnings conference call with analysts, defendants misleadingly told investors that Perrigo would achieve 5% to 10% revenue growth and 10% to 20% operational income growth in fiscal 2015.   In response to an analyst question asking if the analysts' models should be changed, Papa stated:

> As we've said in our February analyst day, ***we expect to be able to grow the top line in this business by somewhere in that 5% to 10% range and then that's organic growth.   And then to grow the operating income line approximately double that range from a growth rate for both those numbers***.   So, 5% to 10% growth rate over a three year time period per year, and then approximately double that on the operating income line.

254.   Immediately following Papa's statement, Brown reiterated the growth rate and assured investors that the Company had looked at this very closely.  Brown confirmed, "*[y]ou will probably never meet a more self-aware and hard-on-themselves team as this one, and we've obviously looked at these numbers very carefully* as we talk about finishing up the rest of the year and the run rates going into next year."

255.   Defendants made similar organic growth rate assurances on August 14, 2014, during the Company's fiscal 4Q 2014 earnings conference call.  On the call, Brown informed investors:

> We're not commenting specifically on what we put into our forecast for specialty science revenue, but suffice it to say, the remainder, as you're backing into that, still implies a growth rate of our overall business in that five-year CAGR range, or three-year CAGR range.  *Remember, our three-year CAGRs, we've said, are between 5% and 10% top-line revenue growth*.

256.   On November 06, 2014, Perrigo held a conference call to discuss its fiscal 1Q 2015 earnings and announce the Omega acquisition.   During the conference call, Papa reassured investors that "[w]e continue to believe that the organic growth rate of the Perrigo Company will be somewhere in that 5% to 10% top line growth rate.  And then opportunity to potentially double that growth rate to 10% to 20% on the operating income and EPS line for the core business that we have at Perrigo."

257.   The statements identified in ¶¶253-256 were false and misleading when made because: (a) Perrigo's organic growth was not consistent and was trending downward; (b) the statements omitted that the growth included revenue from unlawful and collusive pricing of Perrigo's generic prescription drugs; and (c) the statements omitted that the revenue included income from the Tysabri royalty stream in violation of GAAP.

258.   In response to Mylan's public announcement that it intended to purchase Perrigo for cash and stock worth $205 for each Perrigo share, on April 21, 2015, Perrigo and the Director Defendants issued a press release stating, *inter alia*, that:

> Following a thorough review, advised by its financial and legal advisors, the Board unanimously concluded that the Proposal substantially undervalues the Company and its future growth prospects and is not in the best interests of Perrigo's shareholders.
>
> Key factors informing the Board's determination include:
>
> • The Proposal substantially undervalues Perrigo's differentiated global business, including the Company's leading market position in key franchises, global distribution platform, and proven expertise in product development and supply chain management;
>
> • ***The Proposal would deny Perrigo shareholders the full benefits of Perrigo's durable competitive position and compelling growth strategy, which is reflected in the Company's three-year organic net sales compound annual growth rate (CAGR) goal for calendar 2014 to 2017 of 5-10%***;
>
> *       *       *

Joseph C. Papa, Chairman, President and CEO, said, "***The Board believes the Proposal substantially undervalues Perrigo and its growth prospects and that continued execution by the management team against our global growth strategy will deliver superior shareholder value. Perrigo has a long history of driving above market shareholder value through consistent growth with a focus on profitability and operational excellence, which is reflected in our organic net sales CAGR goal of 5-10% for the next three years. . . . We will continue to capitalize on our durable competitive position by expanding our international platform organically and through future synergistic deals. These actions will advance our leadership in the global OTC marketplace***.***"***

259. The statements identified in ¶258 were materially false and misleading when made because: (a) Perrigo's organic growth was not "consistent"; (b) contrary to Irish Takeover Rules, the Director Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and [did] not omit anything likely to affect the import of such information" and, as a result, the press release did omit material facts; (c) the statements omitted that Omega management modeled Omega's long-term organic growth to be substantially below the 5% to 10% range referenced in the press release; (d) the statements omitted that the growth that Perrigo was able to achieve was derived to a material extent from unlawful, collusive pricing that inflated revenues in Perrigo's Generic Rx division; (e) the statements omitted that the revenue growth included improperly accounting for income from the Tysabri royalty stream as revenue in violation of GAAP; (f) the statements omitted that the Company had failed to integrate Omega operationally, a failure that would

compromise the organic growth figures defendants touted to investors; and (g) the statements omitted that certain of Perrigo's key synergy assumptions for the Omega acquisition were unproven and unlikely to materialize, which would negate the cost savings and growth projections defendants were touting to investors.

260.   Also on April 21, 2015, defendants made a presentation to investors attempting to justify their rejection of the lucrative Mylan offer.   During the presentation, Papa (on behalf of all of the Director Defendants) stated as follows:

> Simply put, the Board believes that continued execution by the management team against our existing global growth strategy will deliver a superior shareholder value.  *Perrigo has a long history of driving shareholder value through consistent, above-market growth, and we are exceptionally well positioned to continue to deliver superior growth and shareholder value as we build our strong independent future*.
>
> \*     \*     \*
>
> We're just back from the board meeting in Ireland and I'm thrilled to talk to you about our future growth prospects, *which gives me great confidence that our strong durable base will enable us to achieve our goal to grow our net sales by 5% to 10% into the future*. We continue to grow at this rate on a significantly bigger base, but there is a significant potential upside not included in the CAGR goal.  *To reiterate this, our growth goal is purely organic.  We have historically delivered a balanced mix of organic and inorganic growth, which we expect to continue into the future*.  We also see substantial upside for Perrigo on the horizon over and above this three-year goal.
>
> \*     \*     \*
>
> It's a very exciting chapter in the Perrigo growth story.  We built a tremendous platform for growth and value creation and our pipeline is stronger than ever.   Plus, we are positioned to benefit from clear demographic trends and the movement of products from Rx to OTC.

Plus, *we have just completed the Omega acquisition, which among other major benefits, provides a significantly enhanced international platform for additional growth*.

261.   The statements identified in ¶260 were materially false and misleading when made because: (a) Perrigo was not "exceptionally well positioned to continue to deliver superior growth"; (b) Perrigo did not have a "strong durable base" capable of delivering 5% to 10% "purely organic" growth; (c) the Omega acquisition did not "significantly enhance[]" Perrigo's claimed organic growth rates; (d) Perrigo's growth prospects and competitive position were not accurately described and the Director Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and [did] not omit anything likely to affect the import of such information"; (e) the statements omitted that Omega management had modeled Omega's long-term organic growth to be substantially below the 5% to 10% range referenced in the statement; (f) the statements omitted that the growth that Perrigo was able to achieve was derived to a material extent from unlawful, collusive pricing that inflated revenues in Perrigo's Generic Rx division; (g) the statements  omitted that the Company had failed to integrate Omega operationally, a failure that would compromise the organic growth figures defendants touted to investors; and (h) the statements omitted that certain of Perrigo's key synergy assumptions for the Omega

acquisition were unproven and unlikely to materialize, which would negate the cost savings and growth projections defendants were touting to investors.

262.   During the April 21, 2015 investor presentation, Brown utilized slides claiming (in relevant part) to establish Perrigo's "Proven Financial Track Record," "proven history of meeting [its] goals," and "ability to keep delivering":



## Proven Financial Track Record

A proven history of meeting our goals...

| | Fiscal Year 2011-2014 3YR CAGR* (Organic Net Sales) | Organic Net Sales CAGR Goal**⁺ | |
|---|---|---|---|
| | | Low | High |
| CHC Segment | ✅ 6% | 5% | 10% |
| Rx Segment | ✅ 22% | 8% | 12% |
| Nutritionals Segment | ❌ 3% | 5% | 10% |
| Consolidated Perrigo | ✅ 7% | 5% | 10% |

*Perrigo excluding acquisitions post FY10
**See Appendix for reconciliation of non-GAAP measures to GAAP
⁺ Per February 28, 2014 Analyst Day

9

Brown, on behalf of Perrigo and the Director Defendants, stated:

> ***The durability of our diverse product portfolio is clearly evident as our consolidated result is solidly in the range.  We have met our consolidated organic only goals in the past and fully intend to do so in the future.***  Looking forward, our goal is to once again deliver an organic net sales CAGR for the next three years in the 5% to 10% range, while off a significantly larger base.

263.   The statements identified in ¶262 were materially false and misleading when made because: (a) Perrigo did not have the "ability to keep delivering" organic net sales growth of 5% to 10% and had not had that ability for several quarters; (b) the information presented in these slides and defendant Brown's discussion of growth was not "in accordance of the facts" as the Director Defendants had promised, and the presentation *did* omit material facts "likely to affect the import of such information" presented; (c) the presentation omitted that Perrigo was improperly including as revenue income from the Tysabri royalty stream and revenue from the sale of generic drugs involved in collusive price-fixing schemes.

264.   On May 6, 2015, Papa attended the Deutsche Bank Health Care Conference and stated the following:

> We believe we have a business that will grow 5% to 10%, organically. So *we believe we can grow revenue 5% to 10% organically in our base business*.
>
> *       *       *
>
> But the final point I guess I want to make is that in the meantime, the Perrigo Company is, number one, going to continue to execute on our base business.  *We think we can execute as we've said, with the 5% to 10% compound annual growth rate over the three years organically*.
>
> *       *       *
>
> What we've always said is what's most important for us is to continue to execute on our business, show that 5% to 10% compound annual growth rate.

Historically, what we've been able to do is actually we've done right in the middle that we've done about 8% compound annual growth rate organically. And then we've supplemented that with another approximately 7-8% of inorganic opportunity. Those are the things we're going to continue to do. And that's why I think the Board was very comfortable in stating that we felt the Mylan offer substantially undervalues the Company.

265. On May 12, 2015, Papa attended the Bank of America Merrill Lynch Health Care Conference and stated:

I think the biggest challenge we have right now is that we just don't see the offer that's on the table as being equivalent to what we think the value of the Perrigo Company is. So we think it substantially undervalues the Company.

*Given that, what's incumbent upon on me and the Board of the Company and the executive committee is make sure we continue to focus on driving the business, making sure that we continue to deliver on the 5% to 10% compound annual growth rate, continue to deliver on really the bottom line*.

266. On June 2, 2015, Papa attended the Jefferies Global Health Care Conference, stating: "[H]istorically, Perrigo has grown by about 5% to 10% annually. Specifically we've grown about 8% organically. And we've grown about 8% inorganically on an annual basis."

267. The statements identified in ¶¶264-266 were materially false and misleading when made because: (a) they omitted that Perrigo's actual average organic growth was far below 5% to 10%; (b) they omitted that Perrigo's growth included generic drug price increases that were the result of unlawful and collusive price fixing; (c) they omitted that Perrigo's top line growth included improperly

- 143 -

accounting for Tysabri royalty payments as revenue in violation of GAAP; and (d) they omitted that at the time of the statements, Perrigo was *failing* to achieve organic growth goals, and therefore "continu[ing] to execute" at the current rate would necessarily mean missing the growth targets touted to investors as a reason to reject Mylan's lucrative takeover offer.

268.   On August 5, 2015, Perrigo issued a press release announcing its earnings for fiscal 4Q 2015.  Like other releases during the Mylan offer period, the August 5, 2015 press release stated: "The directors of Perrigo accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."  The press release quoted defendant Papa as stating: "Our durable business model and future growth prospects are self-evident as we continue to progress on our stand-alone strategy."

269.   On August 6, 2015, in conjunction with the presentation of Perrigo's financial results for the 4Q 2015 calendar year, defendants made a presentation to investors that claimed they had a "[c]lear strategy for delivering 5%-10% organic growth" as well as "[m]ultiple avenues for additional upside."  This presentation also assured investors: "The directors of Perrigo accept responsibility for the information

contained in this presentation.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."

270.  The statements identified in ¶¶268-269 were materially false and misleading when made because: (a) Perrigo's purportedly "self-evident" future growth was based on unachievable assumptions and was greatly exaggerated; (b) Perrigo's growth prospects and competitive position were not accurately described and the Director Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and [did] not omit anything likely to affect the import of such information" and, as a result, Perrigo's press release *did* omit material facts; (c) the statements omitted that the growth that Perrigo was able to achieve was derived to a material extent from unlawful, collusive pricing that inflated revenues in Perrigo's Generic Rx division; (d) the statements omitted that the Company had failed to integrate Omega operationally, a failure that would compromise the organic growth figures defendants touted to investors; and (e) the statements omitted that certain of Perrigo's key synergy assumptions for the Omega acquisition were unproven and unlikely to materialize, which would negate the cost savings and growth projections defendants were touting to investors.

271.   In its August 13, 2015 Form 10-K filed with the SEC and signed by defendants Papa, Brown, Brlas, Cohen, Fouse, Gibbons, Gottfried, Hoffing, Jandernoa, Kunkle, Morris and O'Connor, Perrigo stated that its "organic growth has been driven by a series of successful new product launches in the CHC and Rx Pharmaceuticals segments."

272.   The statement identified in ¶271 was false and misleading when made because: (a) the statement omitted that unlawful and collusive drug pricing was driving growth in the generic prescription drug unit; and (b) the statement omitted that income from the Tysabri royalty stream was improperly accounted for as revenue in violation of GAAP.

273.   On August 28, 2015, Perrigo filed a Schedule 14D-9 with the SEC, which was subject to the Irish Takeover Rules, that attached a press release encouraging shareholders to reject Mylan's offers.  The press release included the following false and misleading statement:

> Mr. Papa continued, "Perrigo's experienced management team has an outstanding record for creating value, generating total shareholder return of more than 970 percent since 2007.  We remain focused on our 'Base Plus Plus Plus' growth strategy – realizing an organic net sales CAGR goal of 5-10% over the next three years, compelling upside from $29 billion in prescription to OTC switches, attractive M&A opportunities that we believe will have a multiplier effect on earnings and cash flow generation, and sizable potential new indications for Tysabri®.  The entire Perrigo Board and management team are confident that, through continued successful execution of this growth strategy, and considering other opportunities that may be available to us over time, we will continue to create superior value well

in excess of Mylan's offer, and with less risk.  We are confident that the majority of Perrigo shareholders will not tender their shares to Mylan."

(Footnote omitted.)

274.   On September 17, 2015, Perrigo and Papa issued a letter urging shareholders to reject Mylan's offer.  The letter was also filed with the SEC on Schedule 14D-9 and stated, among other things:

> Our Board of Directors has repeatedly rejected Mylan's offer because it substantially undervalues our company and does not adequately compensate shareholders for our exceptional standalone growth prospects. . . .
>
> Mylan's offer not only fails to reflect Perrigo's outstanding track record of value creation, it also undervalues our compelling prospects for continued growth and sustainable, long-term shareholder value through the execution of our 'Base Plus Plus Plus' strategy:
>
> • Base: We expect our durable global base business, with consumer-facing products comprising approximately 75% of net sales, coupled with $1 billion in new product launches over the next three years (not including additional launches from the Branded Consumer Healthcare segment), to realize an organic net sales compound annual growth rate ("CAGR") goal of 5-10%;
>
> \*     \*     \*
>
> • Plus: Additional upside from Tysabri® through an increasing royalty rate associated with potential new indications for additional treatments.
>
> After consideration of Mylan's offer, our Board of Directors unanimously concluded that the offer substantially undervalues the strength of Perrigo's business, operations, and future growth opportunities.  ***We are confident in our 5-10% three-year organic revenue CAGR goal, as executed historically, and we expect to meet***

*our financial targets in the years to come, creating value for you well in excess of Mylan's offer, and with less risk*.

\*     \*     \*

The Perrigo Board unanimously believes that Mylan's offer substantially undervalues the Company's current cash flows, business and financial platforms and future growth opportunities.

(Original emphasis omitted.)  The SEC filing further explained Perrigo's reason for

rejecting Mylan's above-market offer as follows:

• ***Perrigo has demonstrated a reliable ability to grow organically***.  Perrigo has grown organic net sales at a 6% CAGR since fiscal 2008, and the Perrigo Board expects that by continuing its leading market position, Perrigo's durable global base business will continue this trend and realize an organic net sales CAGR goal of 5-10% over the next three years.

An appendix to the filing stated:

1. RESPONSIBILITY

1.1.  ***The Directors of Perrigo, whose names are set out in paragraph 2 below, accept responsibility for the information contained in this document***, save that the only responsibility accepted by the Directors of Perrigo in respect of the information in this document relating to Mylan, the Mylan group, the board of directors of Mylan and the persons connected with them, which has been compiled from published sources, has been to ensure that such information has been correctly and fairly reproduced or presented (and no steps have been taken by the Directors of Perrigo to verify this information).  ***To the best of the knowledge and belief of the Directors of Perrigo (having taken all reasonable care to ensure that such is the case), the information contained in this document for which they accept responsibility is in accordance with the facts and does not omit anything likely to affect the import of such information***.

275.   The statements identified in ¶¶273-274 were materially false and misleading when made because: (a) the rejection of Mylan's offer urged by defendants increased, not reduced, risk, as it encouraged investors to squander an offer at a significant premium to Perrigo's market price at the time; (b) Perrigo's growth prospects and competitive position were not accurately described and the Director Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and [did] not omit anything likely to affect the import of such information"; (c) the statements omitted that Perrigo's actual organic growth rate was well below the referenced 5% to 10% range; and (d) the statements omitted that organic growth was threatened by known impediments to the Omega integration and by the increasing difficulty of replicating supracompetitive price hikes in the Generic Rx division.

276.   Also on September 17, 2015, Papa attended the Morgan Stanley Global Healthcare Conference and stated:

> **We try to focus on quality affordable healthcare.  And for us that's been a big driver of our average growth rate of somewhere around 5% to 10% organic.**
>
> *          *          *
>
> **Our goal is to continue [to] drive organically 5% to 10% growth rate**.  On top of that, we'll look to do additional M&A to get another 5% to 10%.  So that the revenue side will grow, and that, let's call it, 10% plus and then grow the bottom line even faster.

That's how we've structured the business.  And that's why we think we've got a great opportunity for the future.

277.   The statements identified in ¶276 were materially false and misleading when made because they omitted: (a) that Perrigo's actual organic growth rate was well below the referenced 5% to 10% range; (b) that organic growth was threatened by known impediments to the Omega integration and by the increasing difficulty of replicating supracompetitive price hikes in the Generic Rx division; and (c) that the organic growth rate was fueled by unlawful, collusive price fixing in Perrigo's Generic Rx division, the opposite of "affordable healthcare."

278.   On October 22, 2015, defendants amplified their misrepresentations regarding organic growth and issued materially false and misleading profit forecasts for both 2015 and 2016.  After issuing 3Q calendar year financial results, defendants projected that Perrigo would earn $7.65 to $7.85 per share for calendar year 2015, and that in 2016 it would "Accelerat[e] Shareholder Value" and "Amplify[] Perrigo's Earnings Power," delivering a baseline earnings per share of $9.30, increasing to $9.83 including the effects of a planned share repurchase and "[o]ptimization [a]ctions."  To reach these lofty goals, Perrigo issued "CY2016 Revenue Guidance" incorporating organic growth assumptions of 5% to 10% overall, 5% to 10% in branded healthcare (formerly Omega), and 8% to 12% in Generic Rx.

279.   Perrigo and the Director Defendants stated as follows with respect to the October 22, 2015 investor presentation: "The directors of Perrigo accept responsibility for the information contained in this presentation. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information." Additionally, Perrigo and the Director Defendants indicated that the guidance for calendar years 2015 and 2016 constituted "profit forecasts" under Rule 28.1 of the Irish Takeover Rules. This statement was intended to, and did, assure investors that the Company had compiled the profit forecasts and "the assumptions upon which [they were] based" using "*scrupulous care, accuracy and objectivity by the directors*," as Irish Takeover Rule 28.1 requires.

280.   On November 3, 2015, Perrigo filed with the SEC Amendment No. 6 to the 14D-9. The filing included a letter to shareholders from Papa pursuant to the Irish Takeover Rules. The letter made assurances about Perrigo's growth, including the following:

> This positive outlook reflects our clear "Base Plus Plus Plus" strategy to deliver top line growth and includes specific actions we are taking to accelerate shareholder value by maximizing efficiency and productivity, and further leveraging the strength of the durable global platform we have built. These actions will supercharge our earnings power and ensure that we maximize the benefits of our global platform to drive continued growth and superior shareholder value. Our business is uniquely positioned, more so than ever before – through our durable

consumer-facing base, our global platform, and significant upside from future OTC switches – to continue our history of producing compelling growth and value.

281.   In a separate letter to investors required by Irish Takeover Rule 28.1, Perrigo and the Director Defendants identified the assumptions they employed to calculate the 2015 and 2016 profit forecasts:

Assumptions

The Perrigo Directors have prepared the Profit Forecast on the basis of the following assumptions:

Factors outside the influence or control of the Perrigo Directors

- There will be no changes in regulation which would impact the Company's ability to price prescription products.

- ***There will be no changes in general trading conditions, economic conditions, competitive environment or levels of demand, in the countries in which Perrigo operates or trades which would materially affect Perrigo's business***.

- ***There will be no business interruptions that materially affect Perrigo***, its major suppliers or major customers by reason of technological faults, natural disasters, industrial disruption, civil disturbance or government action.

- There will be no material changes in the price of raw materials, freight, energy, and labor costs from the prices and costs in place at the date of this profit forecast.

- There will be no material changes in exchange rates, interest rates, bases and rates of taxes, and legislative or regulatory requirements which would have a material impact on Perrigo.

- There will be no material adverse events that affect Perrigo's key products, including, competition from new generic variants, product recalls, product liability claims or discovery of previously unknown side effects.

Other than the impact of the factors above, the Profit Forecast assumes the following factors within the Directors Influence and Control

- Fourth quarter 2015 net sales for the CHC, BCH, Rx and Specialty Sciences segments are assumed to grow in line with the growth rates achieved 2015 year-to-date.

- The 2016 net sales for CHC, BCH and Rx segments are forecasted to grow organically in the middle of the three year compounded annual growth rate ranges published and disclosed to investors in the October 22, 2015 earnings release presentation. *The ranges published and disclosed in April 2015 forecasted compounded annual growth of 5%-10% for the CHC and BCH segments and 8%-12% for the Rx segment*.

- *The integration and realization of synergies in relation to the acquisition of, Omega Pharma, certain branded consumer healthcare products from GSK, and Yokebe will proceed as planned and will not be subject to unforeseen material delays.*

- The forecast only includes those acquisitions closed or announced on or prior to October 22, 2015 and does not include any additional acquisitions, dispositions, partnerships, in-license transactions, or any changes to Perrigo's existing capital structure or business model after October 22, 2015.

- Adjusted operating margin is forecasted to remain consistent in 2016 when compared to 2015 and average -28% of net sales.

- Interest rates underlying Perrigo's variable rate debt instruments will not vary significantly from the spot rates in effect as of October 22, 2015.

- The announced restructuring activities will proceed as planned and will not be subject to unforeseen material delays.

- The adjusted effective tax rate for the year ended December 31, 2016 is estimated at 14%-15% assuming a jurisdictional mix of incomes in line with the Company's current operations and the implementation of the actions announced on October 22, 2015.

- • Other than the Share Buyback Program, there will be no material share repurchases, or issuances, in determining weighted average number of diluted shares.

282. On November 10, 2015, Perrigo filed its eighth and final Schedule 14D-9 amendment. The press release attached was issued pursuant to Irish Takeover Rules and included the following false and misleading statements about Perrigo's value and growth: Mylan's "grossly inadequate offer does not even remotely reflect the value of the terrific growth company Perrigo shareholders own," and "[w]e urge you to focus on the incredible value creation that lies ahead for Perrigo and its shareholders with Perrigo remaining as a standalone company."

283. The statements identified in ¶¶278-282 were materially false and misleading when made because: (a) Perrigo's growth prospects and competitive position were not accurately described and the Director Defendants had not "taken all reasonable care" to ensure that their characterizations of Perrigo's growth and competitive position were "in accordance with the facts and [did] not omit anything likely to affect the import of such information"; (b) Perrigo's profit forecasts for calendar years 2015 and 2016 were not prepared with "scrupulous care, accuracy and objectivity"; (c) the assumptions underpinning Perrigo's profit forecasts for calendar years 2015 and 2016 were not prepared with "scrupulous care, accuracy and objectivity," especially the assumptions regarding 2016 organic net sales growth, an unchanged "competitive environment," and that the Omega integration

and synergies "will proceed as planned"; (d) the statements omitted that Perrigo's actual organic growth rate was well below the range of 5% to 10% issued as guidance for 2016; (e) the statements omitted that Perrigo's "competitive environment" was already changing, as the anti-competitive pricing activities used to boost its overall income and the results of its Generic Rx division were already coming under scrutiny; (f) the profit forecasts improperly included revenue from the Tysabri royalty stream in violation of GAAP; and (g) the profit forecast included revenue from unlawful and collusive price fixing in Perrigo's Generic Rx segment.

284.    On January 11, 2016, Perrigo issued a press release increasing its 2016 earnings per share guidance to a range of $9.50 to $10.10, to adjust for share repurchases announced during the Mylan offer period and for two accretive acquisitions that Perrigo closed in December 2015.  Papa stated:

> "We enter 2016 excited about the prospects for our durable business model and plan for growth.  We expect to launch greater than $1.2 billion in new products over the next three years, including products on our European branded platform.  We have the deepest Rx pipeline in our history and are excited about the quality of our M&A pipeline.  For these reasons, *we remain confident in our ability to deliver on our 2016 growth targets*."

285.    The statements identified in ¶284 were materially false and misleading when made because they omitted: (a) that Perrigo's "growth targets" had been prepared using assumptions of organic growth that Perrigo had failed to meet; (b) that the competitive environment was already changing in the division

contributing more than any other to Perrigo's bottom line, Generic Rx, as regulators and private litigants began to focus on the anti-competitive activities used to inflate results in that division; and (c) that the earnings per share forecast failed to properly account for the deterioration in the fair value of Perrigo's largest financial asset, the Tysabri royalty stream, or the effect of fair value mark-to-market charges on Perrigo's earnings.

286.   On February 25, 2016, Perrigo filed its Form 10-KT with the SEC.  The Form 10-KT was signed by defendants Papa, Brown, Brlas, Cohen, Coucke, Fouse, Hoffing, Jandernoa, Kunkle, Morris and O'Connor and stated: "[O]ur organic growth has been and will continue to be driven by successful new product launches in the CHC, BCH, and Rx segments."

287.   The statement identified in ¶286 was false and misleading when made because it omitted that Perrigo's organic growth was supported by the Company's unlawful and collusive generic drug price fixing and included improperly recognized revenue from the Tysabri royalty stream in violation of GAAP.

## C.   Omega Integration and Overvaluation

288.   Subsequent to the November 6, 2014 announcement that Perrigo would acquire Omega, defendants falsely touted the synergies that the combined company would create and the purported seamless integration process.   During the November 6, 2014 Perrigo conference call announcing the acquisition, Papa

informed investors that "[o]ne of the real keys to this transaction is the immediate scale and broadened footprint this combination provides."  Papa assured investors that "there is a competitive fit of Omega within Perrigo through the company's combined geographic diversity and scale."

289.   During the same November 6, 2014 conference call, defendants also predicted wide ranging synergies.  Papa stated, "[t]here are opportunities to generate top line synergies by driving products from both companies through complementary US and European commercial channels.  Further, with the application of the supply chain excellence across Omega's footprint, *we expect to drive additionally [sic] efficiency and operational synergies through the combined organization*."  Papa went on to explain the operational efficiencies the acquisition would create:

> On the operational side, we are excited by the many opportunities to deliver our world-class supply chain and operational expertise to Omega's existing operations.  As you see, *we are well on our way to identifying multiple opportunities to leverage our increased scale and drive more volume through our efficient manufacturing base*.

290.   During the conference call an analyst asked a specific question about cost synergies and Papa responded as follows:

> [Randall Stanicky – RBC Capital – Analyst:]  And then Omega had a lot of externally sourced products.  I think there's an opportunity for you guys, at least over time, to bring a lot of that source internal.  So how big of an opportunity is that?  Could you quantify it and over what time period?
>
> [Papa:]  Sure.  Great question, and I think that's another area of opportunity for us to be absolutely clear.  The business that Omega

has – is much of it or the majority of it, is outsourced.  So much of the business does come from outside manufacturers.

*We do believe that there are opportunities to take some of those products inside into the Perrigo manufacturing network and supply chain and procurement savings*.  So I do think there is [sic] opportunities there that we are excited about.

And that is another reason why we believe one plus one equals three or more.  So no question about that.  *There is [sic] clearly supply chain opportunities in bringing our operational excellence approach to the business*.

291.   Papa  repeated  his  cost  efficiencies  statement  during  the  same

conference call:

The way I look at this is that one of the strengths that the Perrigo organization brings to this transaction is a very efficient supply chain for procurement and manufacturing efficiency.

We certainly will not attempt to bring every product inside.  *But there will be opportunities for us to lower cost of goods, lower the Omega cost of goods by putting those products into the Perrigo very efficient supply chain*.

Knowing  that  we  are  one  of  the  world's  largest  OTC manufacturers when it comes to actually [sic] procurement of raw materials. *Those raw materials that are appropriate for the US market are also very appropriate for the European market*.

*So  there  clearly  will  be  procurement  synergies* that  we  will experience as a result of bringing some of those products inside.

292.   Defendants  continued  to  make  false  and  misleading  statements  to

investors  concerning  the  Omega  acquisition  at  the  January 12, 2015  JPMorgan

Healthcare Conference.  Papa told investors the following:

*Obviously,  we  believe  it's  financially  accretive,  immediately accretive from day one, and also $1.7 billion in revenue that will add*

*to the Perrigo portfolio of products opportunities. And clearly we also think there are some cost synergies*.  One of the things that Perrigo does very well is manufacture – operational excellence in our facility, we make about 50 billion tablets every year, every second of every day, somewhere in the world 1,600 people [are] taking a Perrigo product. When we take that efficiency and bring [it] into the Omega organization, where about 80% of their products are outsourced, where someone else is making it, we think that also will drive cost synergy for the Omega organization.

293.   The statements identified in ¶¶288-292 were materially false and misleading when made because: (a) they omitted that there were serious impediments to the Omega integration, including technological disparities, the decentralized structure of Omega, management resistance and regulatory hurdles; (b) they omitted that several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey; and (c) Omega was not "accretive" to Perrigo's claimed organic growth rate.

294.   In the April 21, 2015 investor presentation discussed above, Perrigo and the Director Defendants assured investors that the Omega acquisition "is accretive to Perrigo's organic growth profile, and creates additional value derived from synergies and increased global scale."  Presentation slides explained that the "directors of Perrigo accept responsibility for the information contained in this presentation.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case) *the information contained in this presentation is in accordance with the facts and does not omit*

*anything likely to affect the import of such information*."  During the associated conference call, Papa also confirmed that Omega and Perrigo were already working on establishing synergies, stating:

> At Omega, we feel very good about the opportunity with Omega and specifically what I would refer to and we've talked about in the past about revenue synergies.  We do believe that there are revenue synergies with the product portfolio that we have at Perrigo as we bring the 3,000 Perrigo products and help to bring them to Omega and look for ways that we could do line extensions of existing Omega brands.  *That's something that we have teams underway already from an integration process.  Those teams are very active in looking at which ones are the best ones to do, the earliest ones to do and move that forward.  We do believe that that will allow us with the Omega portfolio to be in that 5% to 10% compound annual growth rate.  Obviously, the more success we have with Omega, the more it would help us to be at the higher end of that from the revenue synergies point of view.*

295.   In response to an analyst question during the April 21, 2015 investor presentation, Papa provided an update on the integration of the two companies, stating:

> [David Risinger – Morgan Stanley – Analyst:]  Many of my questions have been asked. I just wanted to ask about Omega though. So, I was hoping that you might be able to characterize the recent organic growth of Omega.  Obviously, we don't have access to that. And also maybe discuss what you're assuming for Omega organic growth ex-currency over the next three quarters that's baked into your guidance for 2015?  I just want to get a sense for the momentum of that business on a stand-alone basis.
>
> [Papa:]  Sure.  Well, I will start with Omega.  *We're very pleased with our initial integration projects with Omega, so there is [sic] a lot of good activities happening with the integration team*.  I'd say it's focused on both driving that topline numbers to put your question but

it's also focused on improving the cost of goods sold. We've got a supply chain team already working with them to drive the bottom line results as well. ***As I talk about the growth of Omega from a historical point of view moving into the future, it has been accretive to our growth rate***. So, we're excited about that.

296. The statements identified in ¶¶294-295 were materially false and misleading when made because: (a) the Director Defendants had not "taken all reasonable care" to ensure that the characterization of Omega's organic growth prospects, synergies and integration was "in accordance with the facts and [did] not omit anything likely to affect the import of such information" and, as a result, the presentation did omit material facts; (b) Omega was not "accretive" to Perrigo's claimed organic growth rate; (c) the presentation failed to disclose serious impediments to integration, including technological disparities, the decentralized structure of Omega, management resistance and regulatory hurdles; and (d) the presentation omitted that several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey.

297. On May 6, 2015, in response to an analyst's request for "highlights . . . about Omega," defendant Papa described "tremendous revenue synergies" generated, in part, through substituting Omega's outsourced manufacturing for Perrigo's in-house manufacturing capabilities. According to Papa:

> [O]ne of the things Omega did really well was sales marketing. One of the things they, by their own admission, say they were not focused on was the supply chain and manufacturing. We think we can help them

tremendously with that.  We've already got over 20 projects, identified staff to lower the cost of goods of the Omega product.

I remind you that 79% of what Omega sells today, they outsource.  Some of those products we can bring into a Perrigo facility or an Omega facility with our expertise, and lower the cost of goods by 30-40%, which *will absolutely add to the bottom line of Omega and Perrigo*.

298.   The statements identified in ¶297 were materially false and misleading when made because they omitted: (a) that EU regulatory hurdles would not allow Perrigo to simply transfer the 79% of supply outsourced by Omega to Perrigo's U.S.-based manufacturing facilities and that Omega lacked the manufacturing facilities to satisfy this supply; and (b) there were already serious, known impediments to the Omega integration, including technological disparities, the decentralized structure of Omega and management resistance, which undermined the synergies projected by Papa.

299.   On June 2, 2015, defendants Perrigo, Papa, Brown and Coucke held a conference call for analysts and investors, in which Coucke stated with respect to Omega:

*[W]e have achieved the success we see today through our unique and disciplined approach, and under the leadership of an exceptional management team that we have built here at Omega Pharma*.  Over the last three years as a private company, Omega Pharma has optimized its commercial infrastructure to deliver superior results.

First of all, we hired best-in-class management and a consumer-centric sales and marketing team with extensive OTC experience. Secondly, we streamlined the operations and we instituted an efficient

management structure with real, efficient, direct, short reporting lines between Omega Pharma leadership team and country management.

300.   The statements identified in ¶299 were materially false and misleading when made because: (a) Omega did not have an "exceptional management team" or "best-in-class management"; (b) Omega had not "optimized its commercial infrastructure"; (c) Omega had not already "streamlined the operations and . . . instituted an efficient management structure," but instead required thorough restructuring; (d) defendants failed to disclose serious impediments to integration, including technological disparities, the decentralized structure of Omega, management resistance and regulatory hurdles; and (e) defendants omitted that several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey.

301.   On June 23, 2015, Brown attended the Oppenheimer Consumer Conference and stated as follows in response to an analyst question regarding the Omega integration:

> I'm happy to talk about Omega.   So Omega pharmaceuticals, a company that grew dramatically.   Started in the mid-1990s by its founder who was a pharmacist and thought that there was a niche potential in the European over-the-counter pharma market of product lines that were potentially not being well served by big pharma, and continued to acquire small brands and build them together over the course of many years.

> Bought many smaller companies.   Built them together, created infrastructure, which . . . made the asset incredibly appealing for us at Perrigo [as] we had aspirations of growing internationally, but didn't

have a distribution footprint.  So as I mentioned earlier, part of the strength of our business model in the US is that we have a truck rolling to pretty much every chain store, every large grocery store in the United States.  We can reach everyone and we reach them almost on a daily basis.

We did not have infrastructure in Europe, but many, many hundreds of products that we eventually could sell if we had the infrastructure upon which to sell it.  Omega gave us that.  [Thirty-five] countries in Europe, many brands, distribution reach.  What made it what we felt was a great marriage and what the seller felt was also a wonderful marriage was the combination of their commercial knowledge, their sales and marketing prowess, and their reach with our product and our supply-chain base.

**We closed the transaction on March 30, so we're about nine weeks in right now, and we are online – I should say in line with our going online integration process.  Back office is working smoothly.  We're bringing them onto all of our back office systems, and importantly what was the underlying core of this deal was allowing Omega to remain independent in their sales and marketing process, not interfering with that, but providing them product to put into that pipeline.**

So that will – that is a regulatory process.  They have been making selections of products in certain countries that they want from our lineup and starting the regulatory processes that are required to get those new drugs approved in those new markets.  And that is on track.

And it is exciting for that team because in one fell swoop you have leading sales and marketing teams country by country being able to pick from a list of products that are relevant to and important for their patients and consumers locally.

So, we are well under way.

302.   The statements identified in ¶301 were materially false and misleading when made because: (a) the Company was not "in line" with its planned Omega integration process; (b) the back office integration was not "working smoothly";

(c) the statements omitted that there were serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega and management resistance; and (d) the statements omitted that several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey.

303.   On August 5, 2015, on a conference call held in connection with the Company's announcement of financial results for the 2Q 2015 calendar year, Papa made the following materially false and misleading statements:

> Before we get into the agenda, however, I'd like to start by thanking Perrigo employees for their diligent focus which has led to adjusted net income growth of 37%.  Even with all the noise you've been following over the past few months, our nearly 13,000 Perrigo employees have announced three M&A transactions, ***delivered on our Omega integration plan***, achieved great operational efficiencies and productivity improvement, executed on our new product launches and delivered on our Base Plus Plus Plus strategy.  It's great work by the team.

304.   The statements identified in ¶303 were materially false and misleading when made because: (a) Perrigo's employees had not "delivered on [the] Omega integration plan"; (b) the statements omitted that there were already serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega and management resistance; and (c) the statements omitted that several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey.

305.    Perrigo filed its fiscal year 2015 Form 10-K with the SEC on August 13, 2015.  The 10-K was signed by defendants Papa, Brown, Brlas, Cohen, Fouse, Gibbons, Gottfried, Hoffing, Jandernoa, Kunkle, Morris and O'Connor and contained the following false and misleading statements concerning the Omega acquisition:

> The Omega acquisition represents a major shift in our business, both geographically, as our business is now more heavily concentrated in European markets than before, and operationally, as the Omega business sells well-known branded products using a large sales force. ***These changes may present challenges and risks related to, among other things, our attempt to create synergies with Omega***.  There is no assurance that we will be able to successfully integrate Omega or otherwise realize the expected benefits of the Omega acquisition.

> Our success in the European markets in which Omega operates will depend on a number of factors, such as:

> \*        \*        \*

> • compliance with differing regulatory and legal requirements, including tax laws, trade laws, labor, safety, local content, consumer protection regulation and import or export licensing requirements;

> \*        \*        \*

> Many of these factors are beyond our control, and any one of them could result in increased costs, decreased net sales and diversion of management's time and energy, any or all of which could materially impact our business, financial condition, and results of operations.

306.    The statements identified in ¶305 were materially false and misleading when made because: (a) the statements omitted that there were already serious, known impediments to the integration of Omega, including technological disparities,

the decentralized structure of Omega and management resistance; (b) the statements omitted that EU regulations were already making it difficult to replace Omega's EU suppliers and impeding the projected synergies; and (c) the statements omitted that several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey.

307.   On September 17, 2015, Perrigo and the Director Defendants issued a letter to investors urging them to reject Mylan's tender offer.  The letter trumpeted that since 2007, "*we have successfully integrated 27 acquisitions* with trailing 12-month net sales of more than $3.2 billion, all while maintaining our relentless focus on return on invested capital.  Simply stated, Perrigo has an outstanding track record of value creation and our future is bright."   The letter further stated that "[t]he directors of Perrigo accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

308.   The statements identified in ¶307 were materially false and misleading when made because: (a) the Director Defendants had not "taken all reasonable care" to ensure that the descriptions of Perrigo's record of integrating acquisitions and value creation was "in accordance with the facts and [did] not omit anything likely

to affect the import of such information" and, as a result, the letter did omit material facts; (b) the letter omitted that Perrigo had not successfully integrated its largest acquisition, Omega; (c) the letter omitted that Omega's senior executives had already warned Perrigo, Papa and Brown of regulatory impediments contradicting their assumption that synergies could easily be achieved by swapping Omega's suppliers, which were located in its key markets, with Perrigo's U.S.-based supply chain; and (d) the letter omitted that the Omega acquisition had not created value for Perrigo shareholders.

309.   On the same day, during his first public address to investors after Mylan's tender offer opened, Papa attacked the Mylan offer as "dilutive," stating:

> We supplemented [Omega] with our manufacturing infrastructure so that we can – one of the *clear synergies* we saw is that we – Omega was manufacturing only about 23% of what they were selling.  The other 77% was from outside their company.  *We said, we can bring some of that back into our business, into the Perrigo infrastructure, lower the cost of goods sold, and drive that to the bottom*.

310.   The statements identified in ¶309 were materially false and misleading when made because: (a) Omega's senior executives had already warned Perrigo, Papa and Brown of regulatory impediments contradicting their assumption that synergies could easily be achieved by swapping Omega's suppliers, which were located in its key markets, with Perrigo's U.S.-based supply chain; (b) there were serious, known impediments to the integration of Omega, including technological

disparities, the decentralized structure of Omega and management resistance; and (c) several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey.

311.   On October 22, 2015, to justify its inflated profit forecasts for calendar years 2015 and 2016, Perrigo and the Director Defendants stated that 2016 net sales for the BCH (Omega) segment would grow in the middle of the 5% to 10% guidance they had previously published, and that the "***integration and realization of synergies in relation to the acquisition of, Omega Pharma*** . . . will proceed as planned and will not be subject to unforeseen material delays." Perrigo and the Director Defendants indicated that these assumptions were prepared in compliance with Irish Takeover Rule 28.1, which requires that they be "***compiled with scrupulous care, accuracy and objectivity by the directors***."

312.   The statements identified in ¶311 above were materially false and misleading when made because: (a) the Director Defendants had not compiled the assumptions regarding BCH net sales, integration of Omega and the realization of synergies with "scrupulous care, accuracy and objectivity"; (b) the statements omitted that Omega's senior executives had already warned Perrigo, Papa and Brown of regulatory impediments contradicting their assumption that synergies could easily be achieved by swapping Omega's suppliers, which were located in its key markets, with Perrigo's U.S.-based supply chain; (c) the statements omitted that

there were serious, known impediments to the integration of Omega, including technological disparities, the decentralized structure of Omega and management resistance; (d) the statements omitted that several key Omega markets were already underperforming, including Spain, Belgium, Italy and Turkey; and (e) the statements omitted that Omega management had actually modeled Omega's  organic growth rate between 2013-2017 to be only 3.2% per year, not the 5% to 10% range touted to investors.

313.   Even after the Mylan tender offer had been thwarted, with the Company on the cusp of announcing "restructuring" and the first impairment charges related to Omega, defendants continued to tout Perrigo's ability to "leverage" synergies from Omega.  For example, during a presentation to investors on January 5, 2016, in response to a question concerning Perrigo leveraging Omega across Perrigo, Papa stated:

> [W]e felt there would be revenue synergies of $100 million-plus and cost-of-goods-sold synergies in the order of magnitude of the $25 million range.  We still feel very good about those – ***certainly on the cost-of-goods-sold synergies.  We clearly are seeing projects in place that are going to generate far superior to $25 million just by simply either bringing some of the products that were outsourcing inside and/or things that we are doing just to leverage the Perrigo supply chain to get better raw material costs***.  So we feel very good about that.

314.   The statements identified in ¶313 were materially false and misleading when made because the statements omitted that Omega executives had already

warned Perrigo, Papa and Brown that the claimed synergies – from Perrigo substituting Omega's existing contract manufacturers with its own manufacturing capacity – would be extremely difficult to "leverage" due to EU regulations.

315.   On February 25, 2016, Perrigo filed its Form 10-KT with the SEC.  The Form 10-KT was signed by defendants Papa, Brown, Brlas, Cohen, Coucke, Fouse, Hoffing, Jandernoa, Kunkle, Morris and O'Connor and made the following false and misleading statements concerning the Omega acquisition:

> The Omega acquisition represents a major shift in our business, both geographically, as our business is now more heavily concentrated in European markets than before, and operationally, as the Omega business sells well-known branded products using a large sales force. **_These changes may present challenges and risks related to, among other things, our attempt to create synergies with Omega_**.  There is no assurance that we will be able to successfully integrate Omega or otherwise realize the expected benefits of the Omega acquisition.

> Our success in the European markets in which Omega operates will depend on a number of factors, such as:

> \*       \*       \*

> •       Compliance with differing regulatory and legal requirements, including tax laws, trade laws, labor, safety, local content, consumer protection regulation, and import or export licensing requirements.

316.   In the same Form 10-KT, Perrigo made the following statement concerning the integration of the Omega business:

> There can be no assurance that our strategic initiatives will achieve their intended effects.

> ***We are in the process of implementing certain initiatives designed to increase operational efficiency and improve our return on invested capital by globalizing our supply chain through global shared service arrangements, streamlining our organizational structure, and disposing of certain assets***.  We believe these initiatives will enhance our revenue, operating margins, and earnings; however, there can be no assurance that these initiatives will produce the anticipated benefits.  Any delay or failure to achieve the anticipated benefits could have a material adverse effect on our projected results.

317.   The statements identified in ¶¶315-316 were false and misleading when made because: (a) the statements omitted that Omega's senior executives had already warned Perrigo, Papa and Brown of EU regulatory impediments contradicting their assumption that synergies could be achieved by swapping Omega's suppliers with Perrigo's supply chain; and (b) the statements omitted that there were serious, known impediments to the integration of Omega, including technological disparities, Omega's decentralized structure and management resistance.

### D.    Declining Fair Value of Tysabri Royalty Stream

318.   Subsequent to Perrigo's acquisition of Elan, the Company improperly accounted for the Tysabri royalty stream that it had acquired in the transaction.  The improper accounting treatment artificially inflated the Company's revenues and hid billions of dollars of deterioration in the value of the Tysabri royalty stream.  On January 13, 2014, during the JPMorgan Healthcare Conference, Papa stated the following:

The other final comment I want to make is certainly about Tysabri. We're very excited about the Tysabri opportunity. We think it's a fabulous medication for patients with MS. We've got a great partner in Biogen that are [sic] commercializing this product. So we're excited what that means. ***We think, importantly, the reason that Tysabri is exciting to us, it is an escalating royalty. The royalty today is going to continue to escalate as a percentage of sales***. We've got a great partner and also this product is at a approximately 1% tax rate, so very low tax rate for this product, gives us a very nice position with this product for the future. Importantly, because the product is a biologic, with a REMS program, we think it has a very long life in terms of its time period of market exclusivity. So very excited about the Tysabri team and what that meant for us, as we bring together the Elan organization, plus Perrigo for the future.

319. On February 6, 2014, Perrigo filed with the SEC its fiscal 2Q 2014 Form 10-Q. The Form 10-Q was signed by Papa and Brown and informed investors that the Tysabri royalty stream would contribute significant revenue to the Company, stating: "The Company acquired *a significant revenue stream* and a $6.1 billion intangible asset for the Multiple Sclerosis drug Tysabri," and "[t]he Tysabri royalty stream is expected to contribute significant revenues, operating income and cash flows to the Company's results of operation."

320. The February 6, 2014 Form 10-Q claimed that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."

321. The Form 10-Q also stated that the Tysabri royalty stream was an "intangible asset" and that "[t]he asset's preliminary value is $6.1 billion, which is being amortized on a straight-line basis over its useful life of 20 years."

322.   On May 7, 2014, Perrigo filed with the SEC its fiscal 3Q 2014 Form 10-Q.   The Form 10-Q was signed by Papa and Brown and made the same misleading statements concerning the Tysabri royalty stream as the 2Q 2014 10-Q described above in ¶¶319 and 321.

323.   On May 7, 2014, during Perrigo's 3Q 2014 earnings conference call with analysts, Papa misleadingly *attributed $53 million in revenue to Perrigo's Specialty Sciences segment*, which represented 12% of Biogen's global sales of Tysabri.

324.   The statements identified in ¶¶318-323 were materially false and misleading when made because: (a) the asset's value was not $6.1 billion; (b) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value, and accounting for the income as revenue; and (c) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand the true value of the royalty stream, as became apparent in February 2017 when Perrigo sold the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met) after originally valuing it at $6.1 billion.

325.   On August 14, 2014, Perrigo filed with the SEC its fiscal year 2014 Form 10-K.  The Form 10-K was signed by defendants Papa, Brown, Brlas, Cohen, Fouse, Gibbons, Gottfried, Hoffing, Jandernoa, Kunkle and Morris and stated the following about the Tysabri royalty stream:

> ***The Company acquired a significant revenue stream and a $5.8 billion intangible asset related to sales of the Multiple Sclerosis drug Tysabri® with the acquisition of Elan***.  The Company collects quarterly royalty payments from Biogen Idec, which is solely responsible for the sales and distribution of the drug.  The Tysabri® royalty stream is expected to contribute significant revenues, operating income and cash flows to the Company's results of operations.

326.   The Form 10-K described the Tysabri royalty stream as an intangible asset and included the following description of how the asset would be valued:

> ***For intangible assets subject to amortization such as Tysabri®, an impairment analysis is performed whenever events or changes in circumstances indicate that the carrying amount of any individual asset may not be recoverable.  An impairment loss is recognized if the carrying amount of the asset is not recoverable and its carrying amount exceeds its fair value***.  Any significant change in market conditions, estimates or judgments used to determine expected future cash flows that indicate a reduction in carrying value may give rise to impairment in the period that the change becomes known.

327.  The 2014 Form 10-K claimed that its financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')" and stated that the Tysabri royalty stream was an "intangible asset" and "[t]he asset's value is $5.8 billion, which is being amortized over its useful life of 20 years."

328.   During the August 14, 2014 4Q 2014 earnings conference call with analysts, defendants continued to improperly account for the Tysabri royalty stream. The following question and answer indicate that defendants were including the Tysabri royalty stream in Perrigo's operating income guidance:

> [David Risinger:]  Okay.  Well, they're all great.  But I guess I'll just pick number one.
>
> So – just wanted to better understand the net income growth guidance for FY15.  It's 31% to 37%, but when one backs out the likely step-up in Tysabri – net income of about $200 million – the implied net income growth for the core seems to be up in the high single digits.  So I just wanted to get a little bit more color on why that's below the Company's long-term earnings growth targets, when there's an easy cough, cold, flu comp versus FY14.
>
> *        *        *
>
> [Brown:]  David, you teed up an amount of contribution coming from our specialty science business of $200 million-ish of income. Don't forget that we do have running costs that come with that, so we have, give or take, I'd say about $20 million of operating costs that come with that business.  Think about, we have acquired not just a royalty stream, but we have incremental activities as well.  So you have to take that into consideration.  ***We're not commenting specifically on what we put into our forecast for specialty science revenue, but suffice it to say, the remainder, as you're backing into that, still implies a growth rate of our overall business in that five-year CAGR range, or three-year CAGR range.  Remember, our three-year CAGRs, we've said, are between 5% and 10% top-line revenue growth***.

329.   The statements identified in ¶¶325-328 were materially false and misleading when made because: (a) the asset's value was not $5.8 billion; (b) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial

asset, failing to disclose the fair market value of the royalty stream, failing to record mark-to-market changes in that fair market value, and recording the income as operating revenue; and (c) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

330.   On November 6, 2014, Perrigo filed with the SEC its fiscal 1Q 2015 Form 10-Q.  The Form 10-Q was signed by Papa and Brown and claimed that its financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."  The November 6, 2014 Form 10-Q stated that the Tysabri royalty stream was an "intangible asset" and that "[t]he asset's value is $5.8 billion, which is being amortized over a useful life of 20 years."

331.   On November 6, 2014, during Perrigo's 1Q 2015 earnings and Omega acquisition conference call, Papa again described the Tysabri royalty stream as revenue for the quarter, stating "specialty science revenue[s] were $92 million, comprised of Tysabri royalties at 18% for the entire quarter in line with our internal expectations."

332.   The statements identified in ¶¶330-331 were materially false and misleading when made because: (a) the asset's value was not $5.8 billion; (b) the

financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value, and accounting for the payments as revenue; and (c) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

333.   On February 5, 2015, Perrigo filed its 2Q 2015 Form 10-Q with the SEC.  The Form 10-Q was signed by Papa and Brown and claimed that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."  The February 5, 2015 Form 10-Q stated that the Tysabri royalty stream was an "intangible asset" and that "[t]he asset's value is $5.8 billion, which is being amortized over a useful life of 20 years."

334.   On February 5, 2015, during the 2Q 2015 earnings conference call, Brown announced that "specialty sciences revenue[s] were $87 million, comprised of Tysabri royalties at 18% for an entire quarter, versus 12% a year ago for the 13 days between the December 18, 2013 closing of the Elan transaction and the fiscal quarter end."

335.   On April 29, 2015, Perrigo filed its 3Q 2015 Form 10-Q with the SEC. The Form 10-Q was signed by Papa and Brown and claimed that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."  The April 29, 2015 Form 10-Q stated the Tysabri royalty stream was an "intangible asset," and "[t]he asset's value is $5.8 billion, which is being amortized over a useful life of 20 years."

336.   The statements identified in ¶¶333-335 were materially false and misleading when made because: (a) the asset's value was not $5.8 billion; (b) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value, and accounting for the payment as revenue; and (c) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

337.   On August 13, 2015, Perrigo filed its fiscal year 2015 Form 10-K with the SEC.  The Form 10-K was signed by defendants Papa, Brown, Brlas, Cohen, Fouse, Gibbons, Gottfried, Hoffing, Jandernoa, Kunkle, Morris and O'Connor and

referenced GAAP compliance but did not disclose the fair value of the Tysabri royalty stream at the end of the fiscal year; instead it stated that the asset had "a value of $5.8 billion and a useful life of 20 years."

338.   The statements identified in ¶337 were materially false and misleading when made because: (a) as the Company conceded in its restatement, the asset's value was not $5.8 billion, but rather was no more than $5.42 billion by June 27, 2015; (b) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value; and (c) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

339.   On October 22, 2015, Perrigo issued a press release announcing its calendar 3Q 2015 earnings.  The press release stated: "The directors of Perrigo accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this

announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

340.   The statements identified in ¶339 were materially false and misleading when made because: (a) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value, and accounting for the payments as revenue; (b) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met); and (c) the Director Defendants had not "taken all reasonable care" to ensure that the description of the Tysabri royalty stream was "in accordance with the facts and [did] not omit anything likely to affect the import of such information."

341.   On November 2, 2015, Perrigo filed its Form 10-Q for the period ended September 26, 2015 with the SEC.  The Form 10-Q was signed by Papa and Brown and claimed that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."  The November 2, 2015

Form 10-Q did not disclose the fair market value of the Tysabri royalty stream, or update prior statements claiming the asset's value to be $5.8 billion.

342.  The statements identified in ¶341 were materially false and misleading when made because: (a) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream, and failing to record mark-to-market changes in that fair market value and accounting for the payments as revenue; and (b) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

343.  On January 5, 2016, Papa gave a presentation to investors at the Goldman Sachs Healthcare CEO's Conference at which he was specifically asked about the Tysabri royalty stream, stating:

> [Papa:]  First and foremost, I'm going to say we think we've got a great partner with Tysabri and Biogen.  And they've just done a great job with the product from day one.  And we are really pleased with what they have done.  And we think there is continued opportunity for more patients to move to what I would refer to as the highly effective category versus the Avadox, Betaseron, Copaxone, [Rebif].
>
> So we think the category of highly effective – especially when the introduction of new competition like Roche and other people are

promoting is going to just expand that slice of the pie. So we feel very good about it.

344.   The statements identified in ¶343 were materially false and misleading when made because: (a) the Company had been reporting financial results that were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value; and (b) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

345.   On February 25, 2016, Perrigo reported its financial results for the stub period between the end of its prior fiscal year and the end of calendar year 2015 on Form 10-KT, which was signed by defendants Papa, Brown, Brlas, Cohen, Coucke, Fouse, Hoffing, Jandernoa, Kunkle, Morris and O'Connor.   The Form 10-KT referenced conformity with GAAP but did not disclose the fair market value of the Tysabri royalty stream at the end of the fiscal year; instead it again stated that that the asset had "a value of $5.8 billion and a useful life of 20 years."   The Form 10-KT also stated the following:

***No goodwill impairment charges were recorded for the six months ended December 31, 2015***, however our testing indicated that our Specialty Sciences reporting unit's fair value exceeded its carrying value by less than 10%. Management evaluated the primary source of cash flow in this segment, the Tysabri® royalty stream, based on a combination of factors including independent external research, information provided from our royalty partner, and internal estimates. Based on this information, management's expectations for future cash flow from this royalty stream have been reduced primarily due to anticipated new competitors entering the market and unfavorable changes in the U.S. dollar relative to other currencies. Actual performance different from the assumptions utilized in our quantitative analysis may further reduce the fair value of the reporting unit, which may result in the fair value no longer exceeding the carrying value, which would require us to record an impairment charge.

We perform an impairment analysis on intangible assets subject to amortization when there is an indication that the carrying amount of any individual asset may not be recoverable. Any significant change in market conditions, estimates or judgments used to determine expected future cash flows that indicates a reduction in carrying value may give rise to impairment in the period that the change becomes known.

346. The statements identified in ¶345 were materially false and misleading when made because: (a) the Tysabri royalty stream did not have a value of $5.8 billion, but rather was worth no more than $5.31 billion as of December 31, 2015; (b) the financial statements in the Form 10-KT were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value; and (c) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in

value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

347.   In a conference call with investors on May 12, 2016, defendant Perrigo and its new CEO, Hendrickson, conceded that the Tysabri royalty stream was a "financial asset." Nonetheless, in the earnings press release Perrigo issued on that same day announcing its 1Q 2016 earnings, Perrigo failed to account for the Tysabri royalty stream as GAAP requires for financial assets or to disclose its fair market value.

348.   On May 16, 2016, defendant Perrigo filed with the SEC its 1Q 2016 Form 10-Q, which was signed by Brown and claimed that its financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')." Like the earnings announcement four days earlier, the Form 10-Q failed to account for the Tysabri royalty stream as a financial asset or disclose its fair market value. Moreover, the May 16, 2016 Form 10-Q stated that the royalty stream's "fair value exceeded the carrying value."

349.   The statements identified in ¶¶347-348 were materially false and misleading because: (a) the reported financial statements were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value,

and accounting for the payments as revenue; and (b) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met). In fact, as the Company admitted in its restated Forms 10-K and 10-Q, the fair value of the Tysabri royalty stream actually fell to no more than $5.02 billion at the end of 1Q 2016, *a decline of $290 million in only three months*. As a result, the royalty stream's fair value did not "exceed[] the carrying value."

350. On August 10, 2016, Perrigo filed with the SEC its 2Q 2016 Form 10-Q, which was signed by Brown and claimed that its financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')." The August 10, 2016 Form 10-Q did not disclose the fair market value of the Tysabri royalty stream at the end of 2Q 2016, instead stating that the "fair value exceeded the carrying value" at the time, but might not in the future if future performance was "different from the assumptions utilized in our quantitative analysis."

351. The statements identified in ¶350 were materially false and misleading when made because: (a) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible

asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value, and accounting for the payments as revenue; and (b) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met). In fact, as the Company admitted in its restated Forms 10-K and 10-Q, the fair value of the Tysabri royalty stream *had deteriorated to no more than $4.02 billion, or $1.78 billion less than the $5.8 billion value claimed during the Relevant Period*. As a result, the royalty stream's fair value did not "exceed[] the carrying value."

352. On November 10, 2016, Perrigo filed with the SEC its 3Q 2016 Form 10-Q, which was signed by Brown and claimed that its financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')." The November 10, 2016 Form 10-Q did not disclose the fair market value of the Tysabri royalty stream at the end of 3Q 2016, instead stating that the "fair value exceeded the carrying value" at the time, but might not in the future if future performance was "different from the assumptions utilized in our quantitative analysis."

353.   The statements identified in ¶352 were materially false and misleading when made because: (a) the financial results reported were not accurate and violated GAAP by improperly accounting for the Tysabri royalty stream as an intangible asset instead of a financial asset, failing to disclose the fair market value of the royalty stream and record mark-to-market changes in that fair market value, and accounting for the payments as revenue; and (b) by failing to properly account for the Tysabri royalty stream, defendants made it impossible for investors to understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).  In fact, as the Company admitted in its restated Forms 10-K and 10-Q, the fair value of the Tysabri royalty stream *had deteriorated to no more than $3.55 billion, or $2.25 billion less than the $5.8 billion value claimed during the Relevant Period*.  As a result, the royalty stream's fair value did not "exceed[] the carrying value."

### E.    Relevant Period Financials

354.   The sales and profit figures Perrigo announced during the Relevant Period, listed in the chart below, were false and misleading, as were Perrigo's reasons for the increases in sales and profits.  The financial figures and the reasons attributed to the figures were false and misleading because they omitted that the figures included sales from unlawful and collusive price fixing in Perrigo's Generic

Rx segment.  Perrigo's undisclosed inflation of its sales through illegal price-fixing constituted a violation of U.S. antitrust laws and exposed the Company to significant risk of prosecution by state and federal authorities, along with the attendant negative financial and reputational harm.  In addition, Perrigo's failure to make required disclosures regarding the impact of artificial price increases (tied to unlawful price-fixing activity) on its reported revenue was in violation of SEC disclosure rules.  In addition, Perrigo's reported financial figures were false and misleading because they omitted that the figures included revenue from the Tysabri royalty stream in violation of GAAP.

| Feb. 6, 2014 Form 10-Q: | | | | |
|---|---|---|---|---|
| | Three Months Ended Dec. 28, 2013 | | Six Months Ended Dec. 28, 2013 | |
| | Net Sales | Gross Profit | Net Sales | Gross Profit |
| Consolidated | $979.0 million | $360.7 million | $1,912.4 million | $717.0 million |
| Rx Pharm. | $246.6 million | $128.8 million | $450.2 million | $241.3 million |

Rx Pharmaceuticals:

Second quarter net sales for fiscal 2014 increased due primarily to $26.3 million of net sales from the acquisitions of Rosemont and Fera, new product sales of $24.2 million and product mix.

Second quarter gross profit for fiscal 2014 increased due primarily to incremental gross profit attributable to the Rosemont and Fera acquisitions, gross profit contribution from new products and product mix.

\*     \*     \*

Year-to-date net sales for fiscal 2014 increased due primarily to $48.9 million of net sales from the acquisitions of Rosemont and Fera, new product sales of $39.2 million and product mix.

Year-to-date gross profit for fiscal 2014 increased due primarily to incremental gross profit attributable to the Rosemont and Fera acquisitions, gross profit contribution from new products and product mix.  The fiscal 2014 gross profit percentage increased due primarily to the Rosemont and Fera acquisitions and favorable pricing dynamics.

**May 7, 2014 Form 10-Q:**

|  | Three Months Ended Mar. 29, 2014 | | Nine Months Ended Mar. 29, 2014 | |
|---|---|---|---|---|
|  | Net Sales | Gross Profit | Net Sales | Gross Profit |
| Consolidated | $1,004.2 million | $315.0 million | $2,916.6 million | $1,031.9 million |
| Rx Pharm. | $223.4 million | $112.9 million | $673.6 million | $354.2 million |

Rx Pharmaceuticals:

Third quarter net sales for fiscal 2014 increased due primarily to new product sales of $32.6 million and $17.1 million of net sales from the Rosemont and Fera acquisitions.  These increases were partially offset by a decrease in existing product sales of $8.7 million due primarily to lower sales volumes on certain existing products as a result of increased competition and $7.6 million in discontinued products.

Third quarter gross profit for fiscal 2014 increased due primarily to incremental gross profit attributable to the Rosemont and Fera acquisitions and gross profit contribution from new products.  The third quarter fiscal 2014 gross profit percentage decreased due primarily to product mix.

*       *       *

Year-to-date net sales for fiscal 2014 increased due primarily to new product sales of $71.7 million and $66.0 million of net sales from the Rosemont and Fera acquisitions and product mix.

Year-to-date gross profit for fiscal 2014 increased due primarily to incremental gross profit attributable to the Rosemont and Fera acquisitions, gross profit contribution from new products and product mix.  The year-to-date gross profit percentage for fiscal 2014 increased due primarily to the Rosemont and Fera acquisitions and favorable pricing dynamics.

**Aug. 14, 2014 Forms 10-K and 8-K:**

|  | Three Months Ended Jun. 28, 2014 | | Twelve Months Ended Jun. 28, 2014 | |
|---|---|---|---|---|
|  | Net Sales | Gross Profit | Net Sales | Gross Profit |
| Consolidated | $1,144.2 million | $415.7 million | $4,060.8 million | $1,447.7 million |
| Rx Pharm. | $253.4 million | $135.6 million | $927.1 million | $489.9 million |

Rx Pharmaceuticals:

The Rx Pharmaceuticals segment fourth quarter net sales increased 30% to $253 million due primarily to new product sales of $35 million and $20 million in sales related to the Fera acquisition.

Gross and operating margin expanded due primarily to higher margin product sales related to the Fera acquisition and favorable product mix despite higher clinical costs and continued investments to grow the specialty sales force.

*       *       *

Fiscal 2014 net sales increased $217.6 million compared to fiscal 2013 due primarily to new product sales of $106.4 million and $83.7 million of net sales from the Rosemont and Fera acquisitions, as well as product mix for sales of existing products.  New product sales were led by sales of Fenofibrate, Fluocinonide cream, Nitroglycerine spray, Repaglinide, and Azelastine nasal spray.

\*     \*     \*

Fiscal 2014 gross profit increased $128.4 million compared to fiscal 2013 due primarily to incremental gross profit attributable to the Rosemont and Fera acquisitions, gross profit contribution from new products, and product mix for sales of existing products.  Gross profit as a percent of sales increased due to the Rosemont and Fera acquisitions, as well as favorable pricing dynamics.

**Nov. 6, 2014 Form 10-Q:**

|  | Three Months Ended Sep. 27, 2014 | | |
|---|---|---|---|
|  | Net Sales | Gross Profit | |
| Consolidated | $951.5 million | $321.8 million | |
| Rx Pharm. | $194.5 million | $96.4 million | |

Rx Pharmaceuticals:

First quarter fiscal 2015 net sales decreased by $9.1 million partially due to planned contractual wholesaler chargebacks and stock adjustments associated with pricing programs which are expected to produce benefits beginning in the second quarter of fiscal 2015, as well as discontinued products of $11.0 million.  The decreases were offset partially by $8.1 million related to new product launches and new business opportunities in the market, and $3.8 million incremental sales attributed to the Fera methazolomide acquisition.

First quarter fiscal 2015 gross profit and gross profit percentage decreased due primarily to the explanations discussed above, offset partially by increases in margin product mix.

**Feb. 5, 2015 Form 10-Q:**

|  | Three Months Ended Dec. 27, 2014 | | Six Months Ended Dec. 27, 2014 | |
|---|---|---|---|---|
|  | Net Sales | Gross Profit | Net Sales | Gross Profit |
| Consolidated | $1,071.7 million | $383.8 million | $2,023.1 million | $705.5 million |
| Rx Pharm. | $276.6 million | $149.5 million | $471.2 million | $245.9 million |

Rx Pharmaceuticals:

Second quarter fiscal 2015 net sales increased by $30.0 million compared to prior year.  Increased volumes and an increase of $33.0 million in new product launches were offset partially by discontinued products of $14.2 million.  Second quarter fiscal 2015 gross profit increased due to the higher sales in the quarter while the gross profit percentage increased due primarily to lower amortization expense compared to the prior year.

\*     \*     \*

Year-to-date fiscal 2015 net sales increased by $21.0 million compared to prior year. Increased volumes and $41.0 million of new product launches were offset partially by discontinued products of $25.2 million and planned contractual wholesaler chargebacks and stock adjustments associated with pricing programs implemented in the first quarter of 2015. These pricing programs began producing benefits in the second quarter of fiscal 2015. Year-to-date fiscal 2015 gross profit increased due to increased sales, while the gross profit percentage decreased due to the planned contractual adjustments made during the first quarter of fiscal 2015, offset partially by lower amortization expense compared to the prior year.

**Apr. 29, 2015 Form 10-Q:**

|  | Three Months Ended Mar. 28, 2015 | | Nine Months Ended Mar. 28, 2015 | |
|---|---|---|---|---|
|  | Net Sales | Gross Profit | Net Sales | Gross Profit |
| Consolidated | $1,049.1 million | $378.8 million | $3,072.3 million | $1,084.3 million |
| Rx Pharm. | $251.6 million | $141.7 million | $722.8 million | $387.6 million |

Rx Pharmaceuticals:

Third quarter fiscal 2015 net sales increased by $28.2 million compared to the prior year. New product sales of $39.8 million, driven by the successful launches of clobetasol spray and testosterone 1.0%, and $7.6 million attributable to acquisitions, were offset partially by a decrease in volumes of certain products and discontinued products.

Third quarter fiscal 2015 gross profit increased due to the higher sales in the quarter and an improved gross profit percentage. The gross profit percentage increased due primarily to product mix and pricing initiatives taken in the first fiscal quarter, as well as favorable foreign exchange movement for products manufactured in Israel.

\*     \*     \*

Year-to-date fiscal 2015 net sales increased by $49.2 million compared to the prior year period. New product launches of $80.8 million and $15.0 million of sales attributable to acquisitions were offset partially by discontinued products of $26.3 million and a decrease in volumes of certain existing products.

Year-to-date fiscal 2015 gross profit increased due to the higher sales in the year and an improved gross profit percentage. The gross profit percentage increased due primarily to product mix and pricing initiatives taken in the first fiscal quarter, as well as favorable foreign exchange movement for products manufactured in Israel.

**Aug. 5, 2015 Form 8-K and Aug. 13, 2015 Form 10-K:**

|  | Three Months Ended Jun. 27, 2015 | | Twelve Months Ended Jun. 27, 2015 | |
|---|---|---|---|---|
|  | Net Sales | Gross Profit | Net Sales | Gross Profit |
| Consolidated | $1,531.6 million | $628.1 million | $4,603.9 million | $1,712.5 million |
| Rx Pharm. | $278.3 million | $161.4 million | $1,001.1 million | $548.9 million |

Rx Pharmaceuticals:

Net sales of $278 million, an increase of 10% as reported, or 11% over the prior year on a constant currency basis, were driven by new product sales of $38 million. These results included the launches of the generic versions of clobetasol spray and testosterone gel 1.0% Adjusted gross profit percent to sales increased 440 basis points as a result of higher margin new product sales and pricing initiatives enacted in calendar 2014.

\*     \*     \*

FY 2015 vs FY 2014

Segment operating income increased $24.1 million, or 7%, as a result of:

• An increase in net sales of $74 million, or 8%, due primarily to:
  • New product sales of $119.0 million related primarily to the launches of Clobetasol Propionate 0.05% Spray, Tacrolimus 0.1% Ointment, and Testosterone Gel 1%; and
  • Net sales attributable to the Lumara product acquisition of $18.1 million; offset partially by
  • Discontinued products of $28.5 million;
  • Decrease in volumes of certain existing products; and
  • Unfavorable foreign exchange movement of $3.8 million for products manufactured in Israel.

• An increase of $59.0 million in gross profit due primarily to:
  • Higher net sales and an improved gross profit percentage; and
  • Favorable product mix and pricing initiatives taken in the first fiscal year quarter.

| Nov. 2, 2015 Form 10-Q: | | | | |
|---|---|---|---|---|
| | Three Months Ended Sep. 26, 2015 | | | |
| | Net Sales | Gross Profit | | |
| Consolidated | $1,344.7 million | $548.8 million | | |
| Rx Pharm. | $260.3 million | $130.4 million | | |

Prescription Pharmaceuticals:

Three Months Ended September 26, 2015 vs Three Months Ended September 27, 2014

Segment operating income increased $26.3 million, or 40%, as a result of:

- An increase in net sales of $65.8 million, or 34%, due primarily to:
  - New product sales of $18.4 million related primarily to the launches of clobetasol propionate 0.05% spray and tacrolimus 0.1% ointment;
  - Increased sales of existing products of $46.7 million; and
  - Absence of planned contractual wholesaler chargeback and stock adjustments associated with pricing programs completed in the prior year; offset partially by
  - Unfavorable foreign exchange movement of $1.2 million.

- An increase of $34.0 million in gross profit due primarily to:
  - Higher net sales and an improved gross profit percentage; and
  - Favorable product mix and absence of pricing initiatives completed in the prior year.

**Feb. 18, 2016 Form 8-K and Feb. 25, 2016 Form 10-KT:**

|  | Three Months Ended Dec. 31, 2015 | | Six Months Ended Dec. 31, 2015 | | Twelve Months Ended Dec. 31, 2015 | |
|---|---|---|---|---|---|---|
| $ million | Net Sales | Gross Profit | Net Sales | Gross Profit | Net Sales | Gross Profit |
| Consolidated | $1,424.8 | $559.3 | $2,769.5 | $1,108.1 | $5,350.3 | $2,115.1 |
| Rx Pharm. | $283.2 | $144.9 | $543.4 | $275.2 | $1,073.3 | $578.3 |

Pharmaceuticals:

  Rx Net sales in the fourth quarter of $283 million, an increase of 2% over a record prior year, were driven by new product sales of $25 million, which were offset by a decrease in sales of existing products of $24 million.

*  *  *

Six Months Ended December 31, 2015 vs. Six Months Ended December 27, 2014

Segment operating income increased $20.9 million, or 12%, as a result of:

- An increase in net sales of $72.2 million, or 15%, due primarily to:
  - New product sales of $43.0 million related primarily to the launches of clobetasol propionate 0.05% spray, tacrolimus 0.1% ointment, and benzoyl peroxide 5%-clindamycin 1% gel (a generic version of Benzaclin™);
  - Net sales attributable to the Lumara acquisition of $7.0 million; and
  - Increase in volumes of certain existing products; offset partially by
  - Unfavorable foreign exchange movement of $2.0 million for products manufactured in Israel.

- An increase of $29.3 million in gross profit due primarily to:
  - Higher net sales and favorable product mix; and
  - Pricing initiatives taken in the first quarter of our fiscal year ended June 28, 2014.

**May 16, 2016 Form 10-Q:**

|  | Three Months Ended Apr. 2, 2016 | | | |
|---|---|---|---|---|
|  | Net Sales | Gross Profit | | |
| Consolidated | $1,383.2 million | $522.9 million | | |
| Rx Pharm. | $256.7 million | $127.4 million | | |

Prescription Pharmaceuticals:

Three Months Ended April 2, 2016 vs. Three Months Ended March 28, 2015

Net sales increased $5.1 million, or 2%, due primarily to:
- Sales attributable to the Entocort® and Tretinoin Products acquisitions totaling $45.6 million; and
- New product sales of $11.2 million; offset partially by
- Decreased sales of existing products of $50.1 million due to declined sales volume of certain products, pricing pressure across extended topical products, and the loss of the exclusivity period for a key extended topical product.

Segment operating income decreased $12.6 million, or 13%, as a result of:
- A decrease of $1.7 million in operating expenses; more than offset by
- A decrease of $14.3 million in gross profit due primarily to increased amortization expense from the Entocort ® and Tretinoin Products acquisitions as well as the pricing pressure noted above, offset partially by a gain on the sale of an intangible asset.

**Aug. 10, 2016 Form 10-Q:**

|  | Three Months Ended Jul. 2, 2016 | | Six Months Ended Jul. 2, 2016 | |
|---|---|---|---|---|
|  | Net Sales | Gross Profit | Net Sales | Gross Profit |
| Consolidated | $1,481.0 million | $567.2 million | $2,864.2 million | $1,090.1 million |
| Rx Pharm. | $293.3 million | $139.3 million | $550.0 million | $266.6 million |

Prescription Pharmaceuticals:

Three Months Ended July 2, 2016 vs. Three Months Ended June 27, 2015

Net sales increased $15.0 million, or 5%, due to:
- Sales attributable to the Entocort® and Tretinoin Products acquisitions totaling $43.7 million; and
- New product sales of $25.6 million due primarily to sales of benzoyl peroxide 5%-clindamycin 1% gel (a generic version of Benzaclin™); offset partially by
- Decreased sales of existing products of $50.3 million due to lower sales volume of certain products, pricing pressure across the portfolio, and the lack of exclusive market position for two key products versus the prior year;
- Discontinued products of $2.8 million; and
- Unfavorable foreign exchange movement of $1.1 million.

Segment operating income decreased $2.7 million, or 3%, as a result of:
- A decrease of $22.1 million in gross profit due primarily to the pricing pressure noted above as well as higher amortization expense from the Entocort® and Tretinoin Products acquisitions

*     *     *

Six Months Ended July 2, 2016 vs. Six Months Ended June 27, 2015

Net sales increased $20.1 million, or 4%, due to:
- Net sales attributable to the Entocort® and Tretinoin Products acquisitions totaling $89.3 million; and
- New product sales of $36.8 million due primarily to sales of benzoyl peroxide 5%-clindamycin 1% gel (a generic version of Benzaclin™); offset partially by
- Decreased sales of existing products of $100.4 million due to declined sales volume of certain products, pricing pressure across the portfolio, and the lack of exclusive market position for two key products versus the prior year;
- Discontinued products of $3.5 million; and
- Unfavorable foreign exchange movement of $2.0 million.

Segment operating income decreased $15.3 million, or 8%, as a result of:
- A decrease of $36.5 million in gross profit due primarily to the pricing pressure noted above, as well as higher amortization expense from the Entocort ® and Tretinoin Products acquisitions . . . .

**Nov. 10, 2016 Form 10-Q:**

|  | Three Months Ended Oct. 1, 2016 | | Nine Months Ended Oct. 1, 2016 | |
|---|---|---|---|---|
|  | Net Sales | Gross Profit | Net Sales | Gross Profit |
| Consolidated | $1,354.9 million | $506.3 million | $4,219.1 million | $1,596.4 million |
| Rx Pharm. | $267.4 million | $128.1 million | $817.4 million | $394.7 million |

Prescription Pharmaceuticals:

Three Months Ended October 1, 2016 vs. Three Months Ended September 26, 2015

Net sales increased $7.1 million, or 3%, due to:
- Sales attributable to the Entocort® and Tretinoin Products acquisitions totaling $32.2 million; and
- New product sales of $18.3 million due primarily to sales of benzoyl peroxide 5%-clindamycin 1% gel (a generic version of Benzaclin™); offset partially by
- Decreased sales of existing products of $40.7 million due to lower sales volume of certain products, pricing pressure across the portfolio, and the lack of exclusive market position for two key products versus the prior year; and
- Unfavorable foreign exchange movement of $2.8 million.

Segment operating income decreased $13.1 million, or 14%, as a result of:

- A decrease of $2.3 million in gross profit due primarily to the pricing pressure noted above as well as higher amortization expense from the Entocort® and Tretinoin Products acquisitions, offset largely by an increase in gross profit attributable to product acquisitions, new product sales, and increased manufacturing productivity.

*       *       *

Nine Months Ended October 1, 2016 vs. Nine Months Ended September 26, 2015

Net sales increased $27.3 million, or 3%, due to:
- Net sales attributable to the Entocort® and Tretinoin Products acquisitions totaling $121.5 million; and
- New product sales of $55.1 million due primarily to sales of benzoyl peroxide 5%-clindamycin 1% gel (a generic version of Benzaclin™); offset partially by
- Decreased sales of existing products of $140.9 million due to declined sales volume of certain products, pricing pressure across the portfolio, and the lack of exclusive market position for two key products versus the prior year;
- Discontinued products of $3.6 million; and
- Unfavorable foreign exchange movement of $4.8 million.

Segment operating income decreased $28.3 million, or 10%, as a result of:
- A decrease of $38.7 million in gross profit due primarily to the pricing pressure noted above, as well as higher amortization expense from the Entocort® and Tretinoin Products acquisitions . . . .

## VI.   LOSS CAUSATION

355.  On February 18, 2016, after months of hyping its strong financial condition and prospects, Perrigo stunned investors by reporting calendar 4Q 2015 revenue, margins, earnings and cash flow that were all below previous guidance. The Company also revised its 2016 earnings guidance downward from that issued during the Mylan offer and reiterated just weeks prior (with adjustments for recent acquisitions) and revealed previously undisclosed problems regarding Omega.  In contrast to earlier claims related to the Omega integration, Perrigo conceded it needed to restructure parts of the BCH unit containing Omega assets.  The Company

further admitted that it needed to record an impairment charge of $185 million because the carrying value of certain Omega assets exceeded their fair value.

356.   Analysts reacted uniformly harshly to the news, with reports by Deutsche Bank, Jefferies, J.P. Morgan, Leerink, Morgan Stanley and UBS all describing the results as a "disappointment" and/or "disappointing."  As a result of these disclosures, the price of Perrigo shares fell $14.77 per share, or over 10%, to close at $130.40 per share on February 18, 2016.  The blow was softened because defendants did not reveal the full extent of their growth problems or Omega issues and did not reveal at all the deteriorating fair market value of the Tysabri royalty stream or the Company's generic drug price collusion.

357.   On April 22, 2016, *Reuters* and other news services reported that Papa would be leaving Perrigo to become the new CEO of Valeant.  According to *Reuter*s, Valeant was negotiating a contract with Papa and planned to announce his appointment as soon as the following week.

358.   A UBS analyst report addressed the bombshell news by stating simply: "We are surprised.  We didn't see this coming."  The market was shocked, given that Papa had spent the better part of the prior year assuring investors of his long-term vision and strategy for the Company.  For example, Jefferies noted in its analyst report that, after investors had "heeded [Papa's] advice and voted against the [Mylan] tender," "the mere thought that [Papa would] consider a new role could lead

one to conclude that [Perrigo] is far from being 'fixed'" and "could imply more . . . [disappointing performance] to come."  By the end of the day, the price of Perrigo shares had fallen $7.33 per share, or nearly 6%, from $128.68 per share on April 21, 2016, to $121.35 per share on April 22, 2016.

359.   Though Perrigo had initially issued a press release stating only that it would not comment on "speculation or market rumor," before the market opened on April 25, 2016 – the next business day – Perrigo confirmed Papa's resignation. Perrigo took the opportunity to drastically lower its earnings guidance for 2016 and announce weak preliminary 1Q 2016 results.  Specifically, Perrigo announced 1Q 2016 earnings per share guidance of $1.71 to $1.77, compared with the $1.89 per share investors had been led to expect.  The Company also again significantly lowered its 2016 earnings guidance, from the already reduced $9.50 to $9.80 per share announced in February down to only $8.20 to $8.60 per share, a decline of nearly 14%.

360.   In sharp contrast to defendants' prior representations about the strength of Perrigo's competitive position and the success of the Omega acquisition, the Company attributed these poor financial results to increased competitive pressures in its prescription drug segment and weaker-than-expected performance within Omega.  Even more surprisingly, Perrigo warned that investors should expect this weak performance to continue for at least the next three quarters.  Perrigo also

revealed that Omega impairment charges might grow even larger than the $185 million charge it had announced two months earlier.

361.   Market commentators and analysts immediately noted that these revelations contradicted defendants' aggressive promotion of Perrigo's growth and prospects during the Mylan offer.   For example, "Mad Money" host Jim Cramer stated that "Papa had come on 'Mad Money' and talked about how the Mylan bid dramatically undervalued Perrigo. . . . *That was clearly untrue*."  Cramer also noted his concern over Papa's decision to depart "under what is probably a terrible moment for Perrigo."

362.   Likewise, Wells Fargo downgraded Perrigo stock, noting that "Perrigo management set unrealistic and aspirational earnings guidance in its effort to defend against Mylan's hostile bid."  A Barclays report stated that the news prompted "[n]o shortage of frustration . . . especially since the reset of expectations comes ~6 months after management convinced shareholders to rebuff [Mylan's] tender offer," and that "the circumstances around Papa's departure, so soon after fending off [Mylan] . . . left many investors concerned that [Perrigo] could be in worse shape than we supposed."

363.   As a result of these disclosures, the price of Perrigo shares plummeted an astonishing 18% on April 25, 2016, dropping by $21.95 per share from the prior

day's close and erasing $3.1 billion in market value following unusually high trading volume of over 30 million shares.

364.   On May 12, 2016, Perrigo announced a disappointing 1Q 2016 loss of $0.93 per share (which the Company later revised to a loss of $2.34 per share).  The Company largely attributed this loss to an additional $467 million impairment charge relating to the Omega acquisition, bringing Omega impairment charges to more than $650 million, only months after touting the success of the Omega acquisition.

365.   In a conference call with investors later that same day, the Company's newly appointed CEO – Hendrickson – stated that the Company's "recent track record of performance against our own expectations is unacceptable" and also indicated that he would "try to be as transparent as possible" and target "realistic" forecasts that the Company can meet.

366.   The market took these statements as a clear admission that the Company and its former CEO had misled investors with unrealistic and unattainable financial goals to defeat Mylan's takeover during the prior year.  For example, in its analyst report addressing these disclosures, Jefferies wrote that it was "looking forward to [Hendrickson's] 'realistic' and 'transparent' approach to running the business since now more than ever the co needs to meet expectations & reestablish credibility." Likewise, a Barclays analyst report described the developments as

Perrigo's new leadership team "'rethink[ing]' everything which is leading to more achievable targets."  As a result, the price of Perrigo shares fell an additional $3.71 per share, or 4%, from $92.75 on May 11, 2016, to $89.04 per share on May 12, 2016.  Despite its promises of transparency, the Company did not come clean about the full extent of its deteriorating growth, the crumbling value of its largest asset, or its reliance on collusive pricing to generate profits for the Generic Rx division.

367.   On August 10, 2016, Perrigo announced that it was yet again revising its guidance in part because of lower performance expectations related to the Omega acquisition as it continued to implement "transformational organizational changes and improvements in products and process in this business."  This news stunned the market, which began to question how Perrigo could have so drastically and continually misstated the benefits and integration of the Omega acquisition.  For example, an RBC Capital Markets analyst report said Perrigo's guidance was only "now reasonable," while a UBS analyst report stated that it was "surprised that management did not plan for [Omega acquisition issues] in the last guidance change."

368.   Perrigo's August 10, 2016 earnings press release acknowledged that part of the shortfall was due to the beginning of the return of competitive pricing to the Generic Rx division, the natural result of increased scrutiny making collusive price hikes more difficult to implement: "To be clear, our financial results were

below our expectations primarily due to competition and price erosion in the Rx business." The press release also stated: "Competition and price erosion impacted both reported gross margin and adjusted gross margin . . . ." In a conference call that same day, defendants also attributed the shortfall partially to "price erosion" in the generics segment. As a result of the August 10, 2016 disclosures, the price of Perrigo shares fell approximately 10%, from $95.09 per share on August 9, 2016, to $86.00 per share on August 10, 2016, following unusually high trading volume of over 13.7 million shares.

369. On November 3, 2016, *Bloomberg* announced that U.S. prosecutors planned to file charges in a generic drug price-fixing probe by the end of the year. The article did not name Perrigo specifically as a company being investigated, but it was clear that U.S. prosecutors viewed the collusive activities as pervasive and affecting the entire generic drug industry. The article pointed out that the investigation was viewed similarly to the DOJ's long-running probe into auto-parts cartels, where charges were eventually brought against 46 companies and 65 individuals. News of the sweeping antitrust investigation into generic drug manufacturers caused the price of Perrigo shares to close down nearly 3.6%, from a close on November 2, 2016 of $82.91 per share to a close on November 3, 2016 of $79.95 per share.

370.   On December 8, 2016, Perrigo announced that it was restructuring it BCH (Omega) segment.  According to the announcement, Perrigo's BCH business in Belgium needed to be restructured "to improve the financial profile and enhance focus of the business on branded consumer OTC products."  The media and analysts immediately understood that the announcement was simply Perrigo further admitting that its Omega acquisition was underperforming, even as it had touted the segment while encouraging investors to turn down the Mylan tender offer.   A December 8, 2016 *FiercePharma* article stated: "Perrigo's Omega Pharma has ***underperformed since the Dublin drugmaker picked it up for $4.5 billion last March***.  Now, under activist pressure, the company is doing something about it." As part of the "restructuring," Perrigo intended to cut jobs, and the "announcement marked the beginning of a consultation period required by Belgian law when job cuts are imminent."  On the same day, *Bloomberg* also reported the news, noting that other generic drug companies had also recently announced restructuring and job cuts.   Perrigo's December 8, 2016 announcement caused its stock price to drop another 2.37%, from a December 7, 2016 close of $83.94 per share to a December 8, 2016 close of $81.95 per share.

371.   On February 27, 2017, Perrigo announced that it had agreed to sell the Tysabri asset, which had been touted to investors at the beginning of the Relevant Period as having a "value of $5.8 billion," and which defendants had never indicated

was impaired, *for only $2.2 billion in cash* (plus potential future payments of up to $0.65 billion).  Perrigo also announced that, for the first time, the fair value of the royalty stream did not equal its carrying cost and that it was therefore recording an impairment charge associated with the asset.  Moreover, Perrigo stated that it was examining "historical revenue recognition practices" associated with the royalty stream and other potential accounting irregularities and, as a result, could not timely file its periodic reports with the SEC.  Finally, Perrigo announced that defendant Brown was unexpectedly leaving the Company.  As CFO, Brown was the person most responsible for these accounting irregularities.  Within months, the Company confirmed investors' fears, restating every single financial statement it had issued during the Relevant Period – an admission that those statements were materially false as of the time they were issued.

372.   As a result, the Company's shares closed down nearly 12%, or $9.91 per share, from $84.68 per share on February 27, 2017 to $74.77 per share on February 28, 2017, on unusually high trading volume of over 14 million shares.  A Morgan Stanley analyst report described the developments as a "[p]ainful re-set" and explained that the pain was the result of inflated and unachievable organic growth targets: "Under previous CEO Joe Papa, Perrigo had targeted 5-10% . . . revenue growth, but the company did not achieve[] that level of growth in recent

years."  Likewise, an RBC Capital Markets analyst described the disclosures as "worse than anticipated" and was concerned by the "***unexpected CFO departure***."

373.   On March 3, 2017, *Bloomberg* reported that Perrigo's name had been raised by antitrust regulators at the DOJ.  On this news, the price of Perrigo shares dropped 3.7%, from a close of $75.56 per share the prior day to a close of $72.76 per share on March 3, 2017.

374.   After the close of the market on May 2, 2017, Perrigo revealed that its offices had been raided as part of an ongoing investigation by the DOJ into price fixing in the pharmaceutical industry.  Investors were stunned.  As a Wells Fargo analyst report noted, Perrigo had not "included a disclosure in its prior SEC filings related to an investigation."  The raid was a far more severe measure than taken against most other generic drug manufacturers, who merely received subpoenas.  Consequentially, on May 3, 2017, the price of Perrigo shares fell over 5%, or $3.88 per share, from $76.23 per share on May 2, 2017 to $72.35 per share on May 3, 2017.

## VII.  POST-RELEVANT PERIOD EVENTS

375.   On May 22, 2017, Perrigo filed its delinquent Form 10-K for calendar year 2016 and restated the financial statements previously filed on Forms 10-Q and 10-K throughout the Relevant Period, including for each of the first three quarters of 2016.   Perrigo's delinquent 2016 Form 10-K conceded extensive material

weaknesses in its financial reporting.  With regard to the Tysabri royalty stream, the

Company admitted:

> [M]anagement determined that its control over the review of the application of the accounting guidance in ASC 805 *Business Combinations* did not operate effectively in the appropriate identification of the assets acquired and liabilities assumed in connection with the Elan acquisition in December 2013.  All originally filed financial statements presented up to the filing of this 2016 Form 10-K included the disclosure of the Elan acquisition with the Tysabri® royalty stream presented as an intangible asset.  In addition, due to the fact that the asset was historically classified as an intangible asset, we did not design or implement controls around the fair value accounting for the Tysabri® royalty stream as a financial asset, so these controls were not in place at any quarter end subsequent to the acquisition, including the date of the annual assessment of internal control.  Accordingly, management concluded that these control deficiencies represent material weaknesses.

376.   Perrigo's delinquent 2016 Form 10-K conceded that, in management's

assessment, the fair value of the Tysabri royalty stream, as of June 27, 2015, was no

more than $5.42 billion, and as of December 31, 2015, was no more than

$5.31 billion.

377.   Perrigo's restated Form 10-Q for 1Q 2016 conceded that, in

management's assessment, the fair value of the Tysabri royalty stream, as of April 2,

2016, was no more than $5.02 billion.

378.   Perrigo's restated Form 10-Q for 2Q 2016 conceded that, in

management's assessment, the fair value of the Tysabri royalty stream, as of July 2,

2016, was no more than $4.02 billion.

379. Perrigo's restated Form 10-Q for 3Q 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream, as of July 2, 2016, was no more than $3.55 billion.

380. Perrigo's delinquent 2016 Form 10-K conceded that, in management's assessment, the fair value of the Tysabri royalty stream, as of December 31, 2016, was no more than $2.35 billion.

381. On June 7, 2017, Hendrickson, Perrigo's CEO, announced that he would retire, making him the second top executive to leave the Company in 2017.

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

382. Numerous additional facts demonstrate that defendants acted intentionally or, at minimum, were reckless, in making the material misstatements and omissions concerning the condition of Perrigo's business.

383. First, Papa professed to have detailed knowledge of Omega's operations and performance – as well as personal knowledge of the factors that drove that performance – and repeatedly spoke on these subjects to investors.   He repeatedly touted successful ongoing efforts to integrate Omega, as well as the contribution such integration would make to Perrigo's organic growth.   For example, Papa stated during a June 2, 2015 presentation to investors that "Omega and Perrigo together were well-positioned" to achieve a "5% to 10% growth rate," and described the Omega acquisition as "immediately accretive."   Similarly, on Perrigo's earnings

call held on August 5, 2015, Papa assured investors that the Company had "delivered on our Omega integration plan" by, among other things, "achiev[ing] great operational efficiencies and productivity improvement."   While making these statements, Papa also repeatedly reassured investors that he and his team were intimately familiar and hands-on with the ongoing integration process.  For example, on May 18, 2015, in direct response to analysts' questions concerning the "negative and positive surprises that [ha]ve occurred since [the Omega acquisition]," Papa affirmatively represented that he "had a chance to work with the [integration] team" and had discussed specific details of the ongoing integration, including identifying Omega products and channels that Perrigo had begun to utilize and delving into the mechanics of the integration process.

384.   In light of these reassuring statements to the market on a topic of immense importance to investors poised to decide whether to tender their shares, it was incumbent on Papa to ensure he understood the true facts concerning the subjects on which he spoke.  Either he possessed the knowledge of the Omega integration that he claimed to have, in which case he knew that his statements were false and misleading, or he lacked the knowledge he claimed to have, in which case his conduct was severely reckless.

385.   Second, as Perrigo itself repeatedly stressed, the Omega acquisition was Perrigo's most important business initiative during the Relevant Period, and

Omega's post-acquisition performance and successful integration were subjects of intense market scrutiny and concern.  As Brown noted on June 23, 2015, the importance of the acquisition was such that Perrigo's business had shifted from predominantly domestic U.S. sales to "55% US, 45% ex-US, primarily Europe."  On the same day, Brown also explicitly linked Perrigo's much touted "5%-10%" organic growth rate to Omega's success, stating "[t]hat is the growth that . . . we see in our future from the combined Perrigo and Omega footprint."  Thus, not only did the acquisition make Omega the second largest segment in Perrigo's business overnight, the Individual Defendants themselves admitted that Perrigo's strategic future and its projected organic growth lay in successfully integrating and running Omega. Moreover, given the importance of the acquisition to Perrigo's performance and the value of its stock, analysts were consistently focused on it since the day it was announced.  Defendants were keenly aware of this fact and, as discussed above, each of them professed to be familiar with the ongoing integration process, as many of the Omega statements were made pursuant to the Irish Takeover Rules.  The admitted importance of the Omega acquisition strongly indicates that Papa, Brown and Coucke were aware of ongoing integration problems, or were severely reckless in not being aware.

386.   Third, defendants indicated that Papa, Brown and Coucke each had significant roles in overseeing the Omega integration, supporting an inference that

they were aware of the true state of the integration and Omega's underperformance. For example, Papa stated on May 6, 2015 that "[w]hat we tried very hard to do is build a relationship with Mark [Coucke]," the CEO and founder of Omega. "That relationship goes back to visiting him, him visiting us in Allegan, Michigan. . . . And we had some very good dialogs about how we can work together. We started some things even before this transaction occurred. So it was a long-time relationship building with Mark." Moreover, on June 2, 2015 Papa stated that "*I had to integrate the Omega organization*." Similarly, Papa stated on February 5, 2015 that he and other senior Perrigo executives "[have] been working with the Omega team [including Coucke] on the post close integration, and we've had meetings with country managers, finance team, and our supply chain teams." Likewise, on June 23, 2015, in response to an analyst's question, Brown reported that the Mylan offer had not impacted the integration efforts, and "[the integration] team continues to do what their mission is and what they had been scheduled to do." Brown then gave a detailed description of Omega's manufacturing and supply chain capabilities before stating that "Omega [is] more invigorated than ever by the combination of what we can do together. [The integration] team is doing their thing and *I am off to Belgium next week*. That [is] process like normal."

387.  Fourth, according to information supplied by Christine Ray, the former head Cyber Security Manager who served as Perrigo's interim Chief Security

Officer and reported directly to Perrigo's executive managers, the heads of the Omega segment repeatedly made adverse information available to senior Perrigo executives, including Papa and Brown. *See* ¶¶165-169. Given the repeated representations that Papa and Brown communicated closely with the senior-most executives at Omega, and were personally involved in and oversaw the integration process, these facts demonstrate that Papa and Brown either knew that the cost synergies they were touting were unrealistic or were severely reckless in ignoring Omega's repeated warnings that this was the case.

388. Fifth, defendants admitted to understanding the difficulty of integrating a large acquisition and achieving merger synergies. In opposing Mylan's bid, they acknowledged the same impediments that plagued Perrigo's integration of Omega. For example, on September 17, 2015, Brown told investors not to tender their shares to Mylan because "Mylan hasn't told you [that] there are potentially very material negative synergies in product divestments and supplier contracts with change of control provisions, which could put significant revenue at risk." Accordingly, defendants either knew that similar problems could emerge with the Omega acquisition, which they described as Perrigo's "number one" "growth driver[] for 2016 and beyond," or were severely reckless in not learning about these potential problems.

389.   Sixth, the Director Defendants (including Papa as the Chairman of the Board) were actually aware of the true facts involving the ongoing integration efforts as they represented in the statements they made to investors under the Irish Takeover Rules.  As discussed above, Rule 19.2 of the Irish Takeover Rules requires that those issuing public statements during a takeover take "all reasonable care to ensure [that] the information contained in the document or advertisement is in accordance with the facts and, where appropriate, that it does not omit anything likely to affect the import of such information."  Pursuant to Rule 19.2, each presentation and press release Perrigo issued from the beginning of the Relevant Period through the end of Mylan's tender offer contained the written assurance that "[t]he *directors of Perrigo accept responsibility for the information contained in this [announcement]*," and that they "*have taken all reasonable care to ensure* . . . the information contained in this [announcement] is in accordance with the facts."  Thus, the Director Defendants, by their own claim to have investigated the factual basis for their assertions, must be charged with knowledge of the true facts concealed from investors.

390.   Likewise, the Director Defendants cannot escape the inference that they were at least reckless when issuing profit forecasts.  Irish Takeover Rule 28 mandates that "[e]very such profit forecast (including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy and objectivity."  The

Director Defendants did not use scrupulous (or even moderate) care, accuracy and objectivity in compiling the profit forecasts they pitched to investors as a basis to reject the Mylan bid, and instead rolled up fanciful assumptions that the Company has since admitted were not "realistic." This conduct demonstrates a willingness to say or do anything to defeat Mylan's bid.

391.   Highlighting his personal knowledge of the promised standards he was breaching, Papa personally assured investors that he was familiar and compliant with the Irish Takeover Rules. On June 1, 2015, he stated that "The Irish rules and Irish governance process is very clear . . . .   [W]e've had regular communications with the takeover panel. . . .   And they've been very helpful to us. . . .   So there's a good process.   We understand it.   We've been working very closely with the takeover panel to **make sure that we follow the rules** . . . ."

392.   Seventh, that the Irish Takeover Panel repeatedly found Perrigo's actions to be misleading during the Mylan offer period bolsters an inference that Perrigo understood that its aggressive statements risked misleading investors. The Irish Takeover Panel – the government body charged with enforcing and adjudicating disputes under the Irish Takeover Rules – twice ruled that Perrigo breached Rule 19.3, "Avoidance of Misleading Statements," by making materially misleading statements in resisting the tender offer. The Panel's August 25, 2015 ruling covered a series of Perrigo's statements concerning the tender offer and stated

in no uncertain terms that the "statements may *mislead shareholders and the market* or may create uncertainty contrary to Rule 19.3(a) of the . . . Takeover Rules." Similarly, in October 2015, the Panel ruled that statements Perrigo made about Mylan's largest shareholder "may be misleading and therefore in breach of Rule 19.3," directing Perrigo to make a corrective statement. The Panel's direct criticism of Perrigo's public statements put defendants on notice as to their responsibility to make accurate, factually substantiated statements under Irish law.

393. Eighth, the sheer size of the misrepresentations involved supports an inference of scienter. The Omega misrepresentations covered up problems so large they led to "total impairments of $2.0 billion" – 43% of the entire Omega purchase value, 66% of the equity Perrigo contributed to the acquisition, *and 1.28 times* the total goodwill Perrigo attributed to the Omega acquisition as of June 27, 2015. The organic growth misrepresentations hid that a decade of rapid organic growth had slowed to only around 1%, and the overstated earnings guidance had to be slashed numerous times. The concealed generic drug price fixing involved hundreds of millions of dollars of unsustainable collusive revenue in Perrigo's most profitable division. Finally, defendants' GAAP violations concealed *billions* of dollars of declines in the value of the Tysabri royalty stream and led to one of the largest restatements in recent history.

394.   Ninth, the temporal proximity between defendants' false reassurances to investors and contradictory revelations supports a strong inference of scienter. Only months after issuing a purported "scrupulous[ly]" objective profit forecast, and less than five weeks after reiterating guidance in January 2016, defendants began to slash that guidance.   Similarly, only five weeks after Papa's January 2016 reassurances concerning "synergies" with Omega, Perrigo announced the first of many large impairment charges related to Omega.   Then Papa resigned less than six months after urging investors to keep Perrigo an independent Company under his leadership, which analysts and market commentators recognized raised concerns about defendants' prior representations (*see, e.g.*, ¶358).   Such confident assurances followed quickly by contradictory revelations contributes to an inference of scienter.

395.   Tenth, the sharpness of the divergences between Relevant Period reassurances and later revelations contributes to a strong inference of scienter.   For example, Papa repeatedly trumpeted Perrigo's "strong history of responsible corporate governance" and "commitment to corporate governance and transparency," which purportedly stood in sharp contrast to "Mylan's irresponsible corporate governance behavior," which Papa called "abysmal." But shortly after making these forceful statements, Papa quit the Company, and the new CEO conceded that Perrigo's guidance to investors had not been "transparent" or "realistic." As discussed above, defendants' repeated boasting concerning the value

and success of the Omega acquisition was also contradicted soon after their positive statements by write-downs that *exceeded* the total value of goodwill Perrigo had recorded in the acquisition. These shocking announcements were then followed by a raft of further executive departures (including that of the CFO and the head of Perrigo's Generic Rx segment) over the course of 2016 and 2017, as well as a restatement. Such sharp contradictions, including a complete reversal from touting synergies to the need to implement major, multi-hundred-million-dollar "restructuring[s]" in the span of weeks, contributes to a strong inference of scienter, or at the very least, severe recklessness.

396. Eleventh, Papa and Brown both claimed to have personal knowledge of Perrigo's generic drug pricing strategy and the pricing environment of other manufacturers, indicating that they would have inescapably learned of the highly unusual coordinated price hikes alleged herein. Moreover, the very nature of the price-fixing activities inflating the results of Perrigo's most profitable division supports an inference of scienter. The price fixing at issue lasted for years and fundamentally transformed the revenues generated by some of Perrigo's most important generic drugs. The successful execution of this scheme required systematic coordination and top-down command and control, which could not be done without the knowledge and approval of the Company's highest ranking executives. Indeed, the significance of the corporate actions required to participate

in any collusive behavior – which includes raising prices for key products to the same levels near simultaneously with multiple competitors pursuant to a collusive agreement – could not have been accomplished by low-level employees acting alone.

397.    Twelfth, on July 20, 2016, a mere three months after Papa's resignation, Perrigo announced a "leadership change" in its Generic Rx division.   Douglas Boothe, who was brought in to head the division just as the collusive price hikes commenced, was replaced.  Boothe's departure came only months after Papa's, and two months before private antitrust litigation against Perrigo related to the division Boothe led.   These facts further contribute to the strong inference that senior executives of Perrigo were personally aware of, or recklessly ignored, price fixing in Perrigo's Generic Rx segment.

398.    Thirteenth, the correct accounting treatment for the Tysabri royalty stream was clear and easy to apply.  The Company itself and its then-CEO described the royalty stream as a "financial asset" in May 2016, approximately a year before restating results, and Perrigo now concedes that GAAP calls for financial assets to be recorded at their fair market value.  Moreover, the $3.6 billion difference between the market price for the Tysabri royalty stream, as reflected in its sales price of just $2.2 billion (before ***contingent*** payments of up to $650 million), and the $5.8 billion value defendants claimed during the Relevant Period, strongly supports an inference

that at least Perrigo, Papa and Brown knew that the Tysabri asset was worth far less than reported to investors.

399.  Fourteenth, in their certifications pursuant to §§302 and 906 of the Sarbanes-Oxley Act of 2002, submitted with the Company's 2015 Form 10-K and Form 10-KT, Papa and Brown represented that: (i) they had reviewed the Company's respective filings; (ii) the reports did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; and (iii) the "information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."   Perrigo's admission that it actually had "material weaknesses" in internal controls, specifically that it "did not maintain, in all material respects, effective internal control over financial reporting [throughout the Relevant Period]," suggests that Papa and Brown were either reckless in making their Sarbanes-Oxley certifications or had actual knowledge of the deficiencies from the investigation they claimed to have conducted.

400.  Fifteenth, the timing and circumstances of Brown's departure demonstrate her scienter.  It came the same day that Perrigo announced it was investigating "historical revenue recognition practices" regarding the Tysabri royalty stream and that it could only sell the Tysabri royalty stream for $2.2 billion (or up to $2.85 billion if certain milestones were satisfied), ***billions less than the***

*value Brown had caused Perrigo to report to investors* using an accounting scheme that Perrigo now admits violated GAAP, and which directly furthered defendants' fraud.

## IX.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

401.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

- The omissions and misrepresentations were material;

- Perrigo shares traded in efficient markets;

- The Company's shares were liquid and traded with moderate to heavy volume during the Relevant Period;

- The Company's shares traded on the NYSE and TASE and were covered by multiple analysts;

- The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's shares; and

- Plaintiffs purchased, acquired and/or sold Perrigo shares between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

402.   Based upon the foregoing, plaintiffs are entitled to a presumption of reliance upon the integrity of the market.

403.   Alternatively, plaintiffs are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406

U.S. 128 (1972), as defendants omitted material information in their Relevant Period statements in violation of a duty to disclose such information, as detailed above.

## X.   NO SAFE HARBOR

404.   Perrigo's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Relevant Period were ineffective to shield those statements from liability.

405.   The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Perrigo who knew that the FLS was false.

## XI.   COUNTS

### COUNT I
### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

406.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

407.   During the Relevant Period, defendants carried out a plan, scheme and course of conduct that was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including plaintiffs, as alleged herein; and (ii) cause plaintiffs to purchase Perrigo common stock at artificially inflated prices.

408.   Defendants (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Perrigo common stock in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

409.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations and prospects.

410.   During the Relevant Period, defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

411.   Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal

Perrigo's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

412.   Plaintiffs have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Perrigo common stock.  Plaintiffs would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Perrigo common stock had been artificially inflated by defendants' fraudulent course of conduct.

413.   As a direct and proximate result of defendants' wrongful conduct, plaintiffs suffered damages in connection with their purchases of the Company's common stock during the Relevant Period.

414.   By virtue of the foregoing, defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### For Violations of §20(a) of the
### Exchange Act Against All Defendants

415.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

416.   Defendant Papa was the CEO and Chairman of the Board of Perrigo and the architect of the strategic positions taken by Perrigo alleged herein. He was directly involved in the day-to-day management of the Company, including its communications to investors.  As a result, he had the power and ability to control

the actions of Perrigo and acted as a controlling person of Perrigo within the meaning of §20(a) of the Exchange Act for all statements and omissions of Perrigo until his resignation, and is liable for Perrigo's violations of the Exchange Act during that time.

417.    The Director Defendants (other than Papa) exercised control over the Company and its communications to investors during the pendency of the Mylan offer because they had the absolute ability under Irish Takeover Rules to accept or reject such communications and were responsible for exercising care over those communications.  By reason of such conduct, the Director Defendants (other than Papa) were control persons of Perrigo within the meaning of §20(a) of the Exchange Act for all statements and omissions of Perrigo during the pendency of the Mylan offer, and are liable for Perrigo's violations of the Exchange Act during that time.

418.    Defendant Brown was the CFO of Perrigo, signed periodic filings on behalf of Perrigo, and certified those filings pursuant to Sarbanes-Oxley.  As a result, Brown exercised control over Perrigo's selection of accounting treatments, the recording of its financial statements, and its decisions to comply or not comply with GAAP.  By reason of such conduct, Brown was a control person of Perrigo within the meaning of §20(a) of the Exchange Act for all statements and omissions of Perrigo regarding its accounting for the Tysabri royalty stream, and is liable for Perrigo's violations of the Exchange Act related thereto.

419.   Perrigo controlled defendants Papa and Brown and the Director Defendants and all of its employees.

## COUNT III
### For Violations of §14(e) of the
### Exchange Act Against All Defendants

420.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

421.   Section 14(e) provides: "It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer."

422.   Defendants' conduct violated their respective obligations under §14(e) of the Exchange Act because defendants made the false statements and omissions set forth above concerning the strength of Perrigo's business in connection with Mylan's tender offer.

423.   Those misstatements and omissions were material in that a reasonable investor would have deemed those facts important in determining whether to tender shares of Perrigo stock in connection with the Mylan tender offer.

424.   Defendants intentionally or recklessly engaged in acts, practices and a course of conduct that was fraudulent, deceptive or manipulative when issuing their false statements in violation of §14(e) of the Exchange Act.

425.   As a direct and proximate result of defendants' violations of §14(e) of the Exchange Act, plaintiffs were prevented from fairly assessing Mylan's offer and were deprived of the opportunity to exchange their Perrigo shares for superior compensation in cash and stock.  As a result, plaintiffs incurred significant damages.

426.   By reason of such conduct, defendants are liable pursuant to §14(e) of the Exchange Act.

**COUNT IV**
**For Violation of the Israel Securities Law, 1968,**
**Against All Defendants for Purchases Made on the TASE**

427.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

428.   Throughout the Relevant Period, Perrigo's common shares were dually listed on both the NYSE and the TASE.

429.   Israeli securities law provides unique treatment for securities of certain firms that are "dual listed," *i.e.*, available for trading on both the TASE and the national U.S. stock markets.  For dual-listed firms incorporated in Israel, and dual-listed firms like Perrigo incorporated elsewhere but approved for such treatment by the Israeli Securities Agency ("ISA"), Israeli law applies the reporting requirements

(including the anti-fraud provisions) of the country of primary listing. *See* Israeli Securities Law, 1968 ("Securities Law"), §§1, 35T, 35DD, 35EEE. Perrigo requested, and the ISA approved, that its securities listed on the TASE be regulated under U.S. law when it first listed on the TASE. *See* Perrigo Company, Prospectus (Feb. 14, 2005) (documenting Perrigo's request and the ISA's approval and stating "the reports to be submitted by Perrigo will be in English, ***and their content will be in accordance with the reporting requirements applicable under the United States Securities laws***").

430. Accordingly, to construe the propriety of Perrigo's disclosures to investors, Israel ***applies U.S. laws and regulations***, including the anti-fraud provisions of the U.S. securities laws, to enforce disclosure obligations for dual-listed stocks. *See* Securities Law, §§35T, 35 DD, 35EE; *Verifone Holdings, Inc. v. Stern*, Class Action 3912-01-08, decision rendered Nov. 16, 2008; *Stern v. Verifone Holdings, Inc.*, Class Action 3912-01-08, decision rendered Aug. 25, 2011 (subsequent to and in light of *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010)). According to Israeli case law, liability for violations thereof is pursuant to §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and §20(a) of the Exchange Act applies to the claims arising from trades made by plaintiffs on the TASE.

431.    During the Relevant Period, in violation of §10(b) of the Exchange Act and Rule 10b-5, defendants carried out a plan, scheme and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Relevant Period, did: (a) artificially inflate and maintain the market price of Perrigo common stock; (b) deceive the investing public, including plaintiffs, as alleged herein; (c) cause plaintiffs to purchase Perrigo common stock at inflated prices in reliance on defendants' false and misleading statements made knowingly or with deliberate recklessness by defendants; and (d) cause plaintiffs losses when the truth was revealed.

432.    During the Relevant Period, in violation of §20(a) of the Exchange Act, the Individual Defendants acted as controlling persons of Perrigo within the meaning of §20(a) of the Exchange Act and made the materially false and misleading statements and omissions on behalf of Perrigo that caused damages to plaintiffs.  By virtue of their controlling shareholder status, executive positions, board membership and stock ownership, and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements plaintiffs contend were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings and other statements

alleged by plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.  Perrigo controlled the Individual Defendants and all of its employees.

433.   Alternatively, if this Court concludes that Israeli, not U.S., law applies to the claims arising from plaintiffs' purchases of common stock on the TASE, the following provisions and causes of action apply to those claims:

(a)     Regulations 3-5 of the Securities Regulations (Periodic and Immediate Reports of Foreign Corporation), 2000, promulgated under the Securities Law – Perrigo breached its reporting obligations under the "foreign law" – namely, U.S. law – defined in §1 of the Securities Law as "the law applying to a foreign corporation because its securities are listed for trade on a foreign stock exchange, including the rules of that foreign stock exchange."  Specifically, Perrigo failed to submit and publicize reports, notices and other documents of the adverse information contained herein as required under U.S. law, in a timely fashion as required under U.S. law or earlier, on issues required under U.S. law.  Perrigo thereby caused damage to plaintiffs.

(b)     Section 36 of the Securities Law and Regulations 30, 36 of the Securities Regulations (Periodic and Immediate Statements), 1970, thereunder – Perrigo failed to submit immediate reports in a timely fashion as required under Regulation 30.  According to Regulation 36(a):

> An [immediate] report shall provide, with respect to any event or matter that deviates from the corporation's ordinary course of business, the details of [such an event's or matter's] nature, scope or potential result which will have or could have a significant effect on the corporation; the same details will be provided with respect to any event or matter that could significantly affect the price of the corporation's securities.

Moreover, even if Perrigo may have delayed timely reporting pursuant to Regulation 36(b), once it became aware of rumors and other public information, it breached its obligation under Regulation 36(d) to submit an immediate report and refer therein to the correctness of the information that has already been made public. Perrigo thereby caused damage to plaintiffs.

(c)     Sections 31-32A, 34, 38B-38C of the Securities Law – Read together, these sections impose liability, *inter alia*, on a corporation, a director of a corporation, its general manager, and a controlling shareholder thereof with regard to a misleading item that was in a report, notice or document that the corporation filed pursuant to this law – to anyone who sold or purchased securities in the course of trading on a stock exchange or over the counter – for damage caused to them by the inclusion of a misleading item in those disclosures. A "misleading item" is defined in §1 of the Securities Law as "including something that is likely to mislead a reasonable investor, and anything or an omission whose absence is likely to mislead a reasonable investor." Specifically, §32A(c) denies the safe harbor protection for "forward looking information" under this section to a party that "knew

that the [forward-looking] information would not be realized." Section 32A(d) further excludes from the safe harbor's purview "facts, figures or other details in a prospectus, opinion, report, review or certificate, as applicable, which served as a basis for [forward-looking] information." Defendants are liable to plaintiffs under these provisions.

(d)     Section 52K of the Securities Law – This general civil liability provision imposes liability on an issuer, the directors of the issuer, its general manager, and on a controlling shareholder of the issuer for any damage caused to a holder of the issuer's securities by virtue of the issuer's violation of the provisions of this law or of regulations hereunder. Defendants are liable to plaintiffs under this provision.

(e)     Sections 35-36 of the Torts Ordinance [New Version] – These sections impose general liability in torts for negligence towards any person where a reasonable person in like circumstances should have foreseen that in the ordinary course of things the former person may be harmed by the latter person's conduct or omission. Defendants are liable for damage caused to plaintiffs by their misrepresentations and omissions as detailed in the above paragraphs.

(f)     Section 63 of the Torts Ordinance [New Version] – This section imposes general liability in torts for breach of statutory duty on any person who failed to comply with a duty imposed on him according to any statute, excepting this

ordinance, where the statute, according to its correct construction, is meant for the protection or benefit of another person, and the breach caused damage to that person of the kind or nature of damage meant by the statute, unless that statute was meant to exclude such remedy.  Defendants are liable for damage caused to plaintiffs by their failure to comply with their duties under the Securities Law as detailed above.

## XII.  PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring and determining that defendants violated the Exchange Act and Securities Law by reason of the acts and omissions alleged herein;

B.    Awarding compensatory damages in favor of plaintiffs against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  February 13, 2018        SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
DAVID R. BUCHANAN

s/ Christopher A. Seeger
CHRISTOPHER A. SEEGER

55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Tel:  973/639-9100
Fax:  973/639-9393
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
LUKE O. BROOKS
RYAN A. LLORENS
ERIC I. NIEHAUS
ANGEL P. LAU
JEFFREY J. STEIN
655 West Broadway, Suite 1900
San Diego, CA  92101
Tel:  619/231-1058
Fax:  619/231-7423

Attorneys for Plaintiff